# EXHIBIT D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:25-cv-09149-DOC-ADSx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| SHIRLEY WEBER, ET AL, | ) | Thursday, December 4, 2025 |
| | ) | ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) | (12:01 p.m. to 12:58 p.m.) |
| | | ( 2:00 p.m. to  2:31 p.m.) |
| | | ( 2:31 p.m. to  2:33 p.m.) |

HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**                    SEE PAGE 2

Court Reporter:              Recorded; CourtSmart

Courtroom Deputy:            Karlen Dubon

Transcribed by:              Exceptional Reporting Services, Inc.
                             P.O. Box 8365
                             Corpus Christi, TX 78468
                             361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | ERIC V. NEFF, ESQ.<br>U.S. Department of Justice<br>150 M St. NE, Suite 8-139<br>Washington, DC 20002<br>202-532-3628 |
| For Intervenors: | GRAYCE S.P. ZELPHIN, ESQ.<br>American Civil Liberties<br>Union of Northern California<br>39 Drumm Street<br>San Francisco, CA 94111<br>530-515-8978 |
| | CHRISTOPHER D. DODGE, ESQ.<br>Elias Law Group<br>250 Massachusetts Ave. NW<br>Suite 400<br>Washington, DC 20001<br>202-987-4928 |
| For Robert Page: | SUZANNE E. SHOAI, ESQ.<br>Orange County Counsel<br>P.O. Box 1379<br>Santa Ana, CA 92702<br>714-834-3300 |
| For Defendants: | MALCOLM A. BRUDIGAM, ESQ.<br>Office of the Attorney General<br>1300 I Street<br>Suite 125<br>Sacramento, CA 95814<br>916-210-7873 |
| | ROBERT W. SETRAKIAN, ESQ.<br>California Department of Justice<br>300 S. Spring Street<br>Suite 1702<br>Los Angeles, CA 90013<br>213-269-6668 |

3

(Call to Order)

THE COURT: -- Shirley Weber.

(Pause)

THE COURT: And, counsel, as you're seated, let me take one more matter. Just remain seated for a moment.

(Pause)

THE COURT: All right. Thank you then. I think that resolves the rest of the morning calendar. So first of all, good morning.

MR. NEFF: Good morning, Your Honor.

THE COURT: This is the matter of United States v. Shirley Weber. It's case number 25-09149. And, counsel, you can just remain seated. You can pretend it's state court if you want to, but make your appearances.

MR. NEFF: Eric Neff on behalf of the United States. Good morning, Your Honor.

THE COURT: Thank you.

MR. BRUDIGAM: Deputy Attorney General Malcolm Brudigam on behalf of defendants Secretary of State Shirley Weber and the State of California.

THE COURT: Okay, thank you very much.

MR. SETRAKIAN: Deputy Attorney General Will Setrakian on behalf of defendants State of California and California Secretary of State Shirley Weber.

4

THE COURT: Thank you very much. I appreciate it.

MR. DODGE: Chris Dodge on behalf of Intervenors NAACP and Siren.

MS. ZELPHIN: Grace Zelphin on behalf of Intervenors League of Women Voters of California.

THE COURT: Is anybody here representing what I call the County case?

MS. SHOAI: Good morning, Your Honor.

THE COURT: Come on up. What we're doing here may be of interest to you. So we want your appearance.

MS. SHOAI: Thank you, Your Honor. Deputy County Counsel --

THE COURT: No, no, wait, wait till we get a good recording of you.

MS. SHOAI: Good morning, Your Honor. Deputy County Counsel Suzanne Schoai on behalf of --

THE COURT: I see. Why don't you have a seat? Do you have any other colleague with you today?

MS. SHOAI: No, Your Honor.

THE COURT: All right. So first, I'd like to address plaintiff's motion for order to produce records pursuant to 52 U.S.C. 20701 that was filed on Monday, set for hearing today. I appreciate the speed, but not at the expense of due process. And although I've encouraged us to move forward as quickly as possible concerning the substantive issues, this is

not the due process because there needs to be at least 28 days' notice before a date for hearing under CD California Rule 6-1.

The plaintiff is seeking to reach the ultimate question in this case regarding the production of records and thousands of voters' lives will be impacted by this case. And the Court will not be setting the matter on any legal -- I don't want to say gamesmanship, but therefore, the motion for order to produce records pursuant to 52 U.S.C. 20701 is denied.

Now, you can once again follow the process and procedure in terms of due process. We'll have time potentially, but this doesn't supply the due process needed.

Second, I'd like to hear arguments if there are any on two motions regarding amicus briefs. First, there was a motion for leave to file an amicus brief brought by 16 states. Those states are Arizona, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

The second request was to file an amicus brief and it was filed by the former secretaries of state and the proposed amicus briefs are allegedly from a bipartisan group of state secretaries for the states of Colorado, Connecticut, Minnesota, Nebraska, Oregon, Pennsylvania, and Washington.

Does any party have a statement to make regarding these amici briefs and any wisdom on your part that if I allow

6

these amici briefs, whether I should then extend for some period of time the opportunity for additional briefs from interested parties, because these are the parties that have directly contacted the Court, but there may be other parties that piecemeal choose to come in, and then I'm deciding that on an almost ex-parte basis, case by case as they come to me, unless you're flying out here for every single hearing for every requested amici brief.

So I was thinking if I was going to allow these, that I should throw this open for 7 days or 14 days for the amici briefs to come in during the period of argument and try to sort through whatever the Court's opinion would be and give you that courtesy and simply extend it. But I'm looking for your wisdom on that because you can anticipate if I'm getting these amici requests now, I promise you, as soon as you leave the courtroom, there's going to be another request. And I don't want to do that ex parte without your wisdom on both parties' parts.

So let's start with the first group. This motion for leave to file an amici brief by 16 states, and one of my concerns was whether this would become a bipartisan effort, for instance, of Democrats and Republicans using the Court in a sense, in a political sense, not necessarily a substantive sense. But I noticed there are what I consider some swing states, New Mexico certainly was during the last election,

71

those records to make sure we are doing our duty as the federal government to make sure that these federal elections remain free and fair.

And counsel simply has to rely on both misrepresentations of the law and our position, stating our -- for example, that our whole case relies on Lynd. No. This action relies on the Civil Rights Act of 1960 and its very clear text, which is the one thing they don't want to talk about because it's very clear.

Privacy concerns are first not a proper concern for this motion to dismiss but even if they were, they're unfounded. Privacy -- the United States is going to comply with all federal laws. That includes the Federal Privacy Act. The DOJ Civil Rights Division itself has a stated policy available on a website as to how we will comply with the Federal Privacy Act and have before.

THE COURT: Explain that to me.

MR. NEFF: Yes, sure.

So we publish a series of regulations. They're called the SORNs that show how we tend to the data and make sure everything is properly protected under, not just Federal Privacy Act, but other obvious concerns when you're dealing with large databases.

THE COURT: Is that part of my record?

MR. NEFF: Yes.

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT: And what would I look at that? What exhibit?

MR. NEFF: At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis. We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

THE COURT: What states are those that have shared either their DMV registrations or the social security numbers of voters?

MR. NEFF: Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

THE COURT: That's okay.

MR. NEFF: I'll also state the biggest one is -- so we also have an MOU that we produce at the state request. Some states request it, some don't. Some say, yes, you're entitled to this data, here you go. And we have a whole data-sharing setup ready. It's essentially the Box program, plus some

73

federal proprietary encryption technology to make sure that this is as secure as it needs to be. And we -- so Texas just told us today they're going to enter in the MOU and share us the data in the next few days. We believe many more states are going to follow just in the next few days but so we have four states that have already sent us the data. No questions asked. Probably another dozen or so states in the next week or so that are just going to sign the MOU and share with us. This really shouldn't be controversial. It's clearly stated as part of our duty under HAVA and the Civil Rights Act is clear that this is the mechanism in which we do it.

**THE COURT:** Do you think that those states with attorney generals complying with your request would be interested in filing an amicus just as other states who may be opposed to your request are filing amicus? In other words, what I want to do is make certain if we have states coming late to the table but in compliance that we're looking at the reasoning by all of the atty generals in the respective states.

And what I was worried about before, frankly, is if I had red and blue states lining up when I started to look at the amicus, I was particularly interested in the states bringing that to me.

Now, I don't know how you define what I call -- well those states that have voted for different -- in different elections in different ways. Arizona, New Mexico, Michigan,

74

Minnesota, seem to be what I call those states that traditionally doesn't go Democrat or Republican.

And then I looked down at the state secretaries for the states and if you notice, there are three states out of there on the amicus. Connecticut is in for the first time. They are not part of the amicus for the 16 states that we initially named but these are the state secretaries for the states of and Connecticut is an addition, Nebraska is an addition, Pennsylvania -- which has certainly been a swing state.

So I was a little worried and that's why I sought your wisdom about whether you all were going to stipulate to me accepting this because I didn't know the weight if I was just dealing with a party disagreement. And I'm not saying that these swing states necessarily carry greater or less weight but I want to be alert that if this is a partisan effort. And certainly the country is divided so ...

**MR. NEFF:** I would be --

**THE COURT:** ... so I've got a stipulation that I'm accepting all of these amicus briefs. I just want to pay you the courtesy if other states are coming onboard, like Texas, et cetera, that we give them a chance for those attorney generals to get this to us but by the same token, I'm going to be writing over the next couple weeks.

Is two weeks enough time for you?

**EXCEPTIONAL REPORTING SERVICES, INC**

75

MR. NEFF:  We can inform the states that --

THE COURT:  Okay.

MR. NEFF:  -- a judge has invited them to file amicus but --

THE COURT:  Will you do so?  In other words, for both parties.  Get it out to all the states that you can and I'll docket this, et cetera.  And there may even be disagreements between different courts examining this matter and different circuits.

MR. NEFF:  I think the bigger picture is that the states that are complying are likely not going to see this as something that they need to delve issue.

THE COURT:  But I just want to pay you the courtesy in terms of due process.  Okay.

MR. NEFF:  Yes.  And I would say that's because this really shouldn't be a political issue.  One side can make it a political issue if they want to just simply in a single position declare it that but it doesn't change the fact that the Civil Rights Act of 1960, the text is quite clear and that no one is in favor of faulty voter rolls.

THE COURT:  We've also had for both parties we've had a series of state rights issues in the federal court for years.  And different states have taken a perspective on what the states' rights issues are.  Some are much more state-right oriented, others aren't.  That's why I was interested in the

EXCEPTIONAL REPORTING SERVICES, INC

76

division. But since you've all stipulated, I'm accepting this amicus at the present time. I just want to make sure you've got the courtesy on both sides of any other parties coming onboard so if we need an extra week we can take it, okay?

Okay. Won't you continue. I'm sorry.

**MR. NEFF:** Thank you, Your Honor.

The -- would emphasize that this data is necessary for the United States to conduct its HAVA operation -- its HAVA enforcement compliance and that is why that data is specifically cited in the statute. It simply couldn't be clearer that it needs to be the last four digits of a social security number or the driver's license; otherwise, we are not able to make a verified finding as to the various voter roll registrations that might have problems. In fact, we sometimes even have to follow up after that data is run. It's rare but there's a reason that was put in the statute because it's something like we can verify it from what I've talked to our database analysts something like 99.999 percent of the time. That's enough for us to be able to know if it's an actual person that lives in that location and is who the voter registration role says it is.

**(Pause)**

Again, with the caveat that we do not need to ever -- that we do not need to get to this. This is essentially an OSC where we only need to state our purpose and then we are

77

entitled to the records.  Also under a prompt order, according to caselaw, a prompt order that this is essentially an OSC hearing.

The facts of California itself are particularly worrisome.  Maybe the most worrisome state in the union.

The state is required to provide various data to the Election Assistance Commission which is a nonpartisan commission.  The state -- the agency created by HAVA in order to try and keep this as neutral as possible and California doesn't provide the complete data.  Their data doesn't have Los Angeles County in it.  It's one-fourth the state's population. That on its own should cause concern countrywide that they've not submitted that data.  It would be irresponsible of the United States to not come in at this point and say we need to see your data to ensure fair and free elections.

All of the harms that opposing counsel have pointed to are based on speculation, logical leaps and there is no concrete evidence they can point to.

That being said, with the overarching point that this is before the Court right now as essentially an order for an order to show cause, dressed up as a complaint, and that you have a dismissal that is essentially fighting that order to show cause, dressed up as a motion to dismiss, I believe the Court should act within what would be its lawful authority to issue a prompt order that California needs to turn those

78

records over to us that we are entitled to.

THE COURT: How do you deal with the state provisions concerning the DMV? In other words, the state is arguing to the Court that that has a -- for want of a better word -- a special category that is not subject to the Voting Rights Act of 1960 or HAVA, and that they have a privacy interest in a sense as well. What does the Court do with that?

MR. NEFF: Any state privacy interest would be trumped by federal law. It would be trumped by both the Federal Privacy Act, which we're complying with. It would be trumped by HAVA, which is a -- I repeat -- a federal minimum standards law for state compliance that specifically mentions driver's license number or last four digits of social.

The state is required to produce and provide this data under the statute. If they have some issue with the driver's license; hypothetically, if a state just said we have some real concerns about our driver's license, they comply with the statute if they provide the last four of the social security number.

Does the Court have other questions or concerns?

THE COURT: Just one moment. Let me look at a note that I made.

**(Pause)**

The state represents that they have offered -- and I think both in the Orange County case with the registrar -- and

79

it's represented today in the statewide case -- the names and addresses. Has that offer in fact been made?

MR. NEFF: Has that offer --

THE COURT: Yes. To you.

MR. NEFF: Oh --

THE COURT: Not to you but to the government, the DOJ.

MR. NEFF: California has taken the unique in the nation position that they are -- that they -- we are permitted to come and inspect it in their offices, that data; which, (a), is not sufficient; (b), we argue is not an appropriate way of providing it in today's day and age where it's actually more secure to share this data electronically through our shared file-sharing --

THE COURT: Kind of slow-walking you. Kind of slow walking.

MR. NEFF: I think --

THE COURT: For want of a better term.

MR. NEFF: That is the United States' interpretation of it but --

THE COURT: How about the voter participation and the registration methods? Have those been offered to you? In other words, that's been argued to me but behind the scenes I don't have that record right now. Has that been offered to you?

80

MR. NEFF: It is in the back-and-forth is in the letters attached as exhibits in the filings, Your Honor; however, the United States' position is that the responses have been woefully inadequate.

THE COURT: Okay. So we've never gotten down to really how that information would be exchanged. It's flowing back and forth in terms of representations but as a practical matter there's a big difference between a representation and conveying the information to you.

MR. NEFF: Well actually in our letters we did lay out to opposing counsel our file-sharing program, how it works, that it is secure and we invite them to -- assuming they have a change of heart, to use it.

THE COURT: About the registration status and the contact information, has that been offered to you?

MR. NEFF: That, I'm not sure about. I'm not sure what the scope of their offer is.

THE COURT: Okay.

MR. NEFF: I just know that it does not include the -- for sure, does not include the driver's license number or the last four of the social as required by the HAVA statute. And in other states as well, that has always been the crux of the dispute.

THE COURT: In their opening arguments they'd argued that in the Benson case out of the Sixth Circuit, Bellows out

Case 3:25-cv-00642-RSM-PAS Document 25-2 Filed 01/30/26 Page 18 of 34 PageID #: 320

81

of the First and Long case out of the Fourth, that there's an inconsistent and uniformed position taken by the government. How do you respond to that?

MR. NEFF: That the -- there is no inconsistency in position.

THE COURT: Explain that to me.

MR. NEFF: What there is is difference in posture of those cases. It is a true statement to say that the United States, as an agency, has yet to go to states to enforce the minimum standards of the HAVA statute. One can argue whether that was a wise or unwise decision but here we are 23 years later and the federal government has yet to do it. It is still, for certain, good law. The United States believes it is a law that should be enforced and complied with. Therefore, because of that history where this hasn't been done before, all of those cases relate to private parties trying to in some way get in.

The DOJ's position is that private parties do not have a right of action under HAVA and therefore they should not be allowed to go to states and say, I would like your driver's license or social security number. However, there are states around the country, including ones that are fighting us, that interestingly, have been willing to turn over that data to a private organization without the same protections as the United States. That's been cited in our briefing, the ERIC

EXCEPTIONAL REPORTING SERVICES, INC

Organization.

So what I would say is all those cases are inapplicable. It often requires selectively quoting them to make it sound like in some way the United States government is not entitled to it. No, the United States government is uniquely mentioned in both the CRA and HAVA. And therefore just because this is the first time the United States is coming in and doing it, doesn't mean that it's not clearly what the statute states.

THE COURT: For both parties, you mentioned that California is one of the main outliers, for want of a better word, from the DOJ and the executive branch's position. Is it the position of the executive branch that there need not be any stated purpose that there's an absolute right to obtain this information per statute?

MR. NEFF: Statute requires we state a purpose. A purpose.

THE COURT: And what is the purpose here?

MR. NEFF: The purpose is for, as stated in our letters to them, for voter roll maintenance enforcement and compliance.

THE COURT: And we stated in Orange County with a limited county case involving Page. There, there were -- and I keep 13 or 17 but 17, I believe, allegations. The most notorious became the dog that voted twice.

Is that, out of 1.2 million voters, what's the basis, for instance, of that kind of request because of course we're always going to have error, including people who legitimately die. So what's the threshold that this stated purpose has? How should I interpret that?

**MR. NEFF:** Under the CRA there is no threshold.

**THE COURT:** Okay. Now, do you need to -- and thank you. Do you need to make any calls? You're all by yourself, you're doing -- there's nobody to consult with but do you need to make any calls? Are you satisfied with your argument?

**MR. NEFF:** I appreciate the offer, Your Honor, but no, we're satisfied.

**THE COURT:** Okay. There'll be a second round.

**MR. NEFF:** Yes.

**THE COURT:** So counsel, however you'd like to proceed then. One of you has another obligation, I don't care which order. You can take the intervenors first or the parties.

**(Pause)**

**MR. BRUDIGAM:** So there was a lot going on there, Your Honor, and so I'm going to try to be thorough in making sure I cover all of those points.

So I think the first thing I want to talk about is this notion that the complaint is just an order to show cause. And essentially what the federal government wants to do is take the Court and sideline them in this dispute and say that the

84

Court has no room for any judicial review here.  And that's just not supported by the text of the statute.

There's nothing in the Civil Rights Act that creates a special statutory procedure.  The words "order to show cause" are not in the statute at all and I'll just read you the text right here.

It says that:

"The appropriate district court shall have jurisdiction by appropriate process to compel the production of such record or paper."

That's what it says, "By appropriate process."  And so that's up to the Court to decide what the appropriate process is here.

And I'd also just point Your Honor to the fact that the Federal Rules of Civil Procedure contemplate what rules apply when you have a government investigative demand.  I mean Federal Rule of Civil Procedure 81(a)(5) specifically says:

"The Federal Rules of Civil Procedure apply to proceedings governing demands for records by the U.S. government."

And so this idea that some other procedure applies, it's not supported by the text, it's not supported by the Federal Rules of Civil Procedure.  The only thing that supports this purported procedure are these early 1960s' cases and like we've said, the federal government, they pin their hopes on

this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's the one they're referring to which says that the Court shouldn't have any role here.

But that case is obviously nonbinding on Your Honor and it's really been overruled.  I would point you to the <u>United States v. Powell</u> case.

THE COURT:  I'm sorry, what -- just a moment.

MR. BRUDIGAM:  Sure.

THE COURT:  All right.  Please continue.  I've got my note.

MR. BRUDIGAM:  So the Supreme Court in United States v. Powell found that the Federal Rules of Civil Procedure, they apply to a proceeding like this.  And in that case it involved an IRS document request statute which used the very same language that we have here which is that the Court shall, by appropriate process, compel relief under that statute.  So even if Your Honor found Kennedy v. Lynd persuasive, it's obviously unbinding, that's been overruled.  So just to be clear, the Federal Rules of Civil Procedure govern this action.

THE COURT:  Well, you've cited on both parties' parts, different enactments by council, statutory provisions.  I think we can all agree that we want qualified voters to vote without any chilling effect.

MR. BRUDIGAM:  I agree.

THE COURT:  Is there -- well I think we can all

86

stipulate to that.

MR. BRUDIGAM: We can.

THE COURT: And I'll use the word "qualified voters".

Is there a chilling effect in the request by the government and if so, what is that chilling effect? How would there allegedly be persons who may believe that the government has no business in the sense of getting more information.

MR. BRUDIGAM: Sure I mean I think --

THE COURT: And behind this the concern of this court eventually, besides the statutory following the law, is going to be the impact of what we write and do. And this case will probably be the first case that comes out that other circuits look at. So with that noble goal in mind of having voter participation, is there a chilling effect or not?

MR. BRUDIGAM: I think there's absolutely a chilling effect here because --

THE COURT: And I need you to define that for me.

MR. BRUDIGAM: Sure.

THE COURT: And it may not be relevant to the opinion but behind all of this, we need voters who are qualified to be able to vote.

MR. BRUDIGAM: Right.

THE COURT: Now the ease of that could be differences between different administrations and whether you have different methodologies. And I know there's a huge controversy

about mail-in ballots and voter registration and drive-in, et cetera, but when we're finally done with this, we want qualified voters to vote. And if there's a chilling effect, or this privacy right that we've somewhat skipped over, I want to hear how you define that.

**MR. BRUDIGAM:** Sure. Your Honor, I think this action should make the stomach of every American turn, knowing that this executive branch is going in, state by state, collecting and vacuuming up everybody's voter registration information. It is on a scale that we have never seen before. Okay.

And what this is going to do --

**THE COURT:** It is their disparity argument. In other words, remember when I started this conversation early on, and I discussed the amicus briefs, I was particularly interested if I was getting just red and blue states. That's why I was looking to see if there were these swing states.

**MR. BRUDIGAM:** I mean I point Your Honor to --

**THE COURT:** Or is this a argument also that a particular group of states are being examined versus other states? Because here, the government has represented while California from their perception might be an outlier, they've also made inquiries of the let's say more, from their standpoint, compliant states like Kansas and -- I forget which one -- just a moment -- Indiana, and that Texas was coming onboard.

88

MR. BRUDIGAM: Yeah. Well, what I would say is I mean those aren't states that are complying, they're voluntarily giving that information to the federal government.

THE COURT: But regardless, the government has made an inquiry so if there's an argument that the government is reaching out and being selective, if the state is voluntarily complying that doesn't seem to me to be singling out progressive states. And if you think that, then I need to hear that and hear your reasoning behind that.

MR. BRUDIGAM: I'm not saying they're singling out states.

THE COURT: Okay. Then we can pass that.

MR. BRUDIGAM: They're going after every state and California is by no means --

THE COURT: So I'm not going to have a disparity argument.

MR. BRUDIGAM: Right, right. I just mean in terms of the position the secretary has taken, I mean the reason they had to sue 14 different states is because nobody wants to turn this data over. The representations that Counsel just gave today, that's the first that I've heard of any state turning over that information. So we are by no means an outlier in taking this position.

THE COURT: Wait just a moment. For the government or DOJ, how do we validate Kansas and Indiana? What validation

89

do I have about that?

MR. NEFF: I was actually looking that up right now, Your Honor, because --

THE COURT: Well go ahead and look it up. You've got lots of time.

MR. NEFF: And I --

THE COURT: By the way, I'm not holding you to it. I know it's in good faith but I'd like to hear what states that we have validation for turning this document over. And there may be numerous states.

MR. NEFF: It's a good-faith representation here. I am kind of a point --

THE COURT: Okay. Well now take away the good faith. I accept that. Okay, I'm asking for proof now.

MR. NEFF: Okay. Wyoming, Kansas, Indiana and Arkansas all complied voluntarily.

THE COURT: Okay. Just a moment.

MR. NEFF: Texas --

THE COURT: Kansas, Indiana, Wyoming and Arkansas ...

MR. NEFF: ... have already complied ...

THE COURT: ... voluntarily.

MR. NEFF: ... voluntarily.

THE COURT: Okay. Texas?

MR. NEFF: Texas, Virginia, Utah, Tennessee, South Dakota --

90

THE COURT:  Just a moment.

MR. NEFF:  Oh it's gonna go long, yeah.  South Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama, all fall into the list of they have expressed with us a willingness to comply based on the represented MOU that we have sent them.  And so we expect full --

THE COURT:  Now apparently Nebraska can't make up its mind because of the proposed amici briefed to the Court, they have the former state secretaries of state for Colorado, Connecticut, Minnesota and guess what?  Nebraska.

MR. NEFF:  Well those are former.  And furthermore, just because some states are representing certain things in court, there are still discussions going on now that this MOU we have is fully blessed.  There are the -- I don't think it's safe at this point to go beyond those states but --

THE COURT:  Then that's fine.

MR. NEFF:  -- that's a fair representation of the state of discussions as of today.

THE COURT:  And Counsel, back to you.

MR. BRUDIGAM:  Sure.  And yeah, so all I heard there was we've heard a willingness.  It doesn't sound like those states have actually turned over any data, just to be clear.

So I want to talk a little bit about --

THE COURT:  No, I think he said that four states have actually.  Kansas --

91

**MR. BRUDIGAM:** Four states have actually turned over but the broader list --

**THE COURT:** -- Indiana, Wyoming and Arkansas.

**MR. BRUDIGAM:** Right.

**THE COURT:** The others were a purported willingness.

**MR. BRUDIGAM:** Right.

So Your Honor, the federal government is really leaning hard into the text of these statutes and they say that we don't want to talk about the text but that's just absolutely not true. And I want to just start with the Civil Rights Act of 1960.

There is a very clear statutory limitation in that provision and it's in Section 20703. And it says that the attorney general's demand shall contain a statement of the basis and the purpose therefore. DOJ has not satisfied this requirement and so their demand is invalid plainly under the statutory text.

**THE COURT:** So the plain representation by the government is too broad; and that is, they want to stop voter fraud.

**MR. BRUDIGAM:** Well, so they've mentioned a couple of things. It keeps changing so I want to unpack this a little bit.

So they said that the purpose is free and fair elections, clean voter rolls. Then he said up here that it's

92

for enforcing HAVA.  So these are multiple different bases. And also it's different than the -- or than the purpose that was originally articulated in the letters to the secretary.

The original request said that it was -- they were seeking it for NVRA voter list -- list maintenance compliance. So the reason and rationale keeps shifting and changing.  And that's a problem, not just because it's suspicious, it's a problem because, again, the text says, "The demand shall contain a statement of the basis and the purpose therefore. The text use of the article."  'The,' twice, in front of the basis and the purpose indicates that there is only one basis and one purpose.

And the federal government has explicitly rejected this plain text reading.  They said it up here that they just need to give you any old basis and then the demand is good.

THE COURT:  That's my question also to both of you; and that is, does the executive branch need to state a purpose? Your argument is that they do.

MR. BRUDIGAM:  They do.

THE COURT:  Counsel for DOJ puts that in broad terms.

MR. BRUDIGAM:  Right.  Well but again, it's not just a purpose, it's -- or not just the purpose, it's also the basis.

THE COURT:  Okay.

MR. BRUDIGAM:  And they have not alleged any basis

**EXCEPTIONAL REPORTING SERVICES, INC**

anywhere in their action.

Now, I also want to talk about -- and just -- you know this -- I'm sorry. I want to talk a little bit more about HAVA, which is the law that apparently now that's the main method of enforcement we're now learning today, that that's what they want to enforce and they specifically reference the requirement under HAVA that states collect social security numbers and driver's license numbers. Well let's look to the text of HAVA. What does it say?

"The state shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph in accordance with state law."

And that is -- when it says "this subparagraph," it's referring directly to the requirement that states collect that information when processing voter registration applications. So there is nothing for the federal government to enforce here. This is solely the state's domain.

And as I said in my original motion, another provision of HAVA explicitly delegates discretion of implementation of HAVA to the states. So again, we're not afraid of the text in this case, we think it strongly supports our position. And so I also want to talk about what this data could be used for.

So we've heard a lot of different reasons. I just

explained why it's not relevant for HAVA. I want to also talk about why it's not relevant for List Maintenance under the NVRA.

So the legal standard under the NVRA requires states to conduct a general program that makes a reasonable effort. So the Sixth Circuit held this year in that Benson case that this just means a serious attempt, a rational, sensible approach. It need not be perfect or optimal. And so under this standard, getting line-by-line voter information of their social security numbers and driver's license numbers, that's entirely unrelated to whether a general program exists or whether the state is making a reasonable effort. And so, again, at every turn, the supposed reason why they need this information, it just doesn't add up.

And then finally, I want to talk about they claimed, as they did in their brief, that California has, quote, "the most worrisome voter registration data in the nation." That's just absolutely wrong, okay? That's an assertion in a brief without any support.

And they also incorrectly say that in submitting data to the Election Administration Commission in response to the EACs survey, this is an election administration survey, they said the LA County didn't submit any data. That's not true. That's simply not true. You can go to the survey and look at the data that LA submitted and you can look at our explanation

95

to DOJ in our letters in advance (inaudible) litigation explaining the questions they had about that survey.  So to the extent that they want to rely on EACs as some after-the-fact rationalization for this demand, it just doesn't make sense. It doesn't add up.

So those are the main --

**THE COURT:**  Were there inconsistent or consistent offers if you're aware of the Page case, as well as this case. In other words, when this started in Orange County, originally counsel was here, there's a representation about the registrar there making the same or similar representations about what they were willing to share with DOJ but I've never compared the two.  And I don't know what the state's position is because DOJ's argument might be, we're getting inconsistent data.  In other words, even when we're sharing, with the different entities promising that they'll share some amount of this data, the different counties are supplying this in different ways.

**MR. BRUDIGAM:**  Sure.  So I won't speak too much about that case but I would say that case is different and there isn't a problem of inconsistent data sharing because in the state case, they're saying, give us the whole list.  We want every voter.

In Orange County, they said, we want a list of just the individuals that have been removed from your list because of non-citizenship, people who renounced or for whatever

96

reason.

THE COURT: So this is much broader from your perspective in terms of protection, privacy, HAVA.

MR. BRUDIGAM: Yeah. It's not an issue of can they be reconciled.

So I do want to just back up again and just zoom out on the big picture here in this case.

You know, as we talked about -- my colleague talked about, in his motion, that the states really have the primary role in administering elections and the voter registration process. The Constitution makes that quite clear in the elections clause. And it makes sense to prioritize the state in this process because they're the ones that are closer to the voters, more accountable to the voters. And so this is an arrangement that it depends on the principle of subsidiarity where a decision should be made at the local level. And here, we don't -- there's no place for the federal government to come in and start demanding these records under that constitutional framework.

And not only are the states the default entity running elections but it's only Congress that can make or alter those rules. Here, we have the executive branch in court trying to get this information. The Constitution says nothing about the executive branch having any role in federal elections.

97

And I would just say that this is not a unique position by this administration. The president has been meddling in state election law since he came into office. And I would point Your Honor to a case in the District of Massachusetts, California v. Trump, where the executive was doing something sort of similar where they were going in under the guise of federal law and trying the change the way states administer and conduct elections and that was pursuant to an executive order the president issued. And so here, we're having another situation where the federal government is coming in under the guise of inapplicable federal laws and trying to interfere with the state's role in elections. And so I'd just say against that backdrop, it's important to keep that in mind; but even if, you know, considering all that, if you'd just go back to the text of these statutes, the federal government is not entitled to this information under those laws.

And so at this point I want to turn it over to my colleague, Will Setrakian, to just provide some rebuttal on the federal privacy laws issue.

**THE COURT:** Thank you. And once again, would you state your name because we're on CourtSmart.

**MR. SETRAKIAN:** Good afternoon, Your Honor. Will Setrakian for defendants, The State of California and California Secretary of State Shirley Weber. Just four quick points on the federal privacy statute.

EXCEPTIONAL REPORTING SERVICES, INC