**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA,

       *Plaintiff*,

    v.

STEVEN KOSKI, in his official capacity as
Commissioner of the Virginia Department of
Elections,

       *Defendant*.

No. 3:26-cv-42

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Jay Jones
  *Attorney General*

Travis G. Hill
  *Chief Deputy Attorney General*

Tillman J. Breckenridge (#85647)*
  *Solicitor General*

Triston Chase O'Savio (#100111)*
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

May 19, 2026

*\*Counsel of Record for Defendant*

**TABLE OF CONTENTS**

Introduction ........................................................................................................... 1

Statement of the Case ........................................................................................... 1

    A.    The United States' factual allegations .......................................... 1

    B.    Additional facts that courts have judicially noticed in parallel actions ...... 3

    C.    Relevant federal statutes ................................................................ 4

    D.    Procedural history .......................................................................... 5

Legal Standard ..................................................................................................... 7

Argument ............................................................................................................. 8

    I.    The requested statewide voter registration list is not a "record" within the meaning of Title III of the Civil Rights Act ........................................... 8

    II.    The U.S. Attorney General's written demand is insufficient to state a claim under Title III of the Civil Rights Act ......................................... 11

        A.    Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding the state's records ........................................................ 11

        B.    This Court can adjudicate the legal sufficiency of the basis and the purpose provided in the U.S. Attorney General's written demand for records ........................................................ 12

        C.    The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted ....................................... 14

        D.    The U.S. Attorney General's written demand provided no factual basis for demanding Virginia's complete and unredacted statewide voter registration list ......................................... 15

        E.    The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient to state a claim under Title III ................................................................. 16

            1.    The written demand lacks any reference or relation to the purposes for which Title III was enacted ................................... 16

            2.    Investigating NVRA and HAVA compliance is an insufficient purpose to invoke Title III ........................................... 17

            3.    This Court can reject a contrived purpose ................................. 18

    III.    The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state law ......................................... 20

        A.    Virginia law prohibits sharing much of the sensitive information that the U.S. Department of Justice requests ......................................... 20

B.     Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information ........................................................ 21

C.     The U.S. Attorney General's demand further failed to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002 ................................................................................................ 22

Conclusion ...................................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................... 7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................... 7

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ................................................................................ 18

*Crooks v. Harrelson*,
282 U.S. 55 (1930)..................................................................................................... 11

*Davis v. Michigan Department of Treasury*,
489 U.S. 803 (1989)................................................................................................... 10

*Epcon Homestead, LLC v. Town of Chapel Hill*,
62 F.4th 882 (4th Cir. 2023) ...................................................................................... 2

*Goodman v. Praxair, Inc.*,
494 F.3d 458 (4th Cir. 2007) ...................................................................................... 8

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ........................................................................ 12

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) .............................................................................. 12, 17

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ........................................................................ 12, 15, 21

*Newport News Industry v. Dynamic Testing, Inc.*,
130 F. Supp. 2d 745 (E.D. Va. 2001) ........................................................................ 7

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016)..................................................................... 22

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024).......................................................................................... 22

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ...................................................................................... 21

*Randall v. United States*,
30 F.3d 518 (4th Cir. 1994) ......................................................................................... 7

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ................................................................................. 7

*United States v. Amore*,
  No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)................... 7, 12, 13, 16

*United States v. Benson*,
   No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ............................... 7, 8, 9, 16

*United States v. Fontes*,
  No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. April 28, 2026)...................... 7, 9, 10

*United States v. Galvin*,
  No. 25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026).................. 5, 7, 11, 12, 14, 15, 18

*United States v. Oregon*,
  No. 6:25-cv-1666, 2026 WL 318402 (D. Or.
  Feb. 5, 2026) ...................................................... 4, 5, 7, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23

*United States v. Powell*,
  379 U.S. 48 (1964)................................................................................................. 13, 19

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................ 3, 4, 7, 11, 12, 13, 15, 17, 18, 19, 20, 22

*Wikimedia Foundation v. National Security Agency*,
  857 F.3d 193 (4th Cir. 2017) ........................................................................... 7, 15, 23

**Statutes**

26 U.S.C. § 7604................................................................................................................. 13

5 U.S.C. § 552a................................................................................................................... 22

52 U.S.C. § 20501............................................................................................................... 5

52 U.S.C. § 20507.................................................................................................... 2, 5, 9, 11, 18

52 U.S.C. § 20701.................................................................................................... 2, 5, 8, 9, 10

52 U.S.C. § 20702........................................................................................................... 5, 10

52 U.S.C. § 20703................................................................................................... 5, 6, 11, 14, 16

52 U.S.C. § 20705............................................................................................................. 13

52 U.S.C. § 21083...................................................................................................... 5, 9, 10, 11

52 U.S.C. § 21085......................................................................................................... 5, 9, 18

Pub. L. No. 107-347, § 208(b), 116 Stat. 2899 (2002) ................................................... 22

Va. Code § 2.2-3808.1 ............................................................................................. 20, 21

Va. Code § 24.2-404 ...................................................................................................... 20

Va. Code § 24.2-405 ............................................................................................... 20, 21

Va. Code § 24.2-406 ............................................................................................... 20, 21

Va. Code § 24.2-407.1 ............................................................................................ 20, 21

Va. Code § 24.2-444 ............................................................................................... 20, 21

Va. Code § 24-1002.1 ............................................................................................. 20, 21

**Rules**

Fed. R. Civ. P. 12 ................................................................................................. 7, 8, 14

Fed. R. Civ. P. 8 ........................................................................................................... 20

**Other Authorities**

Letter from Attorney General Pamela Bondi to Minnesota Governor Tim Walz
(Jan. 24, 2026), available at https://www.sos.mn.gov/media/wihf4a05/
ag-bondi-gov-walz-letter-012426.pdf ...................................................................... 3, 19

U.S. Commission on Civil Rights, Report of the United States Commission on
Civil Rights (Sept. 9, 1959), https://perma.cc/2PDF-GZHB ................................... 9, 17

## INTRODUCTION

Between September 2025 and April 2026, the U.S. Department of Justice has sued at least 30 states and the District of Columbia for refusing to provide their complete and unredacted statewide voter registration lists to the U.S. Attorney General. In each case, the U.S. Department of Justice has argued that the defendant states and election officials violated Title III of the Civil Rights Act by failing to disclose this sensitive data. And in each court to consider and address these claims to date, the United States' complaints have been met with an unbroken string of dismissals. This Court should follow suit.

The United States' amended complaint against Virginia Commissioner of Elections Steven Koski fails to state a claim for at least three reasons. First, Virginia's statewide voter registration list is not the type of "record" relating to a federal election that state elections officials must preserve, retain, and make available for inspection under Title III. Second, the U.S. Attorney General's written demand failed to state the factual basis for demanding Virginia's statewide voter registration list, a prerequisite to states making any record available for inspection. Third, the purpose contained in the U.S. Attorney General's written demand was both contrived and insufficient to require Virginia to make records available under Title III.

The United States' claim also independently fails because the U.S. Attorney General's demand for Virginia voters' sensitive, non-public data violates both state and federal law.

## STATEMENT OF THE CASE

### A.    The United States' factual allegations

In July 2025, the U.S. Department of Justice sent a letter to then-Commissioner of the Virginia Department of Elections Susan Beals. Dkt. 28, Am. Compl. ¶ 21; *see also* Dkt. 39-3, Ltr.

1

from Michael E. Gates to Susan Beals (July 15, 2025) (the "July 2025 Request").[1] In the July 2025 Request, the U.S. Attorney General asks that the Virginia Department of Elections ("ELECT") "produce for inspection the following records" pursuant to "Section 20507(i) of the [National Voter Registration Act ('NVRA')]":

> The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

July 2025 Request at 2. The July 2025 Request makes no reference to Title III of the Civil Rights Act and does not use the word "demand," nor does it state the basis or the purpose of the U.S. Attorney General's request for the statewide voter registration list.

In August 2025, the U.S. Department of Justice sent a second letter to then-Commissioner Beals. Dkt. 28, Am. Compl. ¶ 21; *see also* Dkt. 39-4, Ltr. from Harmeet K. Dhillon to Susan Beals (Aug. 14, 2025) (the "August 2025 Demand").[2] This time, in addition to invoking the NVRA and the Help America Vote Act ("HAVA"), the letter states that "the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ('CRA'), codified at 52 U.S.C. § 20701, et seq.," and that "the Attorney General is demanding an electronic copy of Virginia's complete and current [voter registration list]." Aug. 2025 Demand at

---

[1] The United States has incorporated the July 2025 Request by reference in its complaint, Am. Compl. ¶¶ 21–24, and separately filed it as an exhibit to its motion to compel, Dkt. 39-3. Accordingly, this Court may consider this document in deciding the motion to dismiss. *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023).

[2] Just as with the July 2025 Request, the United States has incorporated the August 2025 Demand by reference in its complaint, Am. Compl. ¶¶ 25–26, and separately filed it as an exhibit to its motion to compel, Dkt. 39-4.

2–3. The August 2025 Demand reiterates that the U.S. Attorney General requests a copy of the list that contains "*all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." *Id.* at 3. The August 2025 Demand includes no factual basis for the U.S. Attorney General's demand, and it asserts that "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

On January 8, 2026, representatives from the Commonwealth informed the United States in an in-person meeting that Commissioner Beals "would not be providing" the statewide voter registration list to the U.S. Attorney General. Am. Compl. ¶ 27. The current ELECT Commissioner, Steven Koski, likewise has not provided the full, unredacted statewide voter registration list that the U.S. Attorney General has requested. Am. Compl. ¶ 28.

### B.    Additional facts that courts have judicially noticed in parallel actions

As one federal court considering a parallel action has judicially noticed: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *United States v. Weber*, 816 F. Supp. 3d 1168, 1185 (C.D. Cal. 2026) (collecting citations).

In January 2026, the U.S. Attorney General tied her demands for state voter rolls directly to immigration enforcement in a letter to Minnesota Governor Tim Walz. Ltr. from U.S. Attorney General Pamela Bondi to Minn. Governor Tim Walz (Jan. 24, 2026), *available at* https://www.sos.mn.gov/media/wihf4a05/ag-bondi-gov-walz-letter-012426.pdf (last accessed May 18, 2026) ("Bondi Minn. Ltr."). "The letter details the Attorney General's views about the state of 'lawlessness' regarding immigration enforcement in Minnesota and concludes with a list

3

Case 3:26-cv-00042-RCY    Document 47    Filed 05/19/26    Page 10 of 30 PageID# 449

of demands to 'restore the rule of law' through 'common sense solutions,'" including "a demand for Minnesota to 'allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960.'" *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) (noticing same letter from U.S. Attorney General Bondi).

More recently, the United States' counsel has admitted this additional purpose of immigration enforcement in the context of parallel litigation. When a federal court asked the United States' counsel in the lawsuit seeking Rhode Island's voter registration list whether the U.S. Department of Justice can "take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens,'" counsel for the United States responded, "In compliance with all federal laws, yes, *and we intend to do so*." ECF No. 47 at 65, *United States v. Amore*, No. 25-cv-00639 (D.R.I. Mar. 30, 2026) (emphasis added).

The U.S. Department of Justice's representations of a broader purpose for collecting states' voter rolls are consistent with reports from other federal agencies that "point to the federal government laying the groundwork to amass the personal information of millions of Americans in a centralized database," including by enlisting technology company Palantir to "build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services," and by pressuring states to disclose to the federal government other "sensitive information from programs like the Supplemental Nutritional Assistance Program (SNAP), as well as data from Medicaid." *Weber*, 816 F. Supp. 3d at 1185.

### C.    Relevant federal statutes

The United States repeatedly mentions the NVRA and HAVA in its complaint. The NVRA was enacted "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C.

4

§ 20501(b)(4). Similarly, HAVA regulates and requires states to maintain a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). Together, the NVRA and HAVA require states "to undertake an ongoing program of voter-list maintenance, though federal law largely leaves the finer details of list maintenance to the states' discretion." *United States v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129, at *1 (D. Mass. Apr. 9, 2026) (citing 52 U.S.C. §§ 20507, 21083, 21085).

Despite the complaint's many references to the NVRA and HAVA, the United States brought its only cause of action under a different federal statute: the Civil Rights Act. Title III of the Civil Rights Act provides the United States government with certain tools to root out racial discrimination in voting in federal elections and imposes a process by which the federal government can use those tools to investigate the infringement of voters' rights. *See Oregon*, 2026 WL 318402, at *10. First, Title III requires state election officers to retain certain records related to voting in a federal election for twenty-two months following the date of the federal election. 52 U.S.C. § 20701. Second, it imposes penalties for theft, destruction, or alteration of those covered records. *Id.* § 20702. Third, it requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "a statement of the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." *Id.* § 20703.

### D.    Procedural history

The U.S. Department of Justice filed its initial complaint against then-Commissioner Susan Beals on January 16, 2026. *See* Dkt. 1, Compl. On March 19, 2026, the U.S. Department of Justice filed an amended complaint, which named current ELECT Commissioner Steven Koski as the defendant in former Commissioner Beals' stead. *See* Dkt. 28, Am. Compl.

The complaint alleges one cause of action: a violation of the Civil Rights Act, 52 U.S.C. §§ 20703. Am. Compl. ¶¶ 29–31. The complaint requests two forms of relief: a declaration that Commissioner Koski violated the Civil Rights Act by refusing to provide the requested records, and an order requiring Commissioner Koski "to provide to the Attorney General the current electronic copy of Virginia's computerized voter registration list, with all fields," including the "full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier" for each registered voter. Am. Compl. at 8.

This complaint is one of at least 30 that the U.S. Department of Justice has filed against states and the District of Columbia in recent months.[3] Every court that has considered and

---

[3] *United States v. Bellows*, No. 25-cv-468 (D. Me.) (filed Sep. 16, 2025); *United States v. State of Oregon*, No. 25-cv-1666 (D. Or.) (filed Sep. 16, 2025); *United States v. Benson*, No. 25-cv-1148 (W.D. Mich.) (filed Sep. 25, 2025); *United States v. Board of Elections of the State of New York*, No. 25-cv-1338 (N.D.N.Y.) (filed Sep. 25, 2025); *United States v. Commonwealth of Pennsylvania*, No. 25-cv-1481 (W.D. Pa.) (filed Sep. 25, 2025); *United States v. N.H. Secretary of State*, No. 25-cv-371 (D.N.H) (filed Sep. 25, 2025); *United States v. Simon*, No. 25-cv-3761 (D. Minn.) (filed Sep. 25, 2025); *United States v. Weber*, No. 25-cv-9149 (C.D. Cal.) (filed Sep. 25, 2025); *United States v. DeMarinis*, No. 25-cv-3934 (D. Md.) (filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-903 (D. Vt.) (filed Dec. 1, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del.) (filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-639 (D.R.I.) (filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-06078 (W.D. Wash.) (filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-01193 (D.N.M.) (filed Dec. 2, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass.) (filed Dec. 11, 2025); *United States v. Griswold*, No. 25-cv-3967 (D. Colo.) (filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-522 (D. Haw.) (filed Dec. 11, 2025); *United States v. Evans*, No. 25-cv-4403 (D.D.C.) (filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-3398 (C.D. Ill.) (filed Dec. 18, 2025); *United States v. Wis. Elections Commission*, No. 25-cv-1036 (W.D. Wis.) (filed Dec. 18, 2025); *United States v. Thomas*, No. 26-cv-21 (D. Conn.) (filed Jan. 6, 2026); *United States v. Beals*, No. 26-cv-00042 (E.D. Va.) (filed Jan. 16, 2026); *United States v. Raffensperger*, No. 26-cv-485 (N.D. Ga.) (filed Jan. 23, 2026); *United States v. Adams*, No. 26-cv-19-GFVT (E.D. Ky.) (filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-2025 (D.N.J.) (filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla.) (filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-166 (D. Utah) (filed Feb. 26, 2026); *United States v. Warner*, No. 26-cv-156 (D.W.V.) (filed Feb. 26, 2026); *United States v. McGrane*, 26-cv-197 (D. Idaho) (filed Apr. 1, 2026).

addressed whether the United States failed to state a claim under Title III of the Civil Rights Act has dismissed the United States' claim. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. April 28, 2026).

## LEGAL STANDARD

This Court must dismiss a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept as true all well-pleaded facts in a complaint," but courts are "not so bound by the plaintiff's legal conclusions, since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). Accordingly, "legal conclusions pleaded as factual allegations, 'unwarranted inferences,' 'unreasonable conclusions,' and 'naked assertions devoid of further factual enhancement' are not entitled to the presumption of truth." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). If a "complaint lacks a cognizable legal theory, then dismissal is proper." *Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 749 (E.D. Va. 2001).

In considering a motion to dismiss filed under Rule 12(b)(6), this Court can also reach affirmative defenses "where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

## ARGUMENT

### I.    The requested statewide voter registration list is not a "record" within the meaning of Title III of the Civil Rights Act

The information that the U.S. Department of Justice seeks from Virginia is not the type of "record" that Title III requires preserving or making available for inspection by the U.S. Attorney General. Title III requires state officers of elections to "retain and preserve . . . all records and papers which come into [the state's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election for a period of 22 months following the date of the federal election. 52 U.S.C. § 20701.

For at least three reasons, the statewide voter registration list that the United States seeks is not a covered record within the meaning of 52 U.S.C. § 20701.

*First*, Virginia's statewide voter registration list would not naturally be understood to have "come into [the State's] possession." 52 U.S.C. § 20701. "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9–11 (collecting definitions). The next words in the statute—"relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701—further "bolster[s]" this interpretation, because "[e]ach of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9.

In contrast, the statewide voter registration list that the U.S. Attorney General seeks was never submitted to the state by a voter or other third party. Instead, it is both created and maintained

8

by state elections officials. 52 U.S.C. §§ 20507, 21083, 21085. Other courts have concluded that Section 20701's focus on records that "come into [the State's] possession" refers "only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Benson*, 2026 WL 362789, at *9–11; *Fontes*, 2026 WL 1177244, at *3–4.

An understanding of Section 20701 that captures records submitted by voters, rather than created by elections officials, comports with the backdrop against which Title III was enacted. "[W]hen the [Civil Rights Act] was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Benson*, 2026 WL 362789, at *9; *see* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights at 93 (Sept. 9, 1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."). Requiring states to preserve records that voters submitted to them would directly respond to that frustration of the federal government's effort to enforce voting rights. *See also Benson*, 2026 WL 362789, at *10 ("Given this understanding, the distinction between applications and a voter list is perfectly logical: a voter application can be examined to determine whether it was unlawfully rejected, whereas a list of those who *successfully* registered to vote would be little help in such an investigation.").

*Second*, the statewide voter registration list is not a static record that elections officials can "retain and preserve." 52 U.S.C. § 20701. Rather, federal law obligates state elections officials to make regular modifications to the list. For instance, the NVRA requires states to "protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll." 52 U.S.C. § 20507(b) (emphasis added). And HAVA requires states to

9

"implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State," 52 U.S.C. § 21083(a)(1)(A), and to "perform list maintenance with respect to the computerized list *on a regular basis*," 52 U.S.C. § 21083(a)(2)(B) (emphasis added). It does not make sense to read Section 20701 to require state elections officials to "retain and preserve . . . for a period of twenty-two months" a list that undergoes such regular changes.

In fact, any contrary reading would bring the NVRA and HAVA into direct conflict with Title III of the Civil Rights Act. This conflict becomes clear when reading Section 20701's preservation and retention requirement in conjunction with Title III's broader statutory scheme. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The very next section of Title III criminalizes "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or *alter[ing]* any record or paper required by section 20701 of this title to be retained and preserved." 52 U.S.C. § 20702. If the statewide voter registration list is such a record, then Title III would forbid state elections officials from altering it. *See* 52 U.S.C. §§ 20701, 20702. But, as discussed above, both the NVRA and HAVA "affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Fontes*, 2026 WL 1177244, at *5. As a result, interpreting Section 20701 to require retention and preservation of statewide voter registration lists "conflicts with the very purpose of [voter registration lists] and would place Title III in conflict with the NVRA and the HAVA." *Id.* at *4.

10

*Third*, the U.S. Attorney General's request is untethered from the only federal election conducted in the 22 months before the demand. Both of the U.S. Department of Justice letters incorporated into the complaint request that Virginia produce the "current" statewide voter registration list as of July or August 2025. *See* August 2025 Demand at 3; July 2025 Request at 2. Because the list undergoes regular changes, *see* 52 U.S.C. §§ 20507(b), 21083(a)(2)(B), the current list that the United States seeks is not a "record or paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" in the 2024 election. *See* 52 U.S.C. § 20703.

## II.    The U.S. Attorney General's written demand lacks a sufficient basis and purpose to state a claim under Title III of the Civil Rights Act

### A.    Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding the state's records

Title III requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." 52 U.S.C. § 20703. "The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 816 F. Supp. 3d at 1184. "Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand." *Id.*

Title III's "statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 2026 WL 972129, at *4. "The text repeats the definite article 'the' before 'basis' and 'purpose,' and it uses the conjunctive 'and' to join them." *Id.* When "'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'" *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930). Accordingly, the U.S. Attorney General "is required to offer a written

11

statement of *both* the purpose and basis for its demands." *Weber*, 816 F. Supp. 3d at 1182 (emphasis in original); *Oregon*, 2026 WL 318402, at \*9; *Galvin*, 2026 WL 972129, at \*4; *Amore*, 2026 WL 1040637, at \*5.

This reading of the independent "basis" and "purpose" requirements is "consistent with the line of Fifth Circuit cases, most notably [*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)], upon which the United States presses the Court to rely here." *Amore*, 2026 WL 1040637, at \*5; *Weber*, 816 F. Supp. 3d at 1182–83; *see also* Am. Compl. ¶¶ 1, 3, 4 (invoking *Lynd*). The U.S. Attorney General's demand letter in *Lynd* provided the factual basis for his demand, stating: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 226 n.6. And it provided the legal purpose of his demand, stating: "The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Id. See also Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (stating same basis and purpose); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (stating same basis and purpose), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

**B.    This Court can adjudicate the legal sufficiency of the basis and the purpose provided in the U.S. Attorney General's written demand for records**

The United States wrongly asserts that, despite its invocation of this Court's jurisdiction, this Court cannot "adjudicate the factual foundation for, or the sufficiency of, the Attorney General's statement of the basis and the purpose contained in the written demand or the scope of the order to produce." Am. Compl. ¶ 4 (citing *Lynd*, 306 F.2d at 226) (quotation marks omitted). Supreme Court precedent post-dating the handful of non-binding cases that the United States cites

establishes that this Court's role "is not so limited." *Oregon*, 2026 WL 318402, at \*7–8 (citing *United States v. Powell*, 379 U.S. 48 (1964)); *see also Amore*, 2026 WL 1040637, at \*3–4.

Title III provides that the "United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Although Title III does not define "appropriate process," the Supreme Court has interpreted identical language in 26 U.S.C. § 7604(a). *Powell*, 379 U.S. at 58 & n.18; *compare* 52 U.S.C. § 20705, *with* 26 U.S.C. § 7604(a) ("If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data" (emphasis added)). And in *Powell*, the Supreme Court concluded that, "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," and courts may "inquire into the underlying reasons for the examination [of records]." 379 U.S. at 58 & n.18.

As a result, several other district courts adjudicating the U.S. Department of Justice's parallel voter-roll lawsuits have concluded that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures," *Weber*, 816 F. Supp. 3d at 1182 & n.15, and have accordingly "applie[d] the Federal Rules of Civil Procedure as in any other case." *Oregon*, 2026 WL 318402, at \*8; *see also Amore*, 2026 WL 1040637, at \*3–4. The United States' contrary argument is especially unpersuasive in light of its "affirmative choice to file a complaint and proceed through ordinary litigation" under the very process contemplated by the Federal Rules of

13

Civil Procedure. *Oregon*, 2026 WL 318402, at *8 n.1. This Court therefore has authority to determine whether the United States has failed as a matter of law to provide the statement of the basis and the purpose of the demand that Section 20703 requires. Fed. R. Civ. P. 12(b)(6).

### C. The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted.

To ascertain whether the written demand contained the requisite basis and purpose, the Court must first identify the written demand. Title III's text makes clear that "the 'demand in writing' must 'contain a statement of the basis and the purpose.'" *Galvin*, 2026 WL 972129, at *3. "The statute therefore "directs the Court to the Attorney General's written demand," *id.*, to determine whether that demand "contain[ed] a statement of the basis and the purpose" for the demand, 52 U.S.C. § 20703. *See also Oregon*, 2026 WL 318402, at *9 (rejecting United States' "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'").

The written demand appears only in the August 2025 Demand. *See* Aug. 2025 Demand at 3 ("Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Virginia's complete and current VRL."); *id.* ("the Attorney General requests that you produce for inspection . . ."). The earlier July 2025 Request does not make any demand, nor does it even invoke Title III of the Civil Rights Act. *See* July 2025 Request at 2 ("We write to you as the chief election official for the Commonwealth of Virginia to request information . . ."); ("the Attorney General requests that you produce for inspection . . ."). As a result, only the August 2025 Demand can fairly be construed as a written demand for records pursuant to Title III, and this Court should look to only that document to assess whether the U.S. Attorney General's written demand complied with 52 U.S.C. § 20703.

**D.    The U.S. Attorney General's written demand provided no factual basis for demanding Virginia's complete and unredacted statewide voter registration list**

The requisite "basis" to support a demand for records under Title III is "a factual basis for investigating a violation of a federal statute." *Oregon*, 2026 WL 318402, at \*9; *see also Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Galvin*, 2026 WL 972129, at \*3 (collecting definitions of "basis"). "Put simply, the statute requires a statement of *why* the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 2026 WL 972129, at \*3 (emphasis in original).

Setting aside the bare legal conclusion asserted within Count One, Am. Compl. ¶ 30 ("The written demand 'contain[ed] a statement of the basis and the purpose therefor.'"); *Wikimedia Found.*, 857 F.3d at 208, the United States' complaint contains no factual allegation that it provided any "basis" in its written demand. *See* Am. Compl. ¶¶ 19–28. That pleading deficiency tracks the documentation incorporated by reference into the United States' complaint. The August 2025 Demand contains "nothing that could fairly be characterized as the factual basis for the demand." *Galvin*, 2026 WL 972129, at \*4 (finding the same of a virtually identical letter to Massachusetts state elections official).

To the extent that this Court considers whether the facts recited in the July 2025 Request could form the requisite basis, those facts remain inadequate. That letter, too, contains neither the word 'basis' or any equivalent phrase (e.g., 'based upon')." *Galvin*, 2026 WL 972129, at \*4; *compare Lynd*, 306 F.2d at 229 n.6, *with* Dkt. 39-3. And the only facts that the July 2025 Request discusses relate to the responses that Virginia itself provided in response to the Election Assistance

15

Commission's Election Administration and Voting Survey. July 2025 Request at 3. After reciting those facts, the July 2025 Request asks the Commissioner to explain Virginia's practices with respect to removing people from its voter rolls and to provide information "regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act." *Id.* at 2, 3. But it does not assert that Virginia has employed any practices that violate the NVRA—much less connect the facts it recites to the racially discriminatory voting practices and infringement of voters' rights that Title III prohibits. Nor does either letter reference any complaints that the U.S. Department of Justice had received about Virginia's list maintenance efforts. *Cf. Benson*, 2026 WL 362789, at *8 (letter indicated that the DOJ had received a complaint regarding Michigan's compliance with HAVA's requirements relating to the provision of unique voter identifiers). Thus, the July 2025 Request provided no basis for the U.S. Attorney General's written demand that would satisfy 52 U.S.C. § 20703's requirements.

### E. The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient to state a claim under Title III

#### 1. The written demand lacks any reference or relation to the purposes for which Title III was enacted

The requisite "purpose" to support a demand for records under Title III must relate to the purposes underlying Title III. *Oregon*, 2026 WL 318402, at *10. "If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Id.* at *9 (declining to "read 'purpose' so broadly" as to grant the United States "unfettered authority to demand voting records for *any* purpose"); *see also Amore*, 2026 WL 1040637, at *6.

16

Because the "larger framework of Title III and the historical context in which it was enacted" demonstrates that the law was "intended to protect against the infringement of voting rights," the "purpose" required in a demand for records under Title III "must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *3, *10; *see also* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights (Sept. 9, 1959), https://perma.cc/2PDF-GZHB. Where a written demand's purpose lacks "any reference or relation to the purposes for which Title III was enacted," the "demand for records is deficient and cannot trigger any duty to produce such records." *Id.*

The U.S. Attorney General's written demand provides no legally sufficient purpose to support its claim under Title III. To be sure, the August 2025 Demand invokes Title III. But it lacks "any reference or relation to the purposes for which Title III was enacted," *Oregon*, 2026 WL 318402, at *10, including any connection to purported violations of individuals' voting rights. To the extent this Court considers the July 2025 Request, it fares even worse, as it does not use the word "purpose" or make any reference to Title III of the Civil Rights Act, let alone the underlying purposes of the Civil Rights Act.

### 2. Investigating NVRA and HAVA compliance is an insufficient purpose to invoke Title III

The United States' claim that it was investigating NVRA or HAVA compliance cannot support the U.S. Attorney General's request for information under Title III, much less the sweeping request for Virginia's complete and unredacted voter registration list. "Title III was not passed as a tool for NVRA compliance." *Weber*, 816 F. Supp. 3d at 1183. Absent some basis to assert that state election officials are conducting list maintenance in a discriminatory manner, list-maintenance practices do not fall within Title III's scope. *See Bruce*, 298 F.2d at 863 & n.2 (noting that statistical evidence indicating that election officials failed to remove "voters who have moved

away or have died" does "not bear any particular importance" to demonstrating illegal discrimination in a Title III proceeding); *Oregon*, 2026 WL 318402, at *10 (where "stated purpose was to investigate list maintenance procedures," Plaintiff failed to state a claim).

And even if NVRA or HAVA compliance could ever be a valid purpose for a Title III demand, obtaining the complete, current, and unredacted version of Virginia's statewide voter registration list would not confirm whether the Commonwealth is complying with the NVRA or HAVA. The NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from official lists" for reasons like the death or change of address of voters. 52 U.S.C. § 20507(a)(4). HAVA sets standards for "maintenance" of a state's voter lists, *id.* § 21083, and leaves the "specific choices on the methods of complying with the requirements of this subchapter . . . to the discretion of the State," *id.* § 21085. These statutes mandate ongoing processes conducted using the State's discretion, not a particular result at a particular point in time. Accordingly, a current voter registration list would not answer the question of what reasonable efforts Virginia is undertaking to comply with federal requirements or what efforts it undertook in advance of a previous election. *See Weber*, 816 F. Supp. 3d at 1192 (citing *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019)).

### 3.  This Court can reject a contrived purpose

Finally, the United States' public representations make clear that the U.S. Attorney General's written demand does not state "the" purpose for the requests. The statute's use of the definite article conveys that the stated purpose must be the *actual* purpose, "not just a conceivable or possible" purpose. *Galvin*, 2026 WL 972129, at *3. Thus, this Court can reject the United States' purported purpose if the complaint and judicially noticeable facts make clear it is contrived. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784–85 (2019) (courts need not "ignore the

disconnect between the decision made and the explanation given" or defer to a "contrived" rationale).

The Supreme Court's *Powell* decision makes clear that, when a court's process is invoked, "a court may not permit its process to be abused," including when the government's demand is "issued for an improper purpose," or "for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. In keeping with that obligation, multiple courts have taken judicial notice of the United States' public representations that conflict with the purpose it states in the complaint and August 2025 Demand. *Weber*, 816 F. Supp. 3d at 1184 ("representations made by the DOJ elsewhere paint a starkly different picture that this Court cannot ignore"); *see also Oregon*, 2026 WL 318402, at *13.

As one federal court has explained: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *Weber*, 816 F. Supp. 3d at 1185 (collecting citations). Indeed, in January 2026, the U.S. Attorney General tied her demands for state voter rolls directly to immigration enforcement in a letter to Minnesota Governor Tim Walz. *See* Bondi Minn. Ltr.; *Oregon*, 2026 WL 318402, at *11 (noticing same letter from U.S. Attorney General Bondi). "The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon*, 2026 WL 318402, at *11.

More recently, the United States' counsel has admitted this additional purpose of immigration enforcement in the context of parallel litigation, confirming that the U.S. Department

19

of Justice "intends to" send states' voter registration lists to the U.S. Department of Homeland Security "and say, hey, check this out to see if any of these people are not citizens.'" ECF No. 47 at 65, *United States v. Amore*, No. 25-cv-00639 (D.R.I. Mar. 30, 2026) (emphasis added).

The United States' statements that it intends to use Title III to further its efforts to "create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling," *Oregon*, 2026 WL 318402, at *13, and is nowhere disclosed in the U.S. Attorney General's written demand for Virginia's statewide voter registration list. This Court should not permit the United States to leverage Title III toward this end "under the guise of a pretextual investigative purpose." *Weber*, 816 F. Supp. 3d at 1186.

### III.    The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state law

#### A.    Virginia law prohibits sharing much of the sensitive information that the U.S. Department of Justice requests

The United States' claim independently fails because the relief it requests is illegal. Fed. R. Civ. P. 8(c)(1). Virginia law does not authorize disclosure of the most sensitive information that the U.S. Department of Justice seeks. The U.S. Attorney General's written demand included "*all fields*" of the statewide voter registration list, to include "either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." Aug. 2025 Demand at 3; *see also* Am. Compl. at 8. But disclosure of registrants' date of birth, driver's license number, full or partial social security number, and certain residential addresses is forbidden under state law.

Virginia law requires ELECT to maintain a list of registered voters, Va. Code § 24.2-404, and imposes restrictions on ELECT's ability to share the voter information it retains, *e.g.*, Va. Code §§ 24.2-444(C), 24.2-405(C), 24.2-406(C), 24.2-407.1, 24-1002.1, 2.2-3808.1. No list that the Department makes available for public inspection shall contain "an individual's social security

number, or any part thereof" or "the day and month of birth of an individual." Va. Code § 24.2-444(C). And "it is unlawful for any agency to disclose the social security number or other identification numbers appearing on a driver's license . . ." Va. Code § 2.2-3808.1.

Virginia law also permits certain voters to provide post office box addresses that must be "included in lieu of [their] street address on the lists of registered voters and persons who voted" that are made available for private or public inspection. Va. Code § 24.2-418(B). The protected voters include active and retired law-enforcement officers, active and retired judges, victims of domestic violence, foster parents, and elections officials. Va. Code §§ 24.2-418(B), 2.2-515.2.

Indeed, Virginia law criminalizes disclosing some of the requested information. Virginia statutes provide authorization to disclose social security numbers under only three enumerated circumstances: (1) to "a court" for use in "jury selection"; (2) to "a commissioner of the revenue or a treasurer" for use in "tax assessment, collection, and enforcement"; or (3) to "the Chief Election Officer of another state" for "maintenance of voter registration systems." Va. Code §§ 24.2-405(C), 24.2-406(C), 24.2-407.1. None of these carveouts authorizes ELECT to provide all or part of voters' social security numbers to the U.S. Department of Justice. And "disclos[ing] or mak[ing] any use of the social security number, or any part thereof, of any applicant for voter registration, except as authorized by law for official use" is a felony offense. Va. Code § 24-1002.1.

**B.    Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information**

Title III does not require Virginia to share the information that state law specifically prohibits disclosing. Instead, Title III has long been understood to "deal[] with public records which ought ordinarily to be open to legitimate reasonable inspection," and not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The same is true of the NVRA. *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (redaction is

21

appropriate under the NVRA as "necessary to protect sensitive information"); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" contained in voter registration lists); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns"). And HAVA "does not contain any disclosure provisions in its statutory text." *Weber*, 816 F. Supp. 3d at 1190. Therefore, because Virginia's privacy protections do "not obstruct" Title III, the NVRA, or HAVA, they can "coexist" with the federal statutes that the United States' complaint cites. *Id.* at 1189.

### C. The U.S. Attorney General's demand further failed to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002

The facts pleaded in the complaint also indicate that the United States's demand for Virginia's complete and unredacted voter registration list fails to comply with the requirements of two federal statutes. First, the Privacy Act of 1974 requires that agencies comply with procedural requirements before maintaining, collecting, or using a group of records searchable by individual, and prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" in most circumstances. 5 U.S.C. § 552a (a)(3), (a)(5), (e)(4), (e)(7), (f). Second, the E-Government Act of 2002 requires the United States to conduct a privacy-impact assessment before collecting information about 10 or more people that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual." Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921–23 (2002).

Neither the United States' complaint nor the letters it incorporates by reference explain any steps that the United States took to comply with the processes required by federal statutes. And the mere assertion that the United States' actions "would be maintained according to all applicable

22

federal laws," Compl. ¶ 23, falls into the category of "legal conclusions pleaded as factual allegations" and "naked assertions devoid of further factual enhancement" that "are not entitled to the presumption of truth" in considering a motion to dismiss. *Wikimedia Found.*, 857 F.3d at 208 (citation omitted). That is particularly so when the United States "conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose" in the context of litigation, but has elsewhere made "open and public statements to the contrary." *Oregon*, 2026 WL 318402, at *11; *see supra* Section II.E.3.

## CONCLUSION

This Court should dismiss the United States' amended complaint.

Date: May 19, 2026

Respectfully submitted,

STEVEN KOSKI, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE VIRGINIA DEPARTMENT OF ELECTIONS

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#85647)*
  *Solicitor General*

Jay Jones
  *Attorney General*

Travis G. Hill
  *Chief Deputy Attorney General*

Triston Chase O'Savio (#100111)*
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

*Counsel of Record for Defendant*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May, 2026, I filed the foregoing using the Court's

CM/ECF filing system, which sends an electronic notification of the same to counsel of record.


By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#85647)*
*Solicitor General*

24