**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>     Defendant. | No. 3:26-cv-00042<br>(Hon. Roderick C. Young) |

**MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-DEFENDANTS
COMMON CAUSE AND KATHERINE ELLENA'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

    I.    The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data. ............. 3

    II.    The United States Seeks to Unlawfully Construct a National Voter Database with the Requested Data. ........................................................................................................ 5

    III.   The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters. ............... 9

LEGAL STANDARD ..................................................................................................... 13

ARGUMENT ................................................................................................................ 13

    I.    THE UNITED STATES SEEKS RECORDS OUTSIDE THE SCOPE OF TITLE III. ..... 13

    II.   THE UNITED STATES HAS NOT COMPLIED WITH TITLE III'S BASIS AND PURPOSE REQUIREMENT. ...................................................................................... 15

    III.  THE UNITED STATES' DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND CONSTITUTIONAL RIGHTS OF VOTERS. ...................................................................... 24

CONCLUSION .............................................................................................................. 29

i

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................. 13

*Burdick v. Takushi*,
504 U.S. 428 (1992).................................................................................................... 1

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963).................................................................................... 15

*Colonial Penn Insurance Co. v. Coil*,
887 F.2d 1236 (4th Cir. 1989).................................................................................. 21

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024).................................................................................................. 21

*Department of Commerce v. New York*,
588 U.S. 752 (2019).................................................................................................. 21

*Equity Investment Associates, LLC v. United States*,
40 F.4th 156 (4th Cir. 2022)..................................................................................... 16

*F.D.I.C. v. Wentz*,
55 F.3d 905 (3d Cir. 1995)........................................................................................ 17

*Goines v. Valley Coummunity Services Board*,
822 F.3d 159 (4th Cir. 2016).................................................................................... 17

*Honeycutt v. United States*,
581 U.S. 443 (2017).................................................................................................. 14

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962)................................................................... 15, 28

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024)............................................................................. 13, 21

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)................................................................. 15, 16, 17, 28

*Navigators Insurance Co. v. Under Armour, Inc.*,
165 F.4th 171 (4th Cir. 2026)................................................................................... 21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009).................................................................................... 13

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021)........................................................................................... 21

*PA Fair Elections v. Pennsylvania Department of State*,
  337 A.3d 598 (Pa. Commw. Ct. 2025) ................................................................. 7

*Public Interest Legal Foundation v. Boockvar*,
  431 F. Supp. 3d 553 (M.D. Pa. 2019) ................................................................ 26

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
  673 F. Supp. 3d 1004 (D. Alaska 2023) ............................................................. 26

*Public Interest Legal Foundation, Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022)................................................................. 26

*Public Interest Legal Foundation, Inc. v. Matthews*,
  No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) .............................. 26

*Republican National Committee v. North Carolina State Board of Elections*,
  120 F.4th 390 (4th Cir. 2024)............................................................................. 1

*Sheetz v. County of El Dorado*,
  601 U.S. 267 (2024).......................................................................................... 27

*Shore v. Charlotte-Mecklenburg Hospital Authority*,
  412 F. Supp. 3d 568 (M.D.N.C. 2019) ............................................................... 21

*State of Ala. ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960)...................................................................... 2

*United States v. Amore*,
  No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)........................ 3, 16, 17

*United States v. Benson*,
  No. 25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ..................... 3, 14

*United States v. Dobbs*,
  629 F.3d 1199 (10th Cir. 2011) ........................................................................ 14

*United States v. Galvin*,
  No. 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ............................. 3, 16, 17, 18

*United States v. Lamin*,
  No. 21-4547, 2022 WL 16757925 (4th Cir. Nov. 8, 2022)...................................... 14

*United States v. Oregon*,
  No. 25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........................... 2, 17, 20, 24

iii

*United States v. Powell*,
    379 U.S. 48 (1964) ........................................................................................... 16

*United States v. Rosinsky*,
    547 F.2d 249 (4th Cir. 1977) ........................................................................... 16

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) ........................................................................... 26

*United States v. Weber*,
    816 F. Supp. 3d 1168 (C.D. Cal. 2026) ................................................... passim

*Bensonlic Interest Legal Foundation v. Benson*,
    136 F.4th 613 (6th Cir. 2025) .......................................................................... 19

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) .......................................................................................... 1

**Statutes**

5 U.S.C. § 552a ........................................................................................... 22, 28

52 U.S.C. § 20501 ........................................................................................ 1, 10

52 U.S.C. § 20507 ...................................................................................... passim

52 U.S.C. § 20701 ........................................................................... 1, 13, 14, 15

52 U.S.C. § 20703 .................................................................................... 14, 15

52 U.S.C. § 20901 ............................................................................................. 1

52 U.S.C. § 21083 ........................................................................................... 10

52 U.S.C. § 21085 ............................................................................. 10, 19, 22

**Other Authorities**

106 Congressional Record 3693 (1960) ...................................................... 15

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated
    on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025,
    https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-
    security.html ...................................................................................................... 6

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians
    Trying to Sway the Election and Change the Country*,
    PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ................................... 7

*Basis*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/basis ............................................................... 18

Bethany Rogers, *Testimony: Pa. Election Denial Group Behind Voter Registration Cancellation Form Mailings*, GoErie.Com (Nov. 2, 2024),
https://www.goerie.com/story/news/politics/elections/state/2024/11/02/pa-voter-registration-cancellation-letters-chester-county/75996247007 ................................................. 8

Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024),
https://www.wesa.fm/politics-government/2024-09-28/pa-fair-elections-conservative-pennsylvania-voter-role-purges ................................................................................................ 7

Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LancasterOnline (July 21, 2024),
https://lancasteronline.com/news/politics/pa-election-integrity-groupmet-with-2-architects-of-2020-effort-to-overturnelection/article_d477633c-460f-11ef-9d56-2fd754d57cab.html ................................................................................................................ 7

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, Spotlight PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 ............................................... 7, 8

Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VoteBeat (Feb. 12, 2025),
https://www.votebeat.org/pennsylvania/2024/02/12/heather-honey-pennsylvania-election-integrity-eric/.......................................................................................................... 7

Chester County, *Nov. 1, 2024 Election Board* overview *Hearing,*
https://chestercopa.portal.civicclerk.com/event/852/................................................................ 8

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*,
N.Y. Times, Sept. 9, 2025,
https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html............. 5

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*,
ProPublica, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.................................................... 6

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
N.Y. Times Magazine, Nov. 16, 2025,
https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ............................................................................................................... 6

H.R. Rep. No. 86-956 (1959)................................................................................................... 2

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*,
NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E ........................................................ 7

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025,
https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post................................................. 6

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*,
PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ ........................................ 7

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*,
STATELINE, Sept. 12, 2025,
https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ........................................................................................................................ 5

Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*,
STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ...................................11

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*,
NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4....................................................... 6

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*,
NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens. ........................................................................................................ 8

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*,
Brennan Center for Justice (updated May 11, 2026), https://perma.cc/5N3D-FUSS............... 3

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*,
POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.................................................................................. 9

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*,
DEMOCRACY DOCKET,
June 12, 2025,
https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters................................................... 6

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*,
NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting ................................................................................................... 8

Post by @AAGDhillon, December 5, 2025,
https://x.com/AAGDhillon/status/1997003629442519114 ....................................... 8

Press Release, United States Department of Justice,
*Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*
(Feb. 26, 2026), https://perma.cc/8SCK-89KR ........................................................ 4

Press Release, United States Department of Justice,
*Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026),
https://perma.cc/8X8U-F9PF ................................................................................... 4

Press Release, United States Department of Justice,
*Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026),
https://perma.cc/3L8Q-SJM5 .................................................................................. 4

Press Release, United States Department of Justice,
*Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls*
(January 6, 2026), https://perma.cc/YCM2-QQKM ................................................. 4

Press Release, United States Department of Justice,
*Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ ............. 4

Press Release, United States Department of Justice,
*Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B ..................................................................... 4

Press Release, United States Department of Justice,
*Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC ........................................... 5

Press Release, United States Department of Justice,
*Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD ....................................... 4

Press Release, United States Department of Justice,
*Justice Department Sues Six States for Failure to Provide Voter Registration Rolls*
(Sept. 25, 2025), https://perma.cc/7J99-WGBA ..................................................... 5

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements*

(July 5, 2018)
https://perma.cc/G2EZUUA5 ........................................................................ 20

Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to
'Nationalize' Elections*, NEW YORK TIMES, Feb. 2, 2026,
https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ............. 10

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal
Probes, Documents Show*,
REUTERS, Sept. 9, 2025,
https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-
voter-roll-data-criminal-probes-documents-2025-09-09 ........................................................ 5

Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll
Data to Homeland Security, Sources Say*,
CBS News (Mar. 26, 2026), https://perma.cc/2MAW-LL89 .................................................. 23

United States Department of Justice, Civil Rights Division,
*Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021),
https://perma.cc/74CP-58EH ...................................................................................... 2

## Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 13

Federal Rule of Civil Procedure 12(c) .......................................................................... 24

Federal Rule of Civil Procedure 56 .............................................................................. 24

## Regulations

Executive Order No. 14399,
91 Fed. Reg. 17125 (Mar. 31, 2026) ................................................................... 12, 24

Intervenor-Defendants Common Cause and Katherine Ellena hereby move to dismiss the United States' Amended Complaint for failure to state a claim pursuant to Rule 12 of the Federal Rules of Civil Procedure and set forth below the relevant facts and points of law in support of their motion. *See* L.R. 7(F)(1).

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. The Amended Complaint and the documents incorporated by reference therein do not plausibly establish that the United States has set forth in writing "the basis and the purpose" of its request for Virginia's statewide voter registration list, as required by Title III of the Civil Rights Act of 1960 (CRA), which the United States purports to invoke. 52 U.S.C. § 20703. And even if they did, production would still be inappropriate, because the requested documents fall outside the scope of the United States' investigative authority and because nothing in the relevant statutes precludes redaction of sensitive voter information.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 404 (4th Cir. 2024) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). It is "preservative of all [other] rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the CRA, 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. These statutes were enacted for the purpose of ensuring that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and

1

secure elections. As the United States Department of Justice itself explains, Title III of the CRA, the election records provision invoked here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., C.R. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States' demand for Virginia's unredacted voter file—which contains sensitive personal information such as driver's license numbers and/or Social Security numbers from every voter in the state—violates the plain text of the CRA, which unambiguously defines the scope of the records covered and the requirements imposed on the Department of Justice ("DOJ") when making a request. Public disclosure of carefully redacted state voting records can help ensure transparency and the accuracy of the voter rolls, especially by ensuring that citizens are not erroneously removed from the voter records. But releasing the State's voter records *without redaction* and for purposes unrelated to protecting voter access would only deter voter participation and undermine the right to vote. Especially so here, where the United States' *actual* reason for the data demand, which it never disclosed in its request but has been widely reported, is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target and challenge voters.

This suit is one of dozens brought by the DOJ seeking a state's complete and unredacted voter file. Six courts have addressed the merits in those actions, and all six have rejected the DOJ's request, dismissing CRA claims materially identical to those in the Amended Complaint here. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No.

1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 1:25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 1:25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026). This Court should do the same.

## BACKGROUND

**I.    The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data.**

Beginning in May 2025, Plaintiff the United States, through DOJ, began sending letters to election officials in at least forty-eight states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated May 11, 2026), https://perma.cc/5N3D-FUSS.

On July 15, 2025, DOJ sent a letter to Susan Beals, Virginia's then-Commissioner of the Department of Elections, demanding, among other things, an electronic copy of Virginia's computerized statewide voter registration list, including "all fields" contained within the list, within fourteen days. Letter of Michael E. Gates to Susan Beals (July 15, 2025) ("July 15 Letter"), Dkt. No. 39-3; First Amended Compl. ("Am. Compl.") ¶¶ 21–24, Dkt. No. 28. This letter cited the public records provision of the NVRA but did not mention the CRA at all. *See* July 15 Letter. The letter also reflects that DOJ expressed an interest in certain categories of persons who purportedly might be included on the voter rolls, including: voters who might have "duplicate" records in the system for some reason (for example, because they changed addresses and registered to vote at their new address); voters who have been convicted of a felony; voters "who have moved out of the commonwealth" and registered in their new state; and non-citizens. *See id.*

3

On August 14, 2025, DOJ sent another letter, again requesting the unredacted voter file, and this time purporting to invoke Title III of the Civil Rights Act of 1960. Letter of Harmeet K. Dhillon to Susan Beals (Aug. 14, 2025) ("August 14 Letter"), Dkt. No. 39-4; Am. Compl. ¶¶ 25–27. The United States again demanded sensitive Virginia voter data, specifying that "all fields" in the voter file should be produced, including each Virginia "registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." August 14 Letter; Am. Compl. ¶ 25. The August 14 Letter stated that the purpose of the request was to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter; Am. Compl. ¶ 26.

The United States alleges that it held "discussions in the months subsequent to the July 15 and August 14 Letters" with Commissioner Beals's representatives, but that the Virginia voter data was never produced to its satisfaction. Am. Compl. ¶ 27. On January 16, 2026, the United States filed this lawsuit—one of at least thirty-one nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Virginia voter data.[1] After a new governor, Abigail Spanberger, was sworn in as the Governor of

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026), https://perma.cc/8X8U-F9PF; Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/8SCK-89KR; Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-

Virginia on January 17, 2026, she appointed a new Commissioner of the Virginia Department of Elections, Steven Koski. Am. Compl. ¶ 28. The United States later filed its First Amended Complaint on March 19, 2026. Dkt. No. 28.

## II.     The United States Seeks to Unlawfully Construct a National Voter Database with the Requested Data.

According to extensive public reporting, DOJ's requests for private, sensitive voter data from Virginia and other states do not appear to relate to voter roll list maintenance under the NVRA and HAVA, the statutes invoked in the August 14 Letter. Rather, they appear to be in connection with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize state voter rolls—all part of a broader effort to "nationalize" elections.

According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.   DOJ   is coordinating these unprecedented efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it:

---

WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[3] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[4] These actors and their associates have previously sought to compel

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAP.-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

[4] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://perma.cc/E87D-XDRX; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization*

states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by "PA Fair Elections," a group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[5]

For example, in the months before the 2024 election, Honey and an organization affiliated with her, PA Fair Elections, pushed an effort to remove thousands of lawful Pennsylvania voters from the rolls, based on faulty sources of voter data such as "Eagle AI," a voter database analysis tool supported by Mitchell and her Election Integrity Network.[6] Then, on the eve of the 2024 election, over 4,000 Pennsylvania voters were subjected to mass-challenges lodged by individuals affiliated with PA Fair Elections.[7] Public reporting and contemporaneous hearing testimony

---

*of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q.

[5] *See, e.g.*, Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT (Feb. 12, 2024), https://perma.cc/HQ9C-TMT7 (discussing Honey's "false" claims regarding voting in Pennsylvania in 2020 and her extensive collaboration with Mitchell); *see also* Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LANCASTERONLINE (July 21, 2024), https://perma.cc/K92T-L288 (describing Mitchell meeting with PA Fair Elections).

[6] *See* Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024), https://perma.cc/8FNC-5KH9; *see also* Kroll & Surgey, *supra*, https://perma.cc/4MEZ-82SF ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[7] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E (same).

confirmed that PA Fair Elections helped facilitate these challenges, which were based on self-evidently flawed attempts to analyze and match data from the Pennsylvania voter database with external sources.[8] The baseless voter challenges were eventually all rejected. *See, e.g.*, Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5.

According to public reporting, as another part of its efforts to use novel and unspecified forms of data analysis to scrutinize state voter data and target voters for potential disenfranchisement, DOJ last year asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[9] DOJ officials have since claimed that "we've checked 47.5 million voter records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting indicates that these efforts are producing false positives—*i.e.*, that they are incorrectly flagging U.S. citizens as being non-citizens who are ineligible to vote.[10]

---

[8] *E.g.*, Bethany Rodgers, *Testimony: Pa. Election Denial Group Behind Voter Registration Cancellation Form Mailings*, GOERIE.COM (Nov. 2, 2024), https://www.goerie.com/story/news/politics/elections/state/2024/11/02/pa-voter-registration-cancellation-letters-chester-county/75996247007. A challenger in one county testified about PA Fair Elections' involvement. Chester County, *Nov. 1, 2024 Election Board Hearing* at 50:30-51:34; 58:00-58:47; 1:54:58-1:55:19, https://chestercopa.portal.civicclerk.com/event/852/media.

[9] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[10] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

A federal court filing by DOJ from earlier this year further corroborates how United States officials have been seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques, and have been working with outside "election integrity" advocates seeking to deny election results in those efforts. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration (SSA):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filing, which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

## III.    The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters.

Additional federal government documents indicate how that the United States ultimately plans to use voters' sensitive personal data: to assert control over voting eligibility in the states, to order the disenfranchisement of voters, and potentially to contest the results of state-run elections. In February this year, President Trump announced his desire to "nationalize" elections in certain

states: "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting." Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

In connection with its requests for states' voter data, the United States has asked states to execute a memorandum of understanding ("MOU") describing how the data will be used. *See* Ex. A, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"). The terms of the MOU purport to vest the United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and then to compel states to remove these voters from the rolls, depriving them of the franchise.

The NVRA and HAVA give states the responsibility of conducting a "reasonable effort" to maintain voter lists and remove actually ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A). The particular procedures developed for complying with HAVA's requirement to maintain a centralized voter file are thus "left to the discretion of the State." 52 U.S.C. § 21085. Moreover, the NVRA builds in significant protections for voters, requiring that, once identified, certain potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake. *Id.* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of protecting and expanding the right to register to vote and participate in democracy. *E.g.*, 52 U.S.C. § 20501.

The terms of the MOU, however, purport to place authority to identify supposed ineligible voters in the hands of the federal government. MOU at 2, 5. The MOU makes DOJ a "Custodian" of the state's voter file, and provides that DOJ will analyze the file and identify "any voter list

10

maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's [voter list] for NVRA and HAVA compliance, i.e., that your state's [voter list] only includes eligible voters." MOU at 4–5. And under the MOU's terms, once federal officials identify supposed "ineligible voters," states would be required to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis, MOU at 5. These removals would be required under the terms of the MOU notwithstanding the procedural protections afforded to voters by the NVRA, including the statute's firm bar on systematic removals of voters within 90 days of an election, 52 U.S.C. § 20507.[11]

DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. In its July 15 Letter, the DOJ requested information on "what actions Virginia is taking to ensure that voters who should not be on the voter rolls are being removed" and the number of voters removed from the rolls due to a felony conviction or lack of citizenship. July 15 Letter at 2–3. Many of these same voters are uniquely vulnerable to being wrongly removed from the voter rolls based on imperfect data matching systems, including naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization) and voters with felony convictions (who may have been previously ineligible to vote before their voting rights were restored).

Recent events have further highlighted the extremely abnormal nature of the United States' request. On January 24, 2026, then-Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin

---

[11] *See also* Jonathan Shorman, *Trump's DOJ Offers States Confidential Deal to Remove Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

11

Cities amidst ongoing violence against the civilian population there.[12] The letter purported to set out three actions that Minnesota—which is one of the states DOJ has sued to try to obtain sensitive voter data—should take to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[13]

More recently, the President issued an executive order, "Ensuring Citizenship Verification and Integrity in Federal Elections." Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026). The order calls for DHS to "compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens" who reside in the state and will be over eighteen at the time of the next federal election. *Id*. § 2(a), at 17125. DHS is to use "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," in doing so. *Id*. The order also directs the United States Postal Service to provide each state with a list of voters "who are enrolled with the USPS . . . for mail-in or absentee ballots," and, remarkably, to refuse to transmit a ballot "from any individual unless those individuals have been enrolled on a State-specific list." *Id*. § 3(b)(iii)–(iv), at 17126.

In short, extensive public reporting, court filings, and the President's and DOJ officials' statements indicate that the United States's aim in seeking sensitive voter data is to create tools for unlawfully mass-challenging voters and interfering with states' democratic processes.

---

[12] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

[13] Bondi Letter at 2, 3.

**LEGAL STANDARD**

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

Thus, in practice, while courts "accept[] all well-pled facts as true and construe[] these facts in the light most favorable to the plaintiff," they ignore "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Courts can also "consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," as well as "documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (internal citations and quotation marks omitted).

**ARGUMENT**

**I.    THE UNITED STATES SEEKS RECORDS OUTSIDE THE SCOPE OF TITLE III.**

The United States' request stumbles out of the gate because it seeks records that are not covered by Title III in the first place.

Section 301 of Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303—the provision granting the Attorney General

13

authority to request records—only obligates officials to turn over "[a]ny record or paper required by [Section 301] to be retained and preserved," *id*. § 20703; that is to say, only those records that have "come into [their] possession," *id*. § 20701.

While Section 301's reference to "all records and papers" is sweeping, Title III is distinct from other statutory records provisions in that it provides an immediate textual limitation on that broad language. The phrase "come into . . . possession," refers to records that elections officials *obtain*, rather than those they create. *Benson*, 2026 WL 362789, at *9 ("Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." (emphasis in original) (collecting federal statutes)); *accord Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" as a matter of 1960s and contemporary usage); *United States v. Dobbs*, 629 F.3d 1199, 1203–04 (10th Cir. 2011) (defining "receive" as "to come into possession of" or "to accept an object and to have the ability to control it"); *see also United States v. Lamin*, No. 21-4547, 2022 WL 16757925, at *2 (4th Cir. Nov. 8, 2022) (unpublished) (noting that *Honeycutt* "confirms" that an individual "obtains" something "when he 'come[s] into possession of' or 'acquire[s]' it").

Just as the court in *Benson* noted with respect to Michigan, Virginia's statewide voter registration file is a live, continuously-updated document created by state officials—so it is not a record or paper "which come[s] into [election officials'] possession." *Benson*, 2026 WL 362789, at *6, 10–11. This reading makes sense in light of the history that motivated Title III. Congress's primary concern in fashioning Title III was to allow the Attorney General to stop election officials from receiving voter registration applications from Black voters and then refusing to process or even destroying them. *See id*. at *9 (quoting a 1959 report from the United States Commission on Civil Rights finding that "[r]ejected [voter registration] applications were destroyed approximately

14

30 days after being rejected, which fact made accurate statistical review of the records impossible"); *see also, e.g.*, 106 Cong. Rec. 3693 (1960) (Sen. Javits) ("[e]xperience has shown that local registration officials engage in every possible dilatory tactic to delay enforcement of voting rights").

The records DOJ seeks from Virginia officials are not ones that "come into [their] possession," 52 U.S.C. § 20701; they are records that those officials create themselves. DOJ's request therefore falls outside of the scope of Title III, so its demand fails as a matter of law. The case can be dismissed for this reason alone.

## II.    THE UNITED STATES HAS NOT COMPLIED WITH TITLE III'S BASIS AND PURPOSE REQUIREMENT.

Even if the DOJ sought records that were covered by Title III, the Attorney General's access to records under Title III is not unbounded. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative . . . be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. "This demand *shall* contain a statement of *the basis __and__ the purpose* therefor." *Id.* (emphases added).

Consistent with the statutory text, contemporaneous case law immediately following the enactment of Title III of the CRA consistently treated "the basis" and "the purpose" as two related, but distinct, concepts. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The "basis" is the factual explanation of *why* the Attorney General believes there is a violation of federal civil rights law in the first place, whereas the "purpose" explains *how* the requested records would help the Attorney General ultimately determine if there is, in fact, a

15

violation of the law. *Lynd*, 306 F.2d at 229 n.6 (noting written demand stating "[t]his demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction" and stating "[t]he purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred").

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 816 F. Supp. 3d at 1184. The statutory requirement is not perfunctory or "a mere formality with which the federal government . . . is free to dispense," *Galvin*, 2026 WL 972129, at *3; it requires a specific statement of the factual circumstances prompting the request and an explanation how that information will aid in the investigatory analysis. The basis-and-purpose requirement prevents the statute from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *Weber*, 816 F. Supp. 3d at 1184; *accord Amore*, 2026 WL 1040637, at *5. That is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, including in the context of administrative subpoenas, where courts have found that the test of whether federal demands for records are enforceable includes an evaluation of whether the underlying investigation is "conducted pursuant to a legitimate purpose," *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 161–62 (4th Cir. 2022) (quoting *United States v. Powell*, 379 U.S. 48, 57 (1964)), and that such subpoenas are not in service of "unnecessary examination or investigations," *United States v. Rosinsky*, 547 F.2d 249, 253 (4th Cir. 1977) (internal quotation marks omitted). Indeed, courts have explained that such a purpose requirement ensures that the information sought

16

is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

As set forth below, the United States failed to articulate in its demand and in the Amended Complaint "the basis and the purpose" for its request for Virginia voters' sensitive voter information. The United States' demand fails to meet this requirement of the CRA for at least three distinct reasons. These failures warrant dismissal of the case.

*First*, the United States simply has not stated a proper "basis" for its demand at all. The United States alleges that its August 14 Letter, which first invoked Title III for its demand, "contain[ed] a statement of the basis and the purpose therefor." Am. Compl. ¶¶ 29–30. But while the August 14 Letter stated that "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," August 14 Letter; Am. Compl. ¶ 26, it never stated any basis for the request, *see* August 14 Letter. Where, as here, a plaintiff's complaint is contradicted by the documents incorporated by reference therein, such as the August 14 Letter, "crediting the document over conflicting allegations in the complaint is proper." *E.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016). Again, the "basis" for a CRA request is a factual explanation of *why* the United States believes there is some relevant violation of law. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at \*9 (holding the basis prong requires "a factual basis for investigating a violation of a federal statute"); *Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Galvin*, 2026 WL 972129, at \*3 (describing the basis as "the foundation or chief supporting factor for the demand," or "a statement of *why* the Attorney General demands production of the requested records" (emphasis in original)); *Amore*, 2026 WL 1040637, at \*5 ("[T]he 'basis'

17

contemplated by Title III is a factual, not legal basis."); *see also Basis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/basis ("something on which something else is established or based"). Here, the United States has made no attempt to assert the factual basis for its request. *See* August 14 Letter.

Nor is any other potential "basis" for the request pleaded. The Complaint alleges that DOJ was at one point "seeking information regarding Virginia's compliance with federal election law," specifically the NVRA and HAVA, based on its review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"). Am. Compl. ¶ 19–24; *see* July 15 Letter. But the Amended Complaint does not allege evidence of anything inconsistent with reasonable list maintenance efforts in the data Virginia reported to EAVS. *See* Am. Compl. ¶¶ 19–26. The United States's failure to properly set forth any "basis" for the demand is sufficient grounds for dismissal of this action. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1184; *Galvin*, 2026 WL 972129, at *3–6.

*Second*, even if the United States had provided a proper "basis" for its demand—and it did not—it also did not explain, and has not explained, any connection between its stated "purpose" and the vast scope of its records request here, seeking the full and unredacted Virginia statewide voter file. Neither DOJ's letters nor the Amended Complaint even attempt to explain *how* unredacted voter files are necessary to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," Am. Compl. ¶¶ 21–26. Indeed, this misunderstands Virginia's obligation under the NVRA: to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507. *See* Am. Compl. ¶ 12.

An unredacted voter registration file is not necessary—or even effective—to investigate Virginia's compliance with the NVRA. A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Am. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a)(4), (c)(1); § 21083(a)(2)(A); § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file, representing one point in time, does not. And even if the United States used voter file data to identify voters who had purportedly moved or died on Virginia's voter list at a single point in time, that would not amount to Virginia failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[14] Indeed, the inclusion on Virginia's voter registration list at any particular point in time of some voters who may have moved is, if anything, to be expected. Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d). This striking mismatch

---

[14] Indeed, the inclusion on Virginia's voter registration list at any particular point in time of some voters who may have moved is, if anything, to be expected. Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

between DOJ's stated purpose and the actual operation of the NVRA provides yet another reason to reject the request. *See Oregon*, 2026 WL 318402, at *9 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function.").

Moreover, even if some portion of the voter file were necessary to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," Am. Compl. ¶ 26 (quoting August 14 Letter), the United States has not pleaded or otherwise pointed to any justification for why the full unredacted voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). The United States' failure to articulate the basis and the purpose for its demand for the *full and unredacted* voter file, in particular, is also fatal to its demand.

*Third*, even if the United States had plausibly set forth some facially sufficient statement of the basis and the purpose for its request related to compliance with the NVRA and HAVA, the CRA claim would also be subject to dismissal because DOJ's stated reason for requesting the sensitive personal data of millions of Virginia voters is pretextual.

Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. 52 U.S.C. § 20703 (emphasis added). By twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying

20

the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184.

A court need not close its eyes to a "significant mismatch" between the stated and actual reasons behind a government action. *Dep't of Comm. v. New York*, 588 U.S. 752, 755, 785 (2019) (rejecting agency's "contrived" justification and refusing to "exhibit a naiveté from which ordinary citizens are free"). Even on a motion to dismiss, this Court has discretion to take judicial notice of certain facts, including from public records incorporated by reference into the Complaint and attached to the motion to dismiss. *See Just Puppies, Inc.*, 123 F.4th at 660. For example, this court may take judicial notice of related court proceedings, such as the thirty other cases seeking a statewide voter file. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239–40 (4th Cir. 1989). It may also take judicial notice of government documents produced by DOJ, such as the MOU. *See, e.g., Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019); *see also, e.g.*, *Navigators Ins. Co. v. Under Armour, Inc.*, 165 F.4th 171, 180 n.9 (4th Cir. 2026).

Public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, DOGE-inspired forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* 5–12 & nn.7–13. As the *Weber* court characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest

21

to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 816 F. Supp. 3d at 1184.

The creation of a national voter database—much less one designed for targeting and mass-challenging voters—has never been authorized by Congress, and would violate (among other provisions of federal law) the federal Privacy Act's prohibition on the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote. *See* 5 U.S.C. § 552a(e)(7).

Now consider the MOU that the United States has recently sought for states to sign in connection with its requests for statewide voter files. *See supra* 13–14. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, this MOU runs directly afoul of those statutes. As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507(a)(4), 21083 (a)(4)(A), and the NVRA includes safeguards to protect voters from erroneous removal, *id*. § 20507, including requirements that certain voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *id*. § 20507(d)(1)(B). But the MOU indicates multiple contemplated violations of those statutory requirements. First, it seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." 52 U.S.C. § 21085; MOU at 2, 5. Second, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and potentially the firm bar against systematic voter removals within 90 days of an election. 52 U.S.C. § 20507. The MOU confirms

22

that DOJ's stated purpose of ensuring compliance with the NVRA and HAVA is not accurate or plausible, and that its actual purpose for seeking to ingest the sensitive personal information of millions of Virginia voters involves defying those statutes and the procedural protections they afford in order to unlawfully centralize control over state voter rolls in the hands of the federal executive.

And now consider the Attorney General's letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data in order to help "support ICE officers" and "bring an end to the chaos" being inflicted on the civilian population there by DHS agents ostensibly tasked with enforcing the immigration laws. *See supra* 11–12. The Bondi Letter, purporting to connect DOJ's request for state voter data with the Administration's draconian immigration-enforcement efforts, further highlights DOJ's failure to disclose the true purpose of the request here. Indeed, reporting recently exposed that DOJ and DHS "are close to finalizing an agreement that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations." Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026), https://perma.cc/2MAW-LL89. DOJ "will share voter roll data that its Civil Rights Division is collecting from states with Immigration and Customs Enforcement Homeland Security Investigations as part of an effort to determine whether non-citizens are unlawfully registered or have cast ballots in prior elections." *Id*. DOJ acknowledged these plans at a hearing in DOJ's lawsuit seeking Rhode Island's voter list, stating that it is "certainly" its "intention" to "run [the lists] against DHS's SAVE database." *See* Ex. B, Mar. 26, 2026 Transcript of Hearing from *United States v. Amore*, No. 1:25-cv-639-MSM-PAS, at 50:17–23. DOJ also admitted that it "cannot promise what any other agency will or will not do" with the data. *Id.* at 66:12–14; 66:8–9

23

(answering whether the lists would be used "for ICE going to people's homes and arresting them").

Meanwhile, President Trump's Executive Order No. 14399 directs agencies to aggregate registration and citizenship data across the executive branch for eligibility screening and enforcement purposes. Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026).

The United States' failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state *the* true purpose for the demand for Virginians' protected personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 816 F. Supp. 3d at 1186; *accord Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

Under the circumstances here, the United States' invocation of Title III of the CRA fails in multiple ways to provide a statutorily sufficient "statement of the basis and the purpose" for its demand and does not comply with the CRA. Dismissal is proper.[15]

## III. THE UNITED STATES' DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND CONSTITUTIONAL RIGHTS OF VOTERS.

Even had the United States requested records covered by Title III and even if it had complied with statutory requirements regarding its request—neither of which it did— its request would also be legally deficient because it does not allow for redactions, omissions, or other

---

[15] Dismissal on the ground of pretext as set forth above would also be proper under Federal Rule of Civil Procedure 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Federal Rule of Civil Procedure 56.

24

modifications to protect the privacy rights of Virginia voters. The text of Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts, including the Fourth Circuit, have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. But the United States has nevertheless sought the full and unredacted voter file. Am. Compl. ¶¶ 22, 25 & p.8. Its CRA claim is accordingly defective and may be dismissed on that ground as well.

Redaction and modification of voting records to ensure voters' privacy is commonplace before a State discloses such records to a requesting party. Prior to these recent lawsuits by the United States, the requirements of Title III of the CRA had not been litigated in decades, but the NVRA provides a ready analogue. The NVRA requires States to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" and to make such records available for "public inspection" upon request. 52 U.S.C. § 20507(i); *see also* Am. Compl. ¶¶ 11–13 (discussing the NVRA). Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to such records under the NVRA. Voting rights advocates have thus consistently relied on the NVRA to investigate infringements of the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university). And courts have consistently held that redacting voters' sensitive personal data is appropriate and even necessary under the NVRA.

25

The text of the NVRA does not address redaction, but the Fourth Circuit has recognized that, in disclosing voting-related information pursuant to the NVRA's public records provisions, "uniquely sensitive information" may properly be redacted. *Long*, 682 F.3d at 339; *accord Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," such redaction of "certain personal information" may be required to "assuage the potential privacy risks implicated by the public release of the Voter File"). Courts must interpret the disclosure provisions in statutes like the NVRA and the CRA in a manner that does not unconstitutionally burden the right to vote. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) ("We are obligated to construe a statute to avoid constitutional problems" where "such a reading is fairly possible") (citation modified). Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and even in some cases require—redaction and the protection of confidential material. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021) (NVRA disclosure provisions "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies" and protecting sensitive information from disclosure); *see also Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Just like the NVRA, the CRA is also silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* § 20507(i)(1). Courts' treatment of

26

information requests under the NVRA is thus highly instructive in this case—and as with the NVRA, the disclosure provisions of Title III of the CRA must be construed to avoid intolerable burdens on critical privacy rights. *See Long*, 682 F.3d at 339; *see also Bellows*, 92 F.4th at 56; *N.C. State Bd. of Elections*, 996 F.3d at 264. *Cf. Sheetz v. Cnty. of El Dorado, Cal.*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules.").

Redaction of voters' personal identifying information would be required here for that reason. Disclosure of voters' sensitive personal information would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). For example, the Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying pursuant to the NVRA's disclosure provisions, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[16] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of voters' personal information risked deterring citizens from registering to vote in the first place, and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339. The danger of imposing those burdens on Virginia voters and

---

[16] The United States itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae at 11, 25–26, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *11, 25–26.

good-government civic groups like Common Cause is present here. *See* Declaration of Suzanne

Almeida, Dkt. No. 15-1, at ¶¶ 11–13.

Federal statutory law would meanwhile require (at a minimum) both substantial redaction

of sensitive information like Social Security and Driver's License Number information, as well as

significant additional procedural steps such as a "privacy impact statement" and hard limitations

on interagency sharing in order to comply with the guardrails mandated by the Federal Privacy

Act, the E-Government Act, and the Driver's Privacy Protection Act. *Weber*, 816 F. Supp. 3d at

1192–95 (holding that United States' request for complete California voter file would violate each

of these statues).[17]

The limited case law considering records requests under the CRA is not contrary to any of

this. Even in the very different context of the Jim Crow South in the early 1960s, the CRA cases

expressly acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*,

306 F.2d at 230, and to shield voters' private, sensitive personal information from disclosure. *See*

*id.* at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing

with public records which ought ordinarily to be open to legitimate reasonable inspection"); *see*

*also In re Coleman*, 208 F. Supp. at 200 (noting, in the context of a records request under Title III

---

[17] The Privacy Act flatly prohibits collecting and maintaining records of First Amendment activity, which includes voting history and party affiliation. 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). It also requires the publication of notice in the Federal Register before the collection of data, *id.* § 552a(e)(4), which the United States does not allege it did here, *see Weber*, 816 F. Supp. 3d at 1193. The E-Government Act requires the publication of a "privacy impact assessment" "prior to 'initiating a new collection of information' that 'includes any information in an identifiable form permitting the physical or online contacting of a specific individual' if the information encompasses '10 or more persons.'" *Id.* at 1194 (quoting E-Government Act § 208(b)). Again, the United States does not allege it did that here. Finally, the Driver's Privacy Protection Act "prevents the disclosure of 'personal information' that is obtained by" a state Department of Motor Vehicles "in connection with a 'motor vehicle record.'" *Id.* (quoting 18 U.S.C. §§ 2721(a), 2725(1), (3), & (4); *Reno v. Condon*, 528 U.S. 141, 143 (2000)). Virginia receives voter information from its Department of Motor Vehicles.

of the CRA, multiple considerations not at issue in that case but which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right").

Despite the need for privacy protections for voters' sensitive personal information, the United States nevertheless demands the full, unredacted voter file with no redactions, modifications, and/or other procedural steps to protect voters' and ensure compliance with federal law. That is a fatal deficiency. Even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information would need to be redacted or omitted. Conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation modified). The United States's claim seeking the full and unredacted voter file and the sensitive personal identifying information of every registered Virginia voter must be dismissed.

**CONCLUSION**

The United States' First Amended Complaint should be dismissed.

Dated: May 19, 2026                          Respectfully submitted,

/s/ Davin Rosborough
Ari J. Savitzky*
Davin Rosborough (Va. Bar No. 85935)
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Facsimile: (212) 549-2539
asavitzky@aclu.org
drosborough@aclu.org
slakin@aclu.org

29

Patricia J. Yan*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
pyan@aclu.org

*Counsel for Intervenor-Defendants Common Cause and Katherine Ellena*


\* Admitted *pro hac vice*

30