# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

UNITED STATES OF AMERICA,

        *Plaintiff*,

    v.

STEVEN KOSKI, in his official capacity as
Commissioner of the Virginia Department of
Elections,

        *Defendant*.

No. 3:26-cv-42

## BRIEF IN OPPOSITION TO UNITED STATES' MOTION TO COMPEL

Jay Jones
 *Attorney General*

Travis G. Hill
 *Chief Deputy Attorney General*

Tillman J. Breckenridge (#84657)*
 *Solicitor General*

Triston Chase O'Savio (#100111)*
 *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

May 26, 2026

*Counsel of Record for Defendant*

**TABLE OF CONTENTS**

Introduction ................................................................................................................ 1

Statement of the Case .............................................................................................. 2

    A.    Factual background ............................................................................ 2

    B.    Additional facts that courts have judicially noticed in parallel actions ...... 3

    C.    Relevant federal statutes ................................................................... 5

    D.    Procedural history ............................................................................. 6

Argument .................................................................................................................. 8

    I.    These proceedings are governed by the ordinary Federal Rules of Civil Procedure, which do not permit the "summary" disposition of this action that the United States seeks .................................................................... 8

    II.    The requested statewide voter registration list is not a "record" within the meaning of Title III of the Civil Rights Act ........................................... 12

    III.    The U.S. Attorney General's written demand lacks a sufficient basis and purpose under Title III of the Civil Rights Act ...................................... 17

        A.    Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding the state's records ............................................................................... 17

        B.    The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted ............................................................. 18

        C.    The U.S. Attorney General's written demand provided no factual basis for demanding Virginia's complete and unredacted statewide voter registration list ............................................................................. 19

        D.    The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient under Title III ................................................................................................. 20

            1.    The written demand lacks any reference or relation to the purposes for which Title III was enacted ....................................... 20

            2.    Investigating NVRA and HAVA compliance is an insufficient purpose to invoke Title III ........................................................... 21

            3.    This Court can reject a contrived purpose ................................... 22

    IV.    The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state law .................................... 24

        A.    Virginia law prohibits sharing much of the sensitive information that the U.S. Department of Justice requests ................................................... 24

        B.    Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information ................................................. 26

C.    The U.S. Attorney General's demand further failed to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002 ........................................................................................... 27

Conclusion .............................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ...................................................................................... 22

*Bostock v. Clayton County*,
590 U.S. 644 (2020)......................................................................................................... 16

*Crooks v. Harrelson*,
282 U.S. 55 (1930)........................................................................................................... 17

*Davis v. Michigan Department of Treasury*,
489 U.S. 803 (1989) ........................................................................................................ 14

*Donaldson v. United States*,
400 U.S. 517 (1971)................................................................................................... 10, 11

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ............................................................................... 18

*Judicial Watch, Inc. v. Lamone*,
399 F. Supp. 3d 425 (D. Md. 2019)................................................................................. 16

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) ..................................................................................... 18, 22

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ............................................ 1, 8, 9, 11, 12, 18, 20, 26

*New Hampshire Fire Ins. Co. v. Scanlon*,
362 U.S. 404 (1960)........................................................................................................... 9

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) ........................................................................... 26

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024)............................................................................................... 26

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
996 F.3d 257 (4th Cir. 2021) ........................................................................................... 26

*United States v. Amore*,
No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)......... 7, 9, 10, 17, 18, 21

*United States v. Bellows*,
No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026)....................... 8, 13, 15, 21

iv

*United States v. Benson*,
  No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ...................... 7, 13, 14, 15, 20

*United States v. Fontes*,
  No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. April 28, 2026)................ 7, 8, 13, 15

*United States v. Galvin*,
  No. 25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026).................. 5, 7, 17, 18, 19, 20, 23

*United States v. Oregon*,
  No. 6:25-cv-1666, 2026 WL 318402
  (D. Or. Feb. 5, 2026).................................... 4, 5, 7, 9, 10, 11, 17, 18, 19, 20, 21, 22, 23, 24, 27

*United States v. Powell*,
  379 U.S. 48 (1964)................................................................................................ 9, 10, 23

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................ 3, 5, 7, 10, 17, 18, 19, 21, 22, 23, 24, 26

*United States v. Wis. Elections Comm'n*,
  No. 25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ............. 8, 13, 15, 16, 17

**Statutes**

26 U.S.C. § 7604 .................................................................................................................... 9

5 U.S.C. § 552a .................................................................................................................... 27

52 U.S.C. § 20501 ................................................................................................................. 5

52 U.S.C. § 20507 ................................................................................... 2, 5, 13, 14, 15, 16, 22

52 U.S.C. § 20701 ............................................................................................ 3, 5, 12, 13, 14, 15

52 U.S.C. § 20702 ............................................................................................................. 5, 15

52 U.S.C. § 20703 ........................................................................................... 5, 6, 15, 17, 18, 19, 20

52 U.S.C. § 20705 ................................................................................................................. 9

52 U.S.C. § 21083 .................................................................................................... 5, 13, 14, 15

52 U.S.C. § 21085 ......................................................................................................... 5, 13, 22

Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921–23 (2002) .................................................. 27

Va. Code § 2.2-3808.1 ........................................................................................................... 25

Va. Code § 24.2-404 ............................................................................................................... 25

Va. Code § 24.2-405 ............................................................................................ 25

Va. Code § 24.2-406 ............................................................................................ 25

Va. Code § 24.2-407.1 ......................................................................................... 25

Va. Code § 24.2-444 ...................................................................................... 17, 25

Va. Code § 24-1002.1 .................................................................................... 25, 26

**Rules**

Fed. R. Civ. P. 1 ................................................................................................... 8

Fed. R. Civ. P. 3 ............................................................................................... 8, 11

Fed. R. Civ. P. 8 ................................................................................................. 11

Fed. R. Civ. P. 12 ............................................................................................... 11

Fed. R. Civ. P. 24 ............................................................................................... 11

Fed. R. Civ. P. 26 ............................................................................................... 11

Fed. R. Civ. P. 39 ............................................................................................... 12

Fed. R. Civ. P. 56 ............................................................................................... 12

Fed. R. Civ. P. 81 ......................................................................................... 8, 9, 10

**Other Authorities**

Letter from Attorney General Pamela Bondi to Minnesota Governor Tim Walz
   (Jan. 24, 2026), *available at* https://www.sos.mn.gov/media/wihf4a05/
   ag-bondi-gov-walz-letter-012426.pdf .............................................................. 4, 23

U.S. Commission on Civil Rights, Report of the United States Commission on Civil
   Rights (Sept. 9, 1959), https://perma.cc/2PDF-GZHB ..................................... 13, 21

**INTRODUCTION**

After filing its amended complaint, the United States filed a motion to compel production of "the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." Dkt. 39 at 2. This request should sound familiar: it is the same relief that the United States raises in its amended complaint. Am. Compl. at 8. But this time, the United States claims it is entitled to the requested voter registration list "immediately," Mot. 2, and that this Court's role in adjudicating the case before it is "severely limited," Mot. 4 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962)).

Nothing in Title III of the Civil Rights Act disturbs this Court's ordinary authority under the Federal Rules of Civil Procedure, which govern virtually "all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1, 81. Because the Federal Rules of Civil Procedure govern, this Court should deny the motion, which seeks to circumvent the process that those Rules require. At minimum, this Court should resolve the motion to dismiss before considering the United States' motion to compel, and if it does not dismiss the action, it should permit discovery and supplemental briefing before ruling on the United States' motion to compel.

To the extent that this Court reaches the merits of the motion to compel, it should deny the motion. The United States is not entitled to the complete, unredacted, statewide voter registration list that it seeks for at least four reasons. First, Virginia's statewide voter registration list is not the type of "record" relating to a federal election that state elections officials must preserve, retain, and make available for inspection under Title III. Second, the exhibits that the United States attaches to its motion to compel confirm that the U.S. Attorney General's written demand failed

1

to state the factual basis for demanding Virginia's statewide voter registration list, a prerequisite to states making any record available for inspection. Third, the purpose contained in the U.S. Attorney General's written demand was both contrived and insufficient to require Virginia to make records available under Title III. Finally, granting the United States' requested relief would violate both state and federal law.

**STATEMENT OF THE CASE**

### A.  Factual background

In July 2025, the U.S. Department of Justice sent a letter to then-Commissioner of the Virginia Department of Elections Susan Beals. Dkt. 39-3, Ltr. from Michael E. Gates to Susan Beals (July 15, 2025) (the "July 2025 Request"). In the July 2025 Request, the U.S. Attorney General asks that the Virginia Department of Elections ("ELECT") "produce for inspection the following records" pursuant to "Section 20507(i) of the [National Voter Registration Act ('NVRA')]":

> The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

July 2025 Request at 2. The July 2025 Request makes no reference to Title III of the Civil Rights Act and does not use the word "demand," nor does it state the basis or the purpose of the U.S. Attorney General's request for the statewide voter registration list.

In August 2025, the U.S. Department of Justice sent a second letter to then-Commissioner Beals. Dkt. 39-4, Ltr. from Harmeet K. Dhillon to Susan Beals (Aug. 14, 2025) (the "August 2025 Demand"). This time, in addition to invoking the NVRA and the Help America Vote Act

2

("HAVA"), the letter states that "the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ('CRA'), codified at 52 U.S.C. § 20701, et seq.," and that "the Attorney General is demanding an electronic copy of Virginia's complete and current [voter registration list]." Aug. 2025 Demand at 2–3. The August 2025 Demand reiterates that the U.S. Attorney General requests a copy of the list that contains "*all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." *Id.* at 3. The August 2025 Demand includes no factual basis for the U.S. Attorney General's demand, and it asserts that "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*

On January 8, 2026, representatives from the Commonwealth informed the United States in an in-person meeting that Commissioner Beals "would not be providing" the statewide voter registration list to the U.S. Attorney General. Neff Decl. ¶ 12. The current ELECT Commissioner, Steven Koski, likewise has not provided the full, unredacted statewide voter registration list that the U.S. Attorney General has requested. Neff Decl. ¶ 13.

**B.    Additional facts that courts have judicially noticed in parallel actions**

As one federal court considering a parallel action has judicially noticed: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *United States v. Weber*, 816 F. Supp. 3d 1168, 1185 (C.D. Cal. 2026) (collecting citations).

In January 2026, the U.S. Attorney General tied her demands for state voter rolls directly to immigration enforcement in a letter to Minnesota Governor Tim Walz. Ltr. from U.S. Attorney

General Pamela Bondi to Minn. Governor Tim Walz (Jan. 24, 2026), *available at* https://www.sos.mn.gov/media/wihf4a05/ag-bondi-gov-walz-letter-012426.pdf (last accessed May 18, 2026) ("Bondi Minn. Ltr."). "The letter details the Attorney General's views about the state of 'lawlessness' regarding immigration enforcement in Minnesota and concludes with a list of demands to 'restore the rule of law' through 'common sense solutions,'" including "a demand for Minnesota to 'allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960.'" *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) (noticing same letter from U.S. Attorney General Bondi).

More recently, the United States' counsel has admitted this additional purpose of immigration enforcement in the context of parallel litigation. When a federal court asked the United States' counsel in the lawsuit seeking Rhode Island's voter registration list whether the U.S. Department of Justice can "take this list and send it to Homeland Security and say, hey, check this out to see if any of these people are not citizens,'" counsel for the United States responded, "In compliance with all federal laws, yes, *and we intend to do so*." ECF No. 47 at 65, *United States v. Amore*, No. 25-cv-00639 (D.R.I. Mar. 30, 2026) (emphasis added).

The U.S. Department of Justice's representations of a broader purpose for collecting states' voter rolls are consistent with reports from other federal agencies that "point to the federal government laying the groundwork to amass the personal information of millions of Americans in a centralized database," including by enlisting technology company Palantir to "build a massive repository that can house data collected from multiple federal agencies such as the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services," and by pressuring states to disclose to the federal government other "sensitive

information from programs like the Supplemental Nutritional Assistance Program (SNAP), as well as data from Medicaid." *Weber*, 816 F. Supp. 3d at 1185.

### C.       Relevant federal statutes

The United States repeatedly mentions the NVRA and HAVA in its complaint. The NVRA was enacted "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Similarly, HAVA regulates and requires states to maintain a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). Together, the NVRA and HAVA require states "to undertake an ongoing program of voter-list maintenance, though federal law largely leaves the finer details of list maintenance to the states' discretion." *United States v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129, at *1 (D. Mass. Apr. 9, 2026) (citing 52 U.S.C. §§ 20507, 21083, 21085).

Despite the complaint's many references to the NVRA and HAVA, the United States brought its only cause of action under a different federal statute: the Civil Rights Act. Title III of the Civil Rights Act provides the United States government with certain tools to root out racial discrimination in voting in federal elections and imposes a process by which the federal government can use those tools to investigate the infringement of voters' rights. *See Oregon*, 2026 WL 318402, at *10. First, Title III requires state election officers to retain certain records related to voting in a federal election for twenty-two months following the date of the federal election. 52 U.S.C. § 20701. Second, it imposes penalties for theft, destruction, or alteration of those covered records. *Id.* § 20702. Third, it requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "a statement of the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." *Id.* § 20703.

### D.    Procedural history

The U.S. Department of Justice filed its initial complaint against then-Commissioner Susan Beals on January 16, 2026. *See* Dkt. 1, Compl. On March 19, 2026, the U.S. Department of Justice filed an amended complaint, which named current ELECT Commissioner Steven Koski as the defendant in former Commissioner Beals' stead. *See* Dkt. 28, Am. Compl.

The amended complaint alleges one cause of action: a violation of the Civil Rights Act, 52 U.S.C. §§ 20703. Am. Compl. ¶¶ 29–31. The complaint seeks the following relief: a declaration that Commissioner Koski violated the Civil Rights Act by refusing to provide the requested records, and an order requiring Commissioner Koski "to provide to the Attorney General the current electronic copy of Virginia's computerized voter registration list, with all fields," including the "full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier" for each registered voter. Am. Compl. at 8.

Shortly after filing the amended complaint, the United States filed the instant motion to compel. This motion, too, seeks all of the relief requested in the complaint: a declaration that "Commissioner Koski's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703," and an order requiring Commissioner Koski to produce "the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." Mot. 2.

6

This action is one of at least 30 that the U.S. Department of Justice has filed against states and the District of Columbia in recent months.[1] Every court that has considered and addressed whether the United States failed to state a claim under Title III of the Civil Rights Act has dismissed the United States' claim. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 2:26-cv-66-PHX-SMB,

---

[1] *United States v. Bellows*, No. 25-cv-468 (D. Me.) (filed Sep. 16, 2025); *United States v. State of Oregon*, No. 25-cv-1666 (D. Or.) (filed Sep. 16, 2025); *United States v. Benson*, No. 25-cv-1148 (W.D. Mich.) (filed Sep. 25, 2025); *United States v. Board of Elections of the State of New York*, No. 25-cv-1338 (N.D.N.Y.) (filed Sep. 25, 2025); *United States v. Commonwealth of Pennsylvania*, No. 25-cv-1481 (W.D. Pa.) (filed Sep. 25, 2025); *United States v. N.H. Secretary of State*, No. 25-cv-371 (D.N.H) (filed Sep. 25, 2025); *United States v. Simon*, No. 25-cv-3761 (D. Minn.) (filed Sep. 25, 2025); *United States v. Weber*, No. 25-cv-9149 (C.D. Cal.) (filed Sep. 25, 2025); *United States v. DeMarinis*, No. 25-cv-3934 (D. Md.) (filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-903 (D. Vt.) (filed Dec. 1, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del.) (filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-639 (D.R.I.) (filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-06078 (W.D. Wash.) (filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-01193 (D.N.M.) (filed Dec. 2, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass.) (filed Dec. 11, 2025); *United States v. Griswold*, No. 25-cv-3967 (D. Colo.) (filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-522 (D. Haw.) (filed Dec. 11, 2025); *United States v. Evans*, No. 25-cv-4403 (D.D.C.) (filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-3398 (C.D. Ill.) (filed Dec. 18, 2025); *United States v. Wis. Elections Commission*, No. 25-cv-1036 (W.D. Wis.) (filed Dec. 18, 2025); *United States v. Thomas*, No. 26-cv-21 (D. Conn.) (filed Jan. 6, 2026); *United States v. Beals*, No. 26-cv-00042 (E.D. Va.) (filed Jan. 16, 2026); *United States v. Raffensperger*, No. 26-cv-485 (N.D. Ga.) (filed Jan. 23, 2026); *United States v. Adams*, No. 26-cv-19-GFVT (E.D. Ky.) (filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-2025 (D.N.J.) (filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-361 (W.D. Okla.) (filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-166 (D. Utah) (filed Feb. 26, 2026); *United States v. Warner*, No. 26-cv-156 (D.W.V.) (filed Feb. 26, 2026); *United States v. McGrane*, 26-cv-197 (D. Idaho) (filed Apr. 1, 2026).

2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Wis. Elections Comm'n*, No. 25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026).[2]

## ARGUMENT

**I.      These proceedings are governed by the ordinary Federal Rules of Civil Procedure, which do not permit the "summary" disposition of this action that the United States seeks**

The United States wrongly asserts that, despite its invocation of this Court's jurisdiction, this Court must treat its complaint and motion to compel as a "demand to be reviewed in a summary proceeding," not "the commencement of an ordinary, traditional civil action with all of its trappings." Mot. 5–6 (citing *Lynd*, 306 F.2d at 225) (quotation marks omitted).

Nothing in Title III of the Civil Rights Act so fundamentally alters this Court's ordinary authority under the Federal Rules of Civil Procedure that govern virtually "all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1, 81. The Federal Rules of Civil Procedure govern civil actions when, as here, a plaintiff "commenced by filing a complaint with the court." Fed. R. Civ. P. 3. Indeed, the Federal Rules of Civil Procedure yield only in the particular proceedings that Rule 81 exempts. Fed. R. Civ. P. 1, 81. And rather than exempt Title III proceedings, Rule 81(a)(5) confirms that even if the United States had elected not to file a complaint in this matter, the Federal Rules of Civil Procedure would still "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5).

---

[2] The attorney declaration that the United States attached to its motion references only two "successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA," both of which were resolved out of court. Neff Decl. ¶¶ 17–21; Dkt. 39-6, 39-8.

8

The United States' contrary argument rests not on the text of Title III, nor a local rule of this Court, nor any order in these proceedings. *Compare* Mot. 5–7, *with* Fed. R. Civ. P. 81(a)(5). Instead, its position hinges on a handful of decades-old, non-binding cases, in which the Fifth Circuit and its district courts concluded that the Attorney General's filing of a Title III application initiated a "special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225; Mot. 5. But those cases have been overtaken by Supreme Court precedent confirming that this Court's role "is not so limited." *Oregon*, 2026 WL 318402, at \*7–8 (citing *United States v. Powell*, 379 U.S. 48 (1964)); *see also Amore*, 2026 WL 1040637, at \*3–4.

The Supreme Court's conclusion in *Powell* follows naturally from its earlier holding that courts are "extremely reluctant" to allow "summary" proceedings in "the absence of express statutory authorization." *New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407 (1960). No such express authorization exists in Title III, which provides that the "United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because Title III does not separately define or set forth the "appropriate process," its text does not displace the default appropriate process governing civil actions: the Federal Rules of Civil Procedure.

The Supreme Court has held as much in interpreting identical language in 26 U.S.C. § 7604(a). *Powell*, 379 U.S. at 58 & n.18; *compare* 52 U.S.C. § 20705 (recited in previous paragraph), *with* 26 U.S.C. § 7604(a) ("If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other

9

data" (emphasis added)). In *Powell*, the Supreme Court concluded that, "[b]ecause [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," and courts may "inquire into the underlying reasons for the examination [of records]." 379 U.S. at 58 & n.18.

Accordingly, in adjudicating the U.S. Department of Justice's parallel voter-roll lawsuits in other states, multiple district courts have concluded that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures," *Weber*, 816 F. Supp. 3d at 1182 & n.15, and have accordingly "applie[d] the Federal Rules of Civil Procedure as in any other case." *Oregon*, 2026 WL 318402, at *8; *see also Amore*, 2026 WL 1040637, at *3–4. In so doing, they concluded that the "Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*." *Oregon*, 2026 WL 318402, at *8; *Amore*, 2026 WL 1040637, at *4; *see also Weber*, 816 F. Supp. 3d at 1182 n.15. This Court should do the same.

Contrary to the United States' assertion, *Donaldson v. United States*, 400 U.S. 517 (1971), does not undermine the holding in *Powell*. Mot. 7. That case addressed whether an individual who was not the subject of the government's summons had the right to intervene in the proceeding under Federal Rule of Civil Procedure 24(a)(2). *Donaldson*, 400 U.S. at 518, 521. To start, *Donaldson* confirms the ordinary rule: that the Federal Rules of Civil Procedure, "of course, do have an application to a summons proceeding." *Id.* at 528 (citing rule now codified at Fed. R. Civ. P. 81(a)(5)). It also recognizes, consistent with Rule 81, that "a district court, by local rule or by order, may limit the application of the rules in a summons proceeding." *Id.* at 528–29. But it makes clear that, if courts choose to limit the application of the Federal Rules of Civil Procedure, they should ensure "the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Id.* at 529. And in any event, in concluding that the district court did

10

not err in denying intervention by a party that was not summoned, *Donaldson* concluded that the proposed intervenor had not satisfied Rule 24(a)(2)'s requirements for mandatory intervention. *Id.* at 530–31.

*Donaldson* does not support the United States' position here for at least three reasons. First, because *Donaldson* went on to conclude that Rule 24(a)(2) did not require intervention, its discussion of whether and to what extent the Federal Rules of Civil Procedure apply is ultimately dictum. Second, the United States points to no local rule or order of this Court that limits the application of the Federal Rules of Civil Procedure in the context of Title III proceedings. Finally, to the extent that *Donaldson* did permit limiting the Federal Rules of Civil Procedure, it limited the protections that the Rules afford to would-be *intervenors*. In contrast, the United States' request here—to summarily order the full and final relief requested in the complaint, without providing the Commonwealth with any opportunity to conduct discovery to counteract the United States' representations in its supporting declarations and documentation—would impair "the rights of *the party*" that is the subject of the United States' demand. *Donaldson*, 400 U.S. at 529 (emphasis added).

The United States' position is especially unpersuasive given that, unlike in *Lynd* or *Donaldson*¸ it made the "affirmative choice to file a complaint and proceed through ordinary litigation" under the very process contemplated by the Federal Rules of Civil Procedure. *Oregon*, 2026 WL 318402, at *8 n.1. The remaining stages of civil actions governed by the Federal Rules of Civil Procedure are well established: A complaint is followed by a responsive pleading, whether an answer or motion to dismiss. Fed. R. Civ. P. 3, 8, 12. If the complaint is not dismissed, then the action proceeds to discovery. Fed. R. Civ. P. 26. Following discovery, the parties proceed to

11

motions for summary judgment. Fed. R. Civ. P. 56. And if those motions do not dispose of the action, the parties proceed to trial. Fed. R. Civ. P. 39.

The relief requested in the United States' motion to compel would thwart the process contemplated by the governing rules. Because the Federal Rules of Civil Procedure do not countenance the "summary" disposition that the United States seeks in its motion to compel, this Court should deny the motion, and it does not need to address the merits. If it declines to deny the motion outright, then at the very least, this Court should not address this motion until after resolving defendant's motion to dismiss. And if this Court does not dismiss the action, it should permit discovery and supplemental briefing before ruling on the United States' motion to compel.

## II.    The requested statewide voter registration list is not a "record" within the meaning of Title III of the Civil Rights Act

The information that the U.S. Department of Justice seeks from Virginia is not the type of "record" that Title III requires preserving or making available for inspection by the U.S. Attorney General. Title III requires state officers of elections to "retain and preserve . . . all records and papers which come into [the state's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election for a period of 22 months following the date of the federal election. 52 U.S.C. § 20701. Even *Lynd* acknowledged that courts have a role to play in resolving disputes as to "whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers * * * relating to any * * * act requisite to voting.'" 306 F.2d at 226 (quoting 52 U.S.C. § 20701).

For at least three reasons, the statewide voter registration list that the United States seeks is not a covered record within the meaning of 52 U.S.C. § 20701.

*First*, Virginia's statewide voter registration list would not naturally be understood to have "come into [the State's] possession." 52 U.S.C. § 20701. "[C]ourts 'must give effect, if possible,

12

to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted), including the words "come into" in 52 U.S.C. § 20701. "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9–11 (collecting definitions). The next words in the statute—"relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701—further "bolster[s]" this interpretation, because "[e]ach of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9.

In contrast, the statewide voter registration list that the U.S. Attorney General seeks was never submitted to the state by a voter or other third party. Instead, it is both created and maintained by state elections officials. 52 U.S.C. §§ 20507, 21083, 21085. Other courts have concluded that Section 20701's focus on records that "come into [the State's] possession" refers "only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Benson*, 2026 WL 362789, at *9–11; *Fontes*, 2026 WL 1177244, at *3–4; *Wis. Elections Comm'n*, 2026 WL 1430354, at *3–5; *Bellows*, 2026 WL 1430481, at *5–7.

An understanding of Section 20701 that captures records submitted by voters, rather than created by elections officials, comports with the backdrop against which Title III was enacted. "[W]hen the [Civil Rights Act] was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Benson*, 2026 WL 362789, at *9; *see* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights at 93 (Sept. 9, 1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact

13

made accurate statistical review of the records impossible."). Requiring states to preserve records that voters submitted to them would directly respond to that frustration of the federal government's effort to enforce voting rights. *See also Benson*, 2026 WL 362789, at *10 ("Given this understanding, the distinction between applications and a voter list is perfectly logical: a voter application can be examined to determine whether it was unlawfully rejected, whereas a list of those who *successfully* registered to vote would be little help in such an investigation.").

*Second*, the statewide voter registration list is not a static record that elections officials can "retain and preserve." 52 U.S.C. § 20701. Rather, federal law obligates state elections officials to make regular modifications to the list. For instance, the NVRA requires states to "protect the integrity of the electoral process by ensuring the maintenance of an accurate and *current* voter registration roll." 52 U.S.C. § 20507(b) (emphasis added). And HAVA requires states to "implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State," 52 U.S.C. § 21083(a)(1)(A), and to "perform list maintenance with respect to the computerized list *on a regular basis*," 52 U.S.C. § 21083(a)(2)(B) (emphasis added). It does not make sense to read Section 20701 to require state elections officials to "retain and preserve . . . for a period of twenty-two months" a list that undergoes such regular changes.

In fact, any contrary reading would bring the NVRA and HAVA into direct conflict with Title III of the Civil Rights Act. This conflict becomes clear when reading Section 20701's preservation and retention requirement in conjunction with Title III's broader statutory scheme. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to

14

their place in the overall statutory scheme."). The very next section of Title III criminalizes "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or *alter[ing]* any record or paper required by section 20701 of this title to be retained and preserved." 52 U.S.C. § 20702. If the statewide voter registration list is such a record, then Title III would forbid state elections officials from altering it. *See* 52 U.S.C. §§ 20701, 20702. But, as discussed above, both the NVRA and HAVA "affirmatively require[] states to modify [their voter registration lists] under certain conditions." *Fontes*, 2026 WL 1177244, at *5. As a result, interpreting Section 20701 to require retention and preservation of statewide voter registration lists "conflicts with the very purpose of [voter registration lists] and would place Title III in conflict with the NVRA and the HAVA." *Id.* at *4; *see also Wis. Elections Comm'n*, 2026 WL 1430354, at *3–4.

*Third*, the U.S. Attorney General's request is untethered from the only federal election conducted in the 22 months before the demand. Both of the U.S. Department of Justice letters attached to the United States' motion request that Virginia produce the "current" statewide voter registration list as of July or August 2025. *See* August 2025 Demand at 3; July 2025 Request at 2. Because the list undergoes regular changes, *see* 52 U.S.C. §§ 20507(b), 21083(a)(2)(B), the current list that the United States seeks is not a "record or paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" in the 2024 election. *See* 52 U.S.C. § 20703.

At the time the United States submitted its motion to compel, it argued that only one federal court has adopted the reading of 52 U.S.C. § 20701 that Defendant urges here. Mot. 17 (citing *Benson*, 2026 WL 362789, at *9). Since then, three additional courts considering the United States' parallel lawsuits have reached the same conclusion. *Fontes*, 2026 WL 1177244, at *3–5; *Wis. Elections Comm'n*, 2026 WL 1430354, at *3–5; *Bellows*, 2026 WL 1430481, at *5–7. In so doing, they have also rejected the United States' effort to construe the words "come into his possession"

15

as "temporal distinctions," Mot. 19, "because that argument doesn't square with the plain language of the statute." *Wis. Elections Comm'n*, 2026 WL 1430354, at *4. Title III has a separate, express temporal requirement: "for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for." 52 U.S.C. § 20701. Per the statute's text, the "time limit runs from the date of the election, not the date that the records came into election officers' possession." *Wis. Elections Comm'n*, 2026 WL 1430354, at *4.

In its continuing effort to avoid Title III's text, the United States also tries to misdirect this Court's attention to courts' interpretation of a different statute: the NVRA. Mot. 17 (citing *Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 442 (D. Md. 2019), which construes the "all records" provision in 52 U.S.C. § 20507(i)(1)). Because that statute does not contain the "come into his possession" language at issue in this case, the *Lamone* decision has no bearing on how this Court should interpret the statutory text before it. *See* 52 U.S.C. § 20507(i)(1).

Finally, the United States resorts to parade-of-horribles arguments about the consequences of giving the statutory text its natural meaning. Even if its predictions were accurate, such consequences could not override the text Congress chose. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest."). But the United States has the added problem of lacking support for its conclusions. For instance, the United States asserts, without any support, that reading the statute to exempt voter registration lists from production would have "vast" consequences, because "today many—and likely even most—voter registration applications are only in a compiled electronic form in a [statewide voter registration list]." Mot. 17; *but see* Va.

16

Code § 24.2-444 (requiring general registrars to keep and preserve registration records, separate and apart from the Department of Election's obligations with respect to the voter registration list). Other courts have declined the United States' invitation to distort the statutory text based on unsupported consequentialist arguments. *See Wis. Elections Comm'n*, 2026 WL 1430354, at *4.

    **III.**    **The U.S. Attorney General's written demand lacks a sufficient basis and purpose under Title III of the Civil Rights Act**

        **A.**    **Title III requires that the U.S. Attorney General's written demand contain a statement of the basis and the purpose for demanding the state's records**

Title III requires that, upon the U.S. Attorney General's issuance of a "demand in writing" containing "the basis and the purpose" for demanding such records, states must make such records "available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." 52 U.S.C. § 20703. "The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 816 F. Supp. 3d at 1184. "Without these requirements, the DOJ could embark on a fishing expedition of voter records in any state looking for concerns, without identifying a single issue with the state's policies beforehand." *Id.*

Title III's "statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 2026 WL 972129, at *4. "The text repeats the definite article 'the' before 'basis' and 'purpose,' and it uses the conjunctive 'and' to join them." *Id.* When "'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'" *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930). Accordingly, the U.S. Attorney General "is required to offer a written statement of *both* the purpose and basis for its demands." *Weber*, 816 F. Supp. 3d at 1182 (emphasis in original); *Oregon*, 2026 WL 318402, at *9; *Galvin*, 2026 WL 972129, at *4; *Amore*, 2026 WL 1040637, at *5.

This reading of the independent "basis" and "purpose" requirements is "consistent with the line of Fifth Circuit cases, most notably [*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)], upon which the United States presses the Court to rely here." *Amore*, 2026 WL 1040637, at *5; *Weber*, 816 F. Supp. 3d at 1182–83; *see also* Am. Compl. ¶¶ 1, 3, 4 (invoking *Lynd*). The U.S. Attorney General's demand letter in *Lynd* provided the factual basis for his demand, stating: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 226 n.6. And it provided the legal purpose of his demand, stating: "The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Id. See also Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (stating same basis and purpose); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (stating same basis and purpose), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

### B.     The August 2025 Demand is the only "written demand" that the U.S. Attorney General submitted

To ascertain whether the written demand contained the requisite basis and purpose, the Court must first identify the written demand. Title III's text makes clear that "the 'demand in writing' must 'contain a statement of the basis and the purpose.'" *Galvin*, 2026 WL 972129, at *3. "The statute therefore "directs the Court to the Attorney General's written demand," *id.*, to determine whether that demand "contain[ed] a statement of the basis and the purpose" for the demand, 52 U.S.C. § 20703. *See also Oregon*, 2026 WL 318402, at *9 (rejecting United States' "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'").

The written demand appears only in the August 2025 Demand. *See* Aug. 2025 Demand at 3 ("Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding

18

an electronic copy of Virginia's complete and current VRL."); *id.* ("the Attorney General requests that you produce for inspection . . ."). The earlier July 2025 Request does not make any demand, nor does it even invoke Title III of the Civil Rights Act. *See* July 2025 Request at 2 ("We write to you as the chief election official for the Commonwealth of Virginia to request information . . ."); ("the Attorney General requests that you produce for inspection . . ."). As a result, only the August 2025 Demand can fairly be construed as a written demand for records pursuant to Title III, and this Court should look to only that document to assess whether the U.S. Attorney General's written demand complied with 52 U.S.C. § 20703.

> **C.    The U.S. Attorney General's written demand provided no factual basis for demanding Virginia's complete and unredacted statewide voter registration list**

The requisite "basis" to support a demand for records under Title III is "a factual basis for investigating a violation of a federal statute." *Oregon*, 2026 WL 318402, at *9; *see also Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *Galvin*, 2026 WL 972129, at *3 (collecting definitions of "basis"). "Put simply, the statute requires a statement of *why* the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 2026 WL 972129, at *3 (emphasis in original).

The August 2025 Demand contains "nothing that could fairly be characterized as the factual basis for the demand." *Galvin*, 2026 WL 972129, at *4 (finding the same of a virtually identical letter to Massachusetts state elections official). That is sufficient reason to deny the United States' motion to compel.

19

To the extent that this Court considers whether the facts recited in the July 2025 Request could form the requisite basis, those facts remain inadequate. That letter, too, contains neither the word 'basis' or any equivalent phrase (e.g., 'based upon')." *Galvin*, 2026 WL 972129, at \*4; *compare Lynd*, 306 F.2d at 229 n.6, *with* Dkt. 39-3. And the only facts that the July 2025 Request discusses relate to the responses that Virginia itself provided in response to the Election Assistance Commission's Election Administration and Voting Survey. July 2025 Request at 3. After reciting those facts, the July 2025 Request asks the Commissioner to explain Virginia's practices with respect to removing people from its voter rolls and to provide information "regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act." *Id.* at 2–3. But it does not assert that Virginia has employed any practices that violate the NVRA—much less connect the facts it recites to the racially discriminatory voting practices and infringement of voters' rights that Title III prohibits. Nor does either letter reference any complaints that the U.S. Department of Justice had received about Virginia's list maintenance efforts. *Cf. Benson*, 2026 WL 362789, at \*8 (letter indicated that the DOJ had received a complaint regarding Michigan's compliance with HAVA's requirements relating to the provision of unique voter identifiers). Thus, the July 2025 Request provided no basis for the U.S. Attorney General's written demand that would satisfy 52 U.S.C. § 20703's requirements.

### D. The U.S. Attorney General's purported purpose for demanding Virginia's statewide voter registration list is insufficient under Title III

#### 1. The written demand lacks any reference or relation to the purposes for which Title III was enacted

The requisite "purpose" to support a demand for records under Title III must relate to the purposes underlying Title III. *Oregon*, 2026 WL 318402, at \*10. "If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating

20

the demand's purpose would serve no function." *Id.* at \*9 (declining to "read 'purpose' so broadly" as to grant the United States "unfettered authority to demand voting records for *any* purpose"); *see also Amore*, 2026 WL 1040637, at \*6.

Because the "larger framework of Title III and the historical context in which it was enacted" demonstrates that the law was "intended to protect against the infringement of voting rights," the "purpose" required in a demand for records under Title III "must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at \*3, \*10; *see also* U.S. Comm'n on Civ. Rights, Report of the United States Commission on Civil Rights (Sept. 9, 1959), https://perma.cc/2PDF-GZHB. Where a written demand's purpose lacks "any reference or relation to the purposes for which Title III was enacted," the "demand for records is deficient and cannot trigger any duty to produce such records." *Id.*

The U.S. Attorney General's written demand provides no legally sufficient purpose to support its claim under Title III. To be sure, the August 2025 Demand invokes Title III. Aug. 2025 Demand at 3. But it lacks "any reference or relation to the purposes for which Title III was enacted," *Oregon*, 2026 WL 318402, at \*10, including any connection to purported violations of individuals' voting rights. To the extent this Court considers the July 2025 Request, it fares even worse, as it does not use the word "purpose" or make any reference to Title III of the Civil Rights Act, let alone the underlying purposes of the Civil Rights Act.

### 2. Investigating NVRA and HAVA compliance is an insufficient purpose to invoke Title III

The United States' claim that it was investigating NVRA or HAVA compliance cannot support the U.S. Attorney General's request for information under Title III, much less the sweeping request for Virginia's complete and unredacted voter registration list. "Title III was not passed as a tool for NVRA compliance." *Weber*, 816 F. Supp. 3d at 1183; *Bellows*, 2026 WL 1430481, at

21

*7. Absent some basis to assert that state election officials are conducting list maintenance in a discriminatory manner, list-maintenance practices do not fall within Title III's scope. *See Bruce*, 298 F.2d at 863 & n.2 (noting that statistical evidence indicating that election officials failed to remove "voters who have moved away or have died" does "not bear any particular importance" to demonstrating illegal discrimination in a Title III proceeding); *Oregon*, 2026 WL 318402, at *10 (where "stated purpose was to investigate list maintenance procedures," Plaintiff failed to state a claim).

And even if NVRA or HAVA compliance could ever be a valid purpose for a Title III demand, obtaining the complete, current, and unredacted version of Virginia's statewide voter registration list would not confirm whether the Commonwealth is complying with the NVRA or HAVA. The NVRA requires states to "make a reasonable effort to remove the names of ineligible voters from official lists" for reasons like the death or change of address of voters. 52 U.S.C. § 20507(a)(4). HAVA sets standards for "maintenance" of a state's voter lists, *id.* § 21083, and leaves the "specific choices on the methods of complying with the requirements of this subchapter . . . to the discretion of the State," *id.* § 21085. These statutes mandate ongoing processes conducted using the State's discretion, not a particular result at a particular point in time. Accordingly, a current voter registration list would not answer the question of what reasonable efforts Virginia is undertaking to comply with federal requirements or what efforts it undertook in advance of a previous election. *See Weber*, 816 F. Supp. 3d at 1192 (citing *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019)).

### 3. This Court can reject a contrived purpose

Finally, the United States' public representations make clear that the U.S. Attorney General's written demand does not state "the" purpose for the requests. The statute's use of the definite article conveys that the stated purpose must be the *actual* purpose, "not just a conceivable

22

or possible" purpose. *Galvin*, 2026 WL 972129, at *3. Thus, this Court can deny the motion to compel if the United States' purported purpose is contrived. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784–85 (2019) (courts need not "ignore the disconnect between the decision made and the explanation given" or defer to a "contrived" rationale).

The Supreme Court's *Powell* decision makes clear that, when a court's process is invoked, "a court may not permit its process to be abused," including when the government's demand is "issued for an improper purpose," or "for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. In keeping with that obligation, multiple courts have taken note of the United States' public representations that conflict with the purpose it states in the complaint and August 2025 Demand. *Weber*, 816 F. Supp. 3d at 1184 ("representations made by the DOJ elsewhere paint a starkly different picture that this Court cannot ignore"); *see also Oregon*, 2026 WL 318402, at *13.

As one federal court has explained: "Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection," and "DOJ's relationship with DHS further confirms that voting roll data is being used to compile a national database with millions of voters' private information." *Weber*, 816 F. Supp. 3d at 1185 (collecting citations). Indeed, in January 2026, the U.S. Attorney General tied her demands for state voter rolls directly to immigration enforcement in a letter to Minnesota Governor Tim Walz. *See* Bondi Minn. Ltr.; *Oregon*, 2026 WL 318402, at *11 (noticing same letter from U.S. Attorney General Bondi). "The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon*, 2026 WL 318402, at *11.

23

More recently, the United States' counsel has admitted this additional purpose of immigration enforcement in the context of parallel litigation, confirming that the U.S. Department of Justice "intends to" send states' voter registration lists to the U.S. Department of Homeland Security "and say, hey, check this out to see if any of these people are not citizens.'" ECF No. 47 at 65, *United States v. Amore*, No. 25-cv-00639 (D.R.I. Mar. 30, 2026) (emphasis added).

The United States' statements that it intends to use Title III to further its efforts to "create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling," *Oregon*, 2026 WL 318402, at *13, and is nowhere disclosed in the U.S. Attorney General's written demand for Virginia's statewide voter registration list. This Court should not permit the United States to leverage Title III toward this end "under the guise of a pretextual investigative purpose." *Weber*, 816 F. Supp. 3d at 1186.

**IV.     The U.S. Attorney General's demand for the sensitive data in the statewide voter registration list request violates state law**

**A.     Virginia law prohibits sharing much of the sensitive information that the U.S. Department of Justice requests**

The United States' motion independently fails because the relief it requests is illegal. Virginia law does not authorize disclosure of the most sensitive information that the U.S. Department of Justice seeks. The U.S. Attorney General's written demand included "*all fields*" of the statewide voter registration list, to include "either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." Aug. 2025 Demand at 3. Likewise, the United States' motion requests disclosure of "the current electronic copy of Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." Mot. 2. But disclosure of registrants' date of birth,

driver's license number, full or partial social security number, and certain residential addresses is forbidden under state law.

Virginia law requires ELECT to maintain a list of registered voters, Va. Code § 24.2-404, and imposes restrictions on ELECT's ability to share the voter information it retains, *e.g.*, Va. Code §§ 24.2-444(C), 24.2-405(C), 24.2-406(C), 24.2-407.1, 24-1002.1, 2.2-3808.1. No list that the Department makes available for public inspection shall contain "an individual's social security number, or any part thereof" or "the day and month of birth of an individual." Va. Code § 24.2-444(C). And "it is unlawful for any agency to disclose the social security number or other identification numbers appearing on a driver's license . . ." Va. Code § 2.2-3808.1.

Virginia law also permits certain voters to provide post office box addresses that must be "included in lieu of [their] street address on the lists of registered voters and persons who voted" that are made available for private or public inspection. Va. Code § 24.2-418(B). The protected voters include active and retired law-enforcement officers, active and retired judges, victims of domestic violence, foster parents, and elections officials. Va. Code §§ 24.2-418(B), 2.2-515.2.

Indeed, Virginia law criminalizes disclosing some of the requested information. Virginia statutes provide authorization to disclose social security numbers under only three enumerated circumstances: (1) to "a court" for use in "jury selection"; (2) to "a commissioner of the revenue or a treasurer" for use in "tax assessment, collection, and enforcement"; or (3) to "the Chief Election Officer of another state" for "maintenance of voter registration systems." Va. Code §§ 24.2-405(C), 24.2-406(C), 24.2-407.1. For instance, the third carveout explains Virginia's disclosure of the information to the Electronic Registration Information Center (ERIC), a nonpartisan membership organization "comprised of state election officials from around the United States" and created "to help election officials maintain more accurate voter rolls and detect

25

possible illegal voting." ERIC, *What is ERIC?*, https://ericstates.org/about/ (last accessed May 20, 2026); Mot. 22–23; Neff Decl. ¶ 23.

None of these carveouts, however, authorizes ELECT to provide all or part of voters' social security numbers to the U.S. Department of Justice. And "disclos[ing] or mak[ing] any use of the social security number, or any part thereof, of any applicant for voter registration, except as authorized by law for official use" is a felony offense. Va. Code § 24-1002.1.

### B. Title III does not preempt Virginia law's prohibitions on sharing voters' sensitive personal information

Title III does not require Virginia to share the information that state law specifically prohibits disclosing. Instead, Title III has long been understood to "deal[] with public records which ought ordinarily to be open to legitimate reasonable inspection," and not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The same is true of the NVRA. *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (redaction is appropriate under the NVRA as "necessary to protect sensitive information"); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" contained in voter registration lists); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns"). And HAVA "does not contain any disclosure provisions in its statutory text." *Weber*, 816 F. Supp. 3d at 1190. Therefore, because Virginia's privacy protections do "not obstruct" Title III, the NVRA, or HAVA, they can "coexist" with the federal statutes that the United States' complaint cites. *Id.* at 1189.

**C.      The U.S. Attorney General's demand further failed to comply with the requirements of the federal Privacy Act of 1974 and E-Government Act of 2002**

The United States' demand for Virginia's complete and unredacted voter registration list also fails to comply with the requirements of two federal statutes. First, the Privacy Act of 1974 requires that agencies comply with procedural requirements before maintaining, collecting, or using a group of records searchable by individual, and prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment" in most circumstances. 5 U.S.C. § 552a(a)(3), (a)(5), (e)(4), (e)(7), (f). Second, the E-Government Act of 2002 requires the United States to conduct a privacy-impact assessment before collecting information about 10 or more people that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual." Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921–23 (2002).

Neither of the letters attached to the United States' motion explains any steps that the United States took to comply with the processes required by federal statutes, including any privacy-impact assessment. Nor should this court credit the United States' bare assertions that "the Attorney General would keep all data received secure and treat it consistently with the Privacy Act," Neff Decl. ¶¶ 10, without permitting discovery into the steps that the United States took to protect the privacy of the sensitive data it requests and to comply with the Privacy Act and E-Government Act. This Court should be particularly wary of the United States' "assurances that any private and sensitive data will remain private and used only for a declared and limited purpose" in the context of litigation, given the United States "open and public statements to the contrary" outside of litigation. *Oregon*, 2026 WL 318402, at *11; *see supra* Section III.D.3.

## CONCLUSION

This Court should deny the United States' motion to compel.

Date: May 26, 2026

Jay Jones
  *Attorney General*

Travis G. Hill
  *Chief Deputy Attorney General*

Respectfully submitted,

STEVEN KOSKI, IN HIS OFFICIAL CAPACITY
AS COMMISSIONER OF THE VIRGINIA
DEPARTMENT OF ELECTIONS

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#84657)*
  *Solicitor General*

Triston Chase O'Savio (#100111)*
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

*Counsel of Record for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May, 2026, I filed the foregoing using the Court's

CM/ECF filing system, which sends an electronic notification of the same to counsel of record.

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#84657)
  *Solicitor General*

28