**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>    Defendant. | No. 3:26-cv-00042<br>(Hon. Roderick C. Young) |

**INTERVENOR-DEFENDANTS COMMON CAUSE AND KATHERINE ELLENA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

    A.    Statutory Background ............................................................................................. 3

    B.    Factual Background ............................................................................................... 6

ARGUMENT ......................................................................................................................... 8

    I.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ...................................................................................................... 8

    A.    The United States' Attempt to Obtain the Records at Issue Via the Civil Litigation Process Must Proceed According to the Federal Rules of Civil Procedure ............................ 8

    B.    The Cases on Which the United States Relies Do Not Exempt This Case from the Federal Rules. ............................................................................................................. 14

    C.    Even by the Standards of *Kennedy v. Lynd*, the United States Still Failed to Meet Threshold Requirements of a Records Request Under Title III. .......................................... 17

CONCLUSION ..................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Action Recycling Inc. v. United States*,
721 F.3d 1142 (9th Cir. 2013) ........................................................................................ 11

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) ........................................................................................... 4

*Alabama v. United States*,
371 U.S. 37 (1962) ............................................................................................................ 4

*Ayers v. Securities and Exchange Commission*,
482 F. Supp. 747 (D. Mont. 1980) ................................................................................. 16

*Crystal v. United States*,
172 F.3d 1141 (9th Cir. 1999) ................................................................................... 11, 16

*Dinkens v. Attorney General of United States*,
285 F.2d 430 (5th Cir. 1961) ........................................................................................... 4

*Donaldson v. United States*,
400 U.S. 517 (1971) ..................................................................................................... 11, 12

*New Hampshire Fire Insurance Co. v. Scanlon*,
362 U.S. 404 (1960) ........................................................................................................ 11

*Noah v. AOL Time Warner, Inc.*,
261 F. Supp. 2d 532 (E.D. Va. 2003) ............................................................................... 9

*QueerDoc, PLLC v. United States Department of Justice*,
No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ........................ 16

*Sugarloaf Funding, LLC v. United States Department of Treasury*,
584 F.3d 340 (1st Cir. 2009) ........................................................................................... 11

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ........................................................................................................... 10

*United States v. Amore*,
No. 25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) ................... passim

*United States v. Bellows*,
No. 1:25-cv-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026) ...................... 2, 14, 18

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ................................................................... 17, 18

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964)........................................................................... 4

*United States v. Fontes*,
No. CV-26-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026)...................... 2, 10

*United States v. Galvin*,
No. 1:25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) .............................. 13, 19, 20

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)............................................................................................. 12

*United States v. Oregon*,
No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ......................... 2, 9, 13, 14

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)................................................................. 2, 9, 10, 11

*United States v. Westinghouse Electric Corp.*,
788 F.2d 164 (3d Cir. 1986) .................................................................................. 15

*United States v. Wisconsin Elections Commission*,
No. 3:25-cv-01036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ..................... 2, 17, 18

**Statutes**

15 U.S.C. § 57b-1 .............................................................................................. 12

18 U.S.C. § 2721............................................................................................... 16

26 U.S.C. § 7604............................................................................................... 10

42 U.S.C. § 1971............................................................................................... 4

44 U.S.C. § 3351............................................................................................... 16

52 U.S.C. § 10101............................................................................................. 4, 5, 14

52 U.S.C. § 20705............................................................................................. 3, 8, 9, 10

Pub. L. No. 103-322, 108 Stat. 1796 (1994).......................................................... 16

Pub. L. No. 107-347, 116 Stat. 2899 (2002).......................................................... 16

Pub. L. No. 113-283, 128 Stat. 3073 (2014).......................................................... 16

Pub. L. No. 93-579, 88 Stat. 1896 (1974).............................................................. 16

**Other Authorities**

Eric H. Holder, Jr.,
*MLK50 Symposium: Where Do We Go from Here? Keynote Address*, 49 U. Mem. L.
Rev. 33, 38 (2018)..................................................................................................... 5

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*, Brennan Center for
Justice (January 23, 2026)......................................................................................... 6

Press Release, U.S. Department of Justice,
*Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls*
(January 6, 2026) ...................................................................................................... 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*
(Feb. 26, 2026)........................................................................................................... 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Four Additional States and One Locality for Failure to
Comply with Federal Elections Laws* (December 12, 2025) ...................................... 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Four States for Failure to Produce Voter Rolls* (December
18, 2025) .................................................................................................................... 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026) ................. 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Six Additional States for Failure to Provide Voter
Registration Rolls* (December 2, 2025), ................................................................... 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Six States for Failure to Provide Voter Registration Rolls*
(September 25, 2025),................................................................................................. 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026) ............ 7

Press Release, U.S. Department of Justice,
*Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration
Rolls* (September 16, 2025)....................................................................................... 7

Steven F. Lawson,
*Black Ballots: Voting Rights in the South, 1944-1969* (1976) .................................. 4

**Rules**

Federal Rules of Civil Procedure, Rule 81(a)(5) ............................................................ 9

**INTRODUCTION**

The United States not only seeks to force the disclosure of sensitive personal voter data to which it is not entitled, but endeavors to do so via a complete bypass of the Federal Rules of Civil Procedure, asking this Court to summarily dispose of this case at the outset via an improper motion to compel. That gambit must be rejected.

The United States' single cause of action is based on Title III of the Civil Rights Act of 1960 ("CRA" or "Title III"), 52 U.S.C. § 20701 *et seq.*, a disclosure scheme that, until this recent string of lawsuits by the United States, has not been the subject of federal litigation since the early 1960s. The United States seeks records outside the scope of the statute it invokes, since the complete and unredacted statewide voter files that the United States seeks in this and similar lawsuits are not covered under Title III's requirement for retention and production of records that "come into [election officials'] possession." *See* Mem. of Law in Supp. of Intervenor-Defs. Common Cause and Katherine Ellena's Mot. to Dismiss ("MTD Br."), Dkt. No. 51 at 13–15. Moreover, Title III mandates that any request for disclosure by the U.S. Attorney General for covered voting-related records include a statement "in writing" setting forth "the basis and the purpose" for the request. 52 U.S.C. § 20703. Here, the United States has failed to meet that threshold requirement as a matter of law. *See* MTD Br. at 15–24. And even if the United States had pleaded compliance with Title III's requirements and sought records within the scope of Title III—which it did not—the next step in this case would be discovery pursuant to the Federal Rules into whether, among other things, the United States had *in fact* properly disclosed "the basis and the purpose" of its request as mandated by the statute it invokes.

The United States' contrary position is that the rules do not apply, and that this is a "summary" proceeding which can be resolved in one fell swoop via a motion to compel. United States' Mem. in Supp. of Mot. to Compel ("U.S. MTC Br."), Dkt. No. 39-1 at 2, 5–10. The United

1

States' position contravenes the CRA's text, the plain terms of the Federal Rules, and decades of binding precedent which requires the normal application of the Federal Rules of Civil Procedure in cases like this one. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57–58 (1964); *see also* Fed. R. Civ. P. 1, 81. Rather than statutory text and Supreme Court authority, the United States relies on a misreading of inapposite Fifth Circuit cases from the Jim Crow era, a radically different context in which federal courts were required to help protect and expand the franchise. As another district court in a case in California involving a materially identical CRA claim held in rejecting the United States' motion to compel arguments out of hand, "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026); *accord United States v. Fontes*, No. CV-26-00066-PHX-SMB, 2026 WL 1177244, at *1 (D. Ariz. Apr. 28, 2026) (finding that the Federal Rules apply to this case); *United States v. Amore*, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637, at *4 (D.R.I. Apr. 17, 2026) (same); *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026) ("[T]he Court applies the Federal Rules of Civil Procedure as in any other case.").

The United States may not end-run the procedural and substantive protections imposed by the CRA and the Federal Rules to summarily obtain the ultimate relief it seeks in this civil action. Multiple courts, including, most recently, district courts in Maine, *United States v. Bellows*, No. 1:25-cv-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026), and Wisconsin, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026), have denied such motions to summarily compel the production of states' complete and unredacted voter registration lists. This Court should do the same.

## BACKGROUND[1]

### A.    Statutory Background

Amidst the turmoil of the Jim Crow era, Congress enacted the Civil Rights Act of 1960, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race").

Title III requires states to retain and preserve "all records and papers which come into [an election official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." *Id*. § 20703. This written demand must "contain a statement of the basis and the purpose therefor." *Id.* Title III provides the federal courts in the district where such a demand is made with "jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

Title III, as part of the 1960 Civil Rights Act, provided a mechanism by which "preliminary investigations of registration practices [could] be made in order to determine whether or not such practices conform[ed] to constitutional principles," including the prevention of racial discrimination and the protection of the right to vote. *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir.

---

[1] Additional background is provided in Intervenor-Defendants' brief in support of their Motion to Dismiss, Dkt. No. 51, which is incorporated here by reference.

1961). Consistent with that statutory purpose, the federal government used Title III to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 585–86 (5th Cir. 1962), *aff'd sub nom. Alabama v. United States*, 371 U.S. 37 (1962) (registration records subject to the CRA showed that discriminatory registration practices led to less than 10% of Black citizens being registered to vote while nearly 100% of white citizens were registered); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from an investigation pursuant to Title III which revealed that voting registrars engaged in racially discriminatory practices resulting in 89% of white citizens being registered to vote but only 7.5% of Black citizens being registered). Used as it was intended—i.e., as a mechanism to expand and protect the franchise—Title III proved crucial for uncovering evidence of unlawfully low Black voter registration and allowed the federal government to bring voter discrimination cases against such jurisdictions. *See Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) (citing 42 U.S.C. § 1971 (since transferred to 52 U.S.C. § 10101)).

In the early 1960s, those jurisdictions were mainly the Fifth Circuit states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas, where election officials notoriously refused to register Black voters, and civil rights enforcement efforts confronted strong resistance from local officials and local courts.[2] In defending against Title III suits, these states claimed that the Attorney General needed to further elaborate on the basis for the demand, or even to prove discrimination, before he was entitled to inspect election records, even where massive racial disparities with respect to registration and voting were clear and where the Attorney General had

---

[2] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

already identified and set forth in writing both the basis and the purpose for inspecting the jurisdictions' registration records. *See Lynd*, 306 F.2d at 228-229 & n.6. Reflecting Title III's unmistakable aim to expand the franchise, the Fifth Circuit in cases like *Lynd* held that Title III required counties to produce documents that were sought for that purpose when a proper statement of basis and purpose were given. *See id.* (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101] suits or similar actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed."); *see also id.* at 229 n.6 (written demand of the Attorney General stated that it was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction" and that "[t]he purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred")

The need for this use of Title III was short-lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation altogether. Then, in 1965, Congress passed the Voting Rights Act, the "crown jewel of the civil rights movement,"[3] which established new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws—most notably the Voting Rights Act—federal court assessment of Title III has largely been silent since 1965.

---

[3] Eric H. Holder, Jr., *MLK50 Symposium: Where Do We Go from Here? Keynote Address*, 49 U. Mem. L. Rev. 33, 38 (2018).

**B.      Factual Background**

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated May 22, 2026), https://perma.cc/CG42-Y9K9. Virginia was one such state. *See* U.S. MTC Br. at 3–4.

On July 15, 2025, DOJ sent a letter to Susan Beals, Virginia's then-Commissioner of the Department of Elections, demanding, among other things, an electronic copy of Virginia's computerized statewide voter registration list, including "all fields" contained within the list, within fourteen days. U.S. MTC Br., Ex. 2, Letter of Michael E. Gates to Hon. Susan Beals dated July 15, 2025 ("July 15 Letter"), Dkt. No. 39-3. This letter cited the public records provision of the National Voter Registration Act ("NVRA") but did not mention the CRA at all. *See id.* On August 14, 2025, DOJ sent another letter, again requesting the unredacted voter file, and this time purporting to invoke Title III of the Civil Rights Act of 1960. U.S. MTC Br., Ex. 3, Letter of Harmeet K. Dhillon to Susan Beals dated Aug. 14, 2025 ("August 14 Letter"), Dkt. 39-4. The United States again demanded sensitive Virginia voter data, specifying that "all fields" in the voter file should be produced, including each Virginia "registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." *Id.* After citing Title III, DOJ stated that "[t]he purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA [Help America Vote Act]," but did not state a "basis," as required by 52 U.S.C. § 20703. August 14 Letter at 3.

6

The United States alleges that it then held "months of discussions" with Commissioner Beals's representatives, but that the Virginia voter data was never produced to its satisfaction. U.S. MTC Br. at 4. On January 16, 2026, the United States filed this lawsuit—one of at least thirty-one nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Virginia voter data.[4] After a new governor, Abigail Spanberger, was sworn in as the Governor of Virginia on January 17, 2026, she appointed a new Commissioner of the Virginia Department of Elections, Steven Koski. U.S. MTC Br. at 4. The United States later filed its Amended Complaint on March 19, 2026, Dkt. No. 28, and its motion to compel on April 29, 2026, Dkt. No. 39.

DOJ has not identified any deficiencies in Virginia's maintenance of its voter file. Rather, according to extensive public reporting, DOJ's requests for private, sensitive voter data from Virginia and other states appear to be in connection with a purpose that is different from the one set forth in DOJ's August 14 letter, namely, the construction of an unauthorized national voter

---

[4] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Idaho for Failure to Produce Voter Rolls* (Apr. 1, 2026), https://perma.cc/8X8U-F9PF; Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/8SCK-89KR; Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025),https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

7

database that can be used to mass-challenge voters' eligibility and contest election results in certain states.[5]

## ARGUMENT

### I. THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

The United States filed this civil action.  Should the United States's Complaint survive the Rule 12 stage, then the case should proceed to discovery in the normal course under the Federal Rules of Civil Procedure. The United States' motion to compel the sensitive voter information it seeks in this litigation, thereby resolving the case in its entirety with no discovery, motion practice, or trial, is contrary to law and must be denied. The text of the CRA, binding case law, and the terms of the Federal Rules all require that result. And the cases on which the United States relies are inapposite on this question, especially when properly understood in the context of the time in which they were decided.

### A.   The United States' Attempt to Obtain the Records at Issue Via the Civil Litigation Process Must Proceed According to the Federal Rules of Civil Procedure.

The question of what procedure the CRA requires is governed by the text of the statute, as well as binding case law and the applicable Federal Rules. All point in the same direction.

The text itself makes this clear. Title III provides that the Attorney General may make a "demand in writing" for certain voting-related records or papers, which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. It then provides that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title . . . shall have jurisdiction *by appropriate process* to compel the production of such record or paper."

---

[5] The extensive record of public reporting and government documents and admissions relating to this ulterior purpose are described at length in Intervenor-Defendants' Motion to Dismiss at pages 5–12 and notes 2–13.

*Id.* § 20705 (emphasis added). In other words: If there is a dispute over a Title III demand, the Attorney General may go to a federal court to seek relief. The statute contains no special procedures. It does not state that courts must rule summarily or that they are stripped of their ordinary functions. It does not say that the ordinary rules for invoking and deploying judicial power have been circumvented. *See Weber*, 816 F. Supp. 3d at 1182 ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures."); *accord Oregon*, 2026 WL 318402, at *8 ("[T]he Court applies the Federal Rules of Civil Procedure as in any other case. There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations . . . including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place.").

To the contrary, Title III provides for judicial enforcement of records requests under the statute "by appropriate process," 52 U.S.C. § 20705. And the appropriate process is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), with only a narrow set of express exceptions of which the CRA is not one, Fed. R. Civ. P. 81. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that "[t]hese rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute").

The drafters of the Federal Rules clearly knew how to carve out certain types of proceedings from the otherwise unequivocal mandate that the Rules apply to *all* civil actions and proceedings, *see* Fed. R. Civ. P. 81, yet they did not do so for Title III. *Accord Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 539 (E.D. Va. 2003) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the

9

absence of evidence of a contrary legislative intent." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)), *aff'd*, No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004). The Federal Rules—including the protections and processes they supply for testing the sufficiency of pleadings and for taking discovery—apply in this civil action.

Binding precedent is in accord, because *United States v. Powell*, 379 U.S. 48 (1964), controls here. That case involved an attempt to enforce a statute providing the United States with the power to request certain books and records relating to taxes and to compel their production "by appropriate process." 379 U.S. at 52, 57–58 & nn.10, 18 (citing 26 U.S.C. § 7604(a)). There, the Supreme Court squarely held that the tax records statute being enforced did *not* authorize any special or summary proceeding that might supplant the Federal Rules. *Id*. Critically, the IRS statute at issue in *Powell* is virtually identical to Title III in relevant part. The relevant provision of the IRS statute reads: "[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data." 26 U.S.C. § 7604(a) (emphasis added). Title III reads: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because the operative language is materially identical, *Powell*'s holding directly applies. *See Fontes*, 2026 WL 1177244, at *1 (finding "Federal Rules of Civil Procedure appl[y] to this action" "in accord with [*Powell*]"); *Weber*, 816 F. Supp. 3d at 1182 n.15 (explaining *Powell*'s holding "that courts should apply standard civil procedures in ensuring [statutory] prerequisites are satisfied under a similarly worded statute").

10

The *Powell* Court could not have been any clearer: Because the records statute there provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 57–58, 58 n.18; *accord N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960) (absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law") (footnotes omitted). And where the federal government demands the production of documents, the demand may be contested on "any appropriate ground." *Powell*, 379 U.S. at 58. In the years since *Powell*, courts have reaffirmed that it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements and whether the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528 (1971); *Action Recycling Inc. v. United States*, 721 F.3d 1142, 1144–45 (9th Cir. 2013); *Crystal v. United States*, 172 F.3d 1141, 1143–44 (9th Cir. 1999); *see also Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009).[6]

The United States also cites *Donaldson v. United States* for the proposition that "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." U.S. MTC Br. at 7, 9. *Donaldson* indicates that district courts retain the ability to tailor and streamline the procedural path a case takes, including by limiting the scope of any necessary discovery, provided

---

[6] Moreover, even under the deferential framework governing true administrative demands (rather than civil actions like this one), the United States' request would fail. *Powell* requires that such demands be issued for a legitimate purpose and seek information relevant to that purpose. 379 U.S. at 57–58. Here, as multiple courts have recognized, the United States has failed to articulate a genuine factual basis or a non-pretextual purpose for its demand. *See, e.g.*, *Amore*, 2026 WL 1040637, at *5; *Weber*, 816 F. Supp. 3d at 1183–1184. The United States can therefore not satisfy even the minimal requirements *Powell* describes.

11

that core protections, such as scrutiny under Rule 12, are observed. *Donaldson*, 400 U.S. at 528–59. Here, DOJ demands summary disposition and the transfer of voters' sensitive data, without any substantive review of its pleadings, let alone discovery; this would not allow for the "rights of the party summoned" to be "protected," or for any kind of "adversary hearing." *Id.* at 529. The United States also conspicuously omits language from *Donaldson* stating that "The [Federal] Civil Rules, of course, do have an application to a summons proceeding," 400 U.S. at 528—directly contrary to what DOJ argues here, *see* U.S. MTC Br. at 6–7.

The United States also attempts to get out from under *Powell* by pointing to language in the Internal Revenue Code at issue there, regarding subjecting a taxpayer "to unnecessary examination or investigations." U.S. MTC Br. at 8. The United States claims that "no similar language limits the Attorney General's authority to compel records under the CRA." *Id.* But in *Powell*, the Supreme Court held that "the Federal Rules of Civil Procedure apply" not because of substantive language in other provisions of the Internal Revenue Code, but "[b]ecause [the statute] contains no provision specifying the procedure to be followed in invoking the court's jurisdiction" other than its reference to "appropriate process." 379 U.S. at 52, 58 n.18. Moreover, the CRA does include language limiting the parameters of the Attorney General's authority under Title III, including, notably, the language limiting the scope of Title III to records that "come into [election officials'] possession," and the requirement for a "statement of the basis and the purpose therefor." 52 U.S.C. §§ 20701, 20703.[7]

---

[7] Reliance on *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), is also misplaced. U.S. MTC Br. at 6 n.4, 8–9, 11. *Morton Salt* addressed Federal Trade Commission (FTC) investigative authority, when the agency acted under a broad statutory mandate and congressionally conferred subpoena power. 338 U.S. at 647–49. Even with that broad power, the FTC must identify the conduct under investigation and the applicable law in each civil investigative demand it issues. 15 U.S.C. § 57b-1(c)(2). But the FTC does so under an express congressional grant authorizing investigation of any person with relevant information. Title III confers no such power; it permits

12

Finally, it bears noting that DOJ chose to initiate this action by following standard procedural pathways, including filing the Complaint. "Even if *Lynd* applied here"—which it does not—"Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation," thereby subjecting its complaint to ordinary scrutiny under Rule 12. *Oregon*, 2026 WL 318402, at *8 n.1; *accord Amore*, 2026 WL 1040637, at *4 n.1.

The safeguards and procedures built into the Federal Rules of Civil Procedure, including—if a claim survives dismissal—requiring appropriate discovery into all the relevant facts, followed by the proper presentation of summary judgment motions on the record or trial, are especially important here. The United States seeks to obtain millions of Virginia voters' sensitive personal data—records *outside the scope of the statute it invokes*, *see* MTD Br. at 13–15—and has additionally failed to properly set forth "the basis and the purpose" for its request as required to establish any potential entitlement to such data, 52 U.S.C. § 20703, all while failing to disclose its actual purpose, which is the unlawful construction of a tool to disenfranchise voters. *See supra* n.5. But the United States cannot simply end-run the Federal Rules and the CRA's requirements. Because the motion to compel would improperly circumvent the Federal Rules and impermissibly award the United States all of the relief it seeks in this lawsuit before it has proven entitlement to judgment on its claim, the motion should be denied.

---

inspection only of "records and papers" upon a written demand stating a "basis" and "purpose." 52 U.S.C. §§ 20701, 20703. In any event, unlike the FTC in *Morton Salt*, the United States here has not identified concrete facts suggesting a violation of federal law, nor has it sought information through a tailored demand tied to a specific investigation. *See Galvin*, 2026 WL 972129, at *3–5; *Amore*, 2026 WL 1040637, at *5.

B.      **The Cases on Which the United States Relies Do Not Exempt This Case from the Federal Rules.**

The United States' contrary assertion that Title III creates some sort of special summary proceeding rests largely on a set of Fifth Circuit cases from the early 1960s, chief among them *Kennedy v. Lynd*. U.S. MTC Br. at 2–3, 5–10. Notably, those cases pre-date the binding Supreme Court precedent in *Powell*. *See, e.g.*, *Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*."); *Bellows*, 2026 WL 1430481, at *5 (similar); *Amore*, 2026 WL 1040637, at *4 (similar). Those non-binding cases are also inapposite, as they arose in a completely different context, and they did not involve the disclosure of sensitive personally identifying information and substantial data privacy risks. This Court should not adopt the United States' proposal to bypass the Federal Rules in this unprecedented context based on out-of-context snippets from those cases.

Indeed, decisions like *Lynd* must be understood in context, as a pragmatic response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). The Fifth Circuit painted a clear picture of the situation: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an

14

order for production." *Id.* at 227. This was all despite the fact that "the factual foundation for" the basis and purpose of the Attorney General's Title III requests was utterly self-evident at that time— massive racial disparities with respect to registration and voting in the counties at issue were clear and the Jim Crow regimes were using every possible means to block Black Americans from registering to vote. *See id.*

It was in this context that the Fifth Circuit recognized a need for summary resolution of the Title III requests being deployed against the Jim Crow registrars. Following 18 months of litigation, these courts recognized that plenary "judicial review or ascertainment" of further facts was not warranted to further the aims of Title III; to the contrary, at that point, and in that context, the statutory goal of protecting the franchise could only be met with summary resolution. *See id.* at 226–28. The 1960s Fifth Circuit cases analyzing the CRA cannot be divorced from this historically specific context and should not be taken to stand for the general availability of summary proceedings whenever the CRA is invoked.

Here, the context of this records request could not be more different. The United States has invoked the CRA for novel purposes far removed from Congress's aims in 1960, to make sweeping demands for extensive voter data including sensitive, non-public personal identifying information with no showing or claim of legal deficiencies or violations of rights. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual, and that the data at issue is in fact being sought for unlawful ends that are directly contrary to Title III's purpose to expand the franchise.[8] Such improper purposes can never justify judicial enforcement of a government records request, summarily or otherwise. *See, e.g.*, *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an

---

[8] *See supra* n.5.

15

improper purpose [], its enforcement constitutes an abuse of the court's process."); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1302 (W.D. Wash.)(finding that where litigant makes "adequate showing of bad faith or improper purpose, courts may examine whether the agency is 'pursuing the authorized purposes in good faith.'" (quoting *Crystal v. United States*, 172 F.3d 1141, 1144–45 (9th Cir. 1999))); *Ayers v. SEC*, 482 F. Supp. 747, 751 (D. Mont. 1980) (where a subpoena "was issued 'for an improper purpose . . . or for any other purpose reflecting on the good faith of the particular investigation,' it shall not be enforced by the courts." (quoting *Powell*, 379 U.S. at 58)).

The 1960s Fifth Circuit cases do not support proceeding summarily here for another reason as well: They were decided before sensitive personal identifying information such as Social Security Numbers or driver's license numbers was widely collected as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to such personal information.[9] The premise of those early Fifth Circuit cases was that they involved *public* records; as the court explained in *Lynd*: "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. Indeed, the court in *Lynd* even acknowledged that courts in Title III cases might "issue protective orders" even where the statute's requirements were satisfied. *Id.* at 230. Those courts plainly did not intend their decisions to lay down a rule of law that would justify the summary disposition of a request like the one here, involving the disclosure of highly sensitive, protected personal information, *see id.* at 230–31, and particularly

---

[9] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

16

in the context of an unprecedented fishing expedition seeking this sensitive information from dozens of states, *see In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"). Such considerations, absent in the 1960s Fifth Circuit cases, further emphasize why the protections and procedures of the Federal Rules must apply here.

C.    **Even by the Standards of *Kennedy v. Lynd*, the United States Still Failed to Meet Threshold Requirements of a Records Request Under Title III.**

Even by the United States' own standard—based largely on those 1960s Fifth Circuit cases—the United States is still not entitled to summary disposition of its CRA claim. For example, *Lynd* requires that the Attorney General make a "written demand for inspection of records and papers *covered*" by Section 301 of the CRA, which only includes those records that "come into [election officials'] possession." *See Lynd*, 306 F.2d at 226 (emphasis added); 52 U.S.C. § 20701. But whether the United States' requested records fall under the scope of records covered by Title III would thus still be subject to judicial review. *See United States v. Wisconsin Elections Comm'n*, 2026 WL 1430354, at *2 (describing *Lynd* as "noting that even in a summary proceeding, the court must decide as a matter of law whether the records can be properly demanded under Title III") (citing *Lynd*, 306 F.2d at 226).

As the United States has acknowledged, in a comparable case seeking Michigan's complete and unredacted voter file, the district court in *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), held that because Title III only requires retention and production of records that "come into [election officials'] possession," this would apply "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter

17

registration list that is *created* by state officials." U.S. MTC Br. at 16–17; *Benson*, 819 F. Supp. 3d at 768. In support, the court in *Benson* explained that "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*," and that "Congress could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier," but that this interpretation would "give effect to the phrase 'come into [their] possession' and prevent it from being surplusage." *Id.* (emphasis in original). The *Benson* court also noted as further support that Section 301 of the CRA provides examples of other covered records, including applications and registrations, each of which "refers to something that the voter submits or does as part of the registration process." *Id.* at 768–69.

The United States incorrectly asserts that "no other federal court has adopted such a limitation" as that in *Benson*. U.S. MTC Br. at 17. In fact, the district court in a comparable Arizona case, *United States v. Fontes*, 2026 WL 1177244, at *2–7, had already adopted the same limitation, after careful consideration of *Benson*'s reasoning. *See also* i*d.* at *4 ("separately not[ing] that *Benson*'s interpretation is also harmonious with" Section 302 of the CRA, which creates liability for anyone "who willfully steals, destroys, conceals, mutilates, *or alters* any" covered document, and that interpreting statewide voter registration lists as covered records under the CRA "would place Title III in conflict with the NVRA and the HAVA") (emphasis in original). Since then, two additional courts have adopted the same interpretation that statewide voter registration lists are not records covered under Title III: the district courts in comparable actions in Maine, *United States v. Bellows*, 2026 WL 1430481, at *6–7, and in Wisconsin, *United States v. Wisconsin Elections Commission*, 2026 WL 1430354, at *3–5. Thus, a statewide voter registration list would not be

18

subject to Title III, and the United States would not be entitled to a summary proceeding compelling its production.[10]

The United States also acknowledges that, even under *Lynd*, inquiry into whether "the Attorney General [made] a written demand for federal election records *stating the basis and purpose*" is proper. U.S. MTC Br. at 4 (emphasis added). But that inquiry shows the request here is invalid.

The United States alleges in its motion to compel that, as stated in its August 14 Letter, "the basis for the demand was Title III of the CRA and the purpose was 'to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," and that this was sufficient to satisfy Title III's requirement for a "statement of the basis and the purpose therefor." U.S. MTC Br. at 11. But "Title III of the CRA" is not the "basis" for the request.  The "basis" under Title III "must be 'the' factual basis, not just a conceivable or possible basis," for the demand. *United States v. Galvin*, No. 1:25-13816-LTS, 2026 WL 972129, at *3 (D. Mass. Apr. 9, 2026).

The United States claims, with little supporting analysis, that the 1960s Fifth Circuit cases "conclud[ed] that a Section 303 demand does not require a factual basis," contrary to the conclusion of the court in *Galvin*. U.S. MTC Br. at 12–13. The United States argues that "by omission of any modifier to 'the basis,' Section 303 permits but *does not require* a factual basis; a written demand can simply rely on *only a legal basis*." U.S. MTC Br. at 11–12. But that position "confuses the legal authority under which the Attorney General made the demand—the CRA— and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." *Galvin*, 2026 WL 972129, at *5; *see also Amore*, 2026 WL 1040637, at *5 ("[T]he 'basis'

_____

[10] For additional discussion of the statutory interpretation of records that "come into [election officials'] possession," see MTD Br. at 13–15.

19

contemplated by Title III is a factual, not legal basis."). Indeed, the United States' position would render the statutory requirement circular and meaningless—the legal basis of every Title III request is, by definition, Title III. *See Amore*, 2026 WL 1040637, at *5 ("Congress could not have intended Title III to be interpreted in this redundant and circular manner.").

Indeed, *Lynd* itself is to the contrary. There, the Attorney General stated in writing that his demand was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 229 n.6.  The United States quibbles with the "basis" provided in *Lynd*, claiming it was a case where "[n]o information was given in *Lynd* because none was needed." U.S. MTC Br. at 12. But the point is very simple: In *Lynd*, the Attorney General pointed to a factual basis, *i.e.*, a potential violation—unlawful distinctions on the basis of race relating to voting and voter registration—based on factual information. *See Lynd*, 306 F.2d at 229 n.6.  Here, the Attorney General did not.

Nor is this a matter of applying any "overly stringent reading of 'the basis and the purpose' requirement to mandate that 'based upon' or similar language must be present in the writing offering a factual basis," as the United States now suggests. U.S. MTC Br. at 12; *see also Galvin*, 2026 WL 972129, at *4 ("[N]owhere does either [DOJ] letter use the word 'basis' or any equivalent phrase (e.g., 'based upon')"). Title III does not require "incantatory words." U.S. MTC Br. at 12–13.[11] But it does require something—*some* statement of the specific factual basis for the demand. *See, e.g.*, *Galvin*, 2026 WL 972129, at *4. Here, unlike with the demand in *Lynd*, the August 14

---

[11] In its correspondence with Virginia's election official,  DOJ did include an "incantatory" statement of the required "purpose of the request" right after citing Section 303 in its August 14 Letter, signaling an awareness of the statutory requirement for a "statement of the basis and the purpose therefor." *See* August 14 Letter. In this light, the omission of a comparable statement of the basis is all the more glaring.

Letter on which the United States relies contains nothing about the basis for the request under Title III. *See* August 14 Letter. Similarly, the United States' Amended Complaint, Dkt. No. 28, does not even attempt to state any basis, and offers only a conclusory allegation that "The written demand 'contain[ed] a statement of the basis and the purpose therefor.'" Am. Compl. ¶ 30. Such a conclusory statement will not suffice, and even by the standards of the 1960s Fifth Circuit cases it invokes, the United States still has not adequately pleaded that it has provided a proper statement of the basis and the purpose for its demand.[12]

### CONCLUSION

For these reasons, the United States' motion to compel should be denied.

Dated: June 1, 2026                    Respectfully submitted,

                                       /s/ Davin Rosborough
                                         Ari J. Savitzky*
                                         Davin Rosborough (Va. Bar No. 85935)
                                         Sophia Lin Lakin*
                                         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                         125 Broad Street, 18th Floor
                                         New York, NY 10004
                                         Tel.: (212) 549-2500
                                         Facsimile: (212) 549-2539
                                         asavitzky@aclu.org
                                         drosborough@aclu.org
                                         slakin@aclu.org

                                         Patricia J. Yan*
                                         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                         915 15th Street NW
                                         Washington, DC 20005
                                         Tel.: (202) 457-0800
                                         pyan@aclu.org

---

[12] For additional discussion of Title III's required "statement of the basis and the purpose therefor," as well as the pretextual basis and purpose presented in this case, see MTD Br. at 15–24.

21

*Counsel for Intervenor-Defendants Common Cause and Katherine Ellena*

\* Admitted *pro hac vice*

22