**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

STEVEN KOSKI, in his official capacity as
Commissioner of the Virginia Department of
Elections,

          Defendant.

Case No. 3:26-cv-00042-RCY

**UNITED STATES' OPPOSITION TO DEFENDANT'S AND INTERVENORS' MOTIONS
TO DISMISS DKTS. 46, 48, AND 50.**

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND .................................................................................................. 2

III.   ARGUMENT ....................................................................................................... 3

   A.   The Civil Rights Act calls for a summary proceeding to compel federal election records. 3

   B.   Virginia's SVRL falls within Section 301's broad definition of "all records and papers" that come into the Commissioner's possession. ......................................................... 7

   C.   The Attorney General's July 15 and August 14 Letters provided the basis and purpose to investigate Virginia's compliance with federal election laws. ................................. 10

   D.   Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights. ................................ 15

   E.   The United States is entitled to unredacted "reproduction" and "copying" of Virginia's SVRL. ..................................................................................................................... 19

   F.   The CRA respects federalism by trusting states to comply with federal election law and empowering the Attorney General to verify that States do so. ................................. 22

   G.   The United States is complying with Federal privacy laws which do not prevent disclosure of the requested data to the United States. .............................................. 25

IV.   CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961) ................................................................ passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).................................... 23, 24, 29

*Becker v. United States*, 451 U.S. 1306 (1981) ............................................................... 6

*Becker v. United States*, 452 U.S. 912 (1981) ................................................................. 6

*Becker v. United States*, 452 U.S. 935 (1981) ................................................................. 6

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ..................................................... 19

*Bryan v. United States*, 524 U.S. 184 (1998) ................................................................. 10

*Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001) ............................................. 24

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025), appeal dismissed, No. 25-1585 (1st Cir. July 2, 2025).................................... 21

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ......................................... 17

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)............................................... 1, 16, 21

*Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87 (2017) ................................. 8

*DOJ v. Tax Analysts,* 492 U.S. 136 (1989) ..................................................................... 9

*Donaldson v. United States*, 400 U.S. 517 (1971) ....................................................... 6, 9

*Ebert v. Poston*, 266 U.S. 548 (1925)........................................................................... 18

*Fischer v. United States*, 603 U.S. 480 (2024)............................................................... 10

*Foster v. Love*, 522 U.S. 67 (1997) ............................................................................... 23

*Hall v. DirectTV,* 846 F.3d 757 (4th Cir 2017)............................................................... 7

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963)......................................................... 4

*Kenndey v. Lynd*, 306 F.2d 222 (5th Cir. 1962)...................................................... passim

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011)................................................................. 8

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ........................................ 8

*Morton Salt Co.*, 338 U.S. 632 (1950)........................................................................... 4

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) .......................................................... 14, 15

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ............................................. 8

*United States of America v. Vermont*, No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009)........ 13

*United States v. Alabama*, No. 2:08-cv-00920 (M.D. Ala. March 28, 2009) ............................... 13

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960) ................. 1, 4

*United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026) .................................. 4, 9, 15, 19

*United States v. Clarke*, 573 U.S. 248 (2014) .................................................................... 9

*United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021) .................................... 13

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952) .................................................... 19

*United States v. Indiana*, No. 1:06-cv-01000 (S.D. Ind. July 5, 2006) ....................................... 12

*United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. Apr. 4, 2007) .............. 12

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995) .................................................. 4

*United States v. Mississippi*, 380 U.S. 128 (1965) ............................................................ 9

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) .................................................. 18

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .............................................. 4, 21

*United States v. N.C. State Bd. of Elections*, No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025) .......... 11

*United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006) .................................. 12

*United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026) ................................................. 5

*United States v. Powell*, 379 U.S. 48 (1964) ................................................................. 5, 6

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026) ................................................. 5, 6

**Statutes**

5 U.S.C. § 552a ................................................................................................. 25

18 U.S.C. § 2721 ............................................................................................... 25

26 U.S.C. § 7605 ................................................................................................. 6

52 U.S.C. § 10101 ............................................................................................. 16

52 U.S.C. § 20507 ......................................................................................... 20, 24

52 U.S.C. § 20701 ......................................................................................... passim

52 U.S.C. § 20702 ............................................................................................. 10

52 U.S.C. § 20703 ......................................................................................... passim

52 U.S.C. § 20704 ............................................................................................. 20

iii

52 U.S.C. § 20705.................................................................................................. 1, 23

52 U.S.C. § 21083 .................................................................................................21, 23

52 U.S.C. § 21111 ...................................................................................................... 23

52 U.S.C. § 20301 *et seq.*........................................................................................... 13

52 U.S.C. § 20510...................................................................................................... 24

52 U.S.C. § 20701 *et seq.*............................................................................................. 6

CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960)................................................... 15

Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974) ...................................................... 25

Va. Code § 2.2-3815............................................................................................. 28, 29

Va. Code. § 24.2-101.................................................................................................... 8

Va. Code. § 24.2-405.................................................................................................... 8

## Other Authorities

Authority to Obtain and Share Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026) ...................... 2

*Black's Law Dictionary* (5th ed. 1979) ...................................................................... 8

*N.C. State Bd. of Elections*, Defs.' 2d Status R. (E.D.N.C. Jan. 30, 2026).............................11, 18

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral
   Process (Aug. 2021)........................................................................................... 17, 18

Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at*
   https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026) .... 28

U.S. Dep't of Just., *Fed. Prosecution of Election Offenses* 75 (8th ed. 2017)............................. 14

U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25,
   2017) ................................................................................................................ 26

U.S. Dep't of Justice, *Fed. Law Constraints on Post-Election "Audits"* (April 2024)................ 14

*United States v. N.C. State Bd. of Elections*, Consent J. & Order (E.D.N.C. Sept. 8, 2025) ...11, 18

## Rules

Fed. R. Civ. P. 81........................................................................................................ 4

## Regulations

28 C.F.R. § 0.51 ....................................................................................................... 27

28 C.F.R. § 0.50 ....................................................................................................... 27

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .................................................................................................... 22

U.S. Const. art. VI, cl. 2 ......................................................................................................... 24

**Legislative Materials**

106 Cong. Rec. 7767 ............................................................................................................... 17

H.R. Rep. 107–329, pt. 1 (2001) ........................................................................................... 18

Plaintiff United States of America respectfully submits this Opposition to: (1) the Motion to Dismiss by the Defendant Commissioner of the Virginia Department of Elections Koski ("Commissioner") (Dkt. 46); (2) Motion to Dismiss by Intervenor-Defendants National Association for the Advancement of Colored People and NAACP Virginia State Conference ("NAACP Intervenors") (Dkt. 48); and (3) Defendant-Intervenors Common Cause and Katherine Ellena's Motion to Dismiss ("Common Cause") (Dkt. 50). Collectively, the moving Defendant and Intervenor-Defendants are referred to as "Movants."

## I.      INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the Attorney General to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705.

The statute confers broad investigatory power to the Attorney General. The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute[.]" *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kenndey v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

1

When, as here, the Attorney General invokes his broad investigatory powers, the Court's inquiry is narrow: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the "officer[s] of election" fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, at 225–26.

Movants attempt to cloud this narrow inquiry by arguing that the United States' demand exceeds its statutory authority in several unfounded respects and violates federal and state privacy laws. First, Movants argue that certain voting records do not constitute "papers" under the CRA that came into the Commissioner's possession. *See* Dkt. 47 at 8–11; Dkt. 49 at 8–9; Dkt. 51 at 13–15. Second, Movants argue that the United States lacks a valid basis and purpose and instead has ulterior motives. *See* Dkt. 47 at 11; Dkt. 49 at 11–12; Dkt. 51 at 17–18. Third, Movants prematurely raise affirmative defenses including the Privacy Act, E-Government Act, and Driver's Privacy Protection Act. *See* Dkt. 47 at 22–23; Dkt. 49 at 20–23. Finally, Movants erroneously argue that Virgina law does not authorize disclosure of the unredacted SVRL to the United States. *See* Dkt. 47 at 21–22; Dkt. 49 at 18–19. None of Movants' assertions have merit.[1]

## II.    BACKGROUND

On July 15, 2025, the United States sent correspondence to then Commissioner of the Virginia Department of Elections, Susan Beals, requesting the SVRL ("July 15 Letter"). *See* Dkt.

---

1    The Attorney General advises the Court of a Department of Justice Office of Legal Counsel opinion which concludes that the CRA authorizes the Attorney General to compel states to produce unredacted SVRLs. https://www.justice.gov/olc/media/1440346/dl. Authority to Obtain and Share Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026).

39, Motion to Compel ("MTC") at Ex. 1, Declaration of Eric Neff ("Neff Decl."), ¶ 7; *id.* at Ex. 2.

On August 14, 2025, the United States sent another letter requesting, pursuant to the CRA, the SVRL with all fields. ("August 14 Letter"). *See* Neff Decl. ¶¶ 9–11; MTC at Ex. 3. The August 14 Letter states that the purpose of the request was to "ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." Neff Decl. ¶ 11; MTC at Ex. 3. Ultimately, on January 8, 2026, representatives for Commissioner Beals expressed in person that she would not be providing the SVRL. *See* Neff Decl. ¶ 12. The United States then filed its complaint on January 16, 2026 (Compl., Dkt. 1), which has since been amended (Dkt. 28). After a change in administrations, Governor Abigail Spanberger appointed Steven Koski to be the next Commissioner of the Virginia Department of Elections. To date, Commissioner Koski has not produced any documents responsive to the United States' outstanding demand for records pursuant to its authority under Title III of the CRA.

### III.    ARGUMENT

#### A.    The Civil Rights Act calls for a summary proceeding to compel federal election records.

The Commissioner argues that the Federal Rules of Civil Procedure govern these proceedings. *See* Dkt. 47 at 13–14. In doing so, the Commissioner repeats what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225. The United States will correct this misconception.

The Attorney General's filing of an application for an order under Title III of the CRA "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Rather, a CRA Title III proceeding is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory

proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225–26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including Movants' respective motions to dismiss, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).[2] In other words, Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950).  Those investigative powers derived from Title III fall comfortably within this paradigm.[3]

The Commissioner relies on two district court decisions out of the Ninth Circuit to reach a

---

[2]     A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by the Commissioner. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026). Consistent with the Supreme Court's treatment of similar statutes, *Benson* construed "a request for records under the CRA as a form of administrative subpoena." *Benson at* *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826–27 (S.D. Miss. 1963)). Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Id.* at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). Consequently, *Benson* acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (quoting *Markwood*, 48 F.3d at 976).  This is because the United States has not issued a subpoena but has made a "*demand*" under the CRA. 52 U.S.C. §20703.

[3]     The Supreme Court consistently recognizes statutes that vest investigative, grand jury-like powers in Executive Branch agencies. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *Morton Salt Co.*, 338 U.S. 632, 642–43 (1950) (same with respect to the Federal Trade Commission).

contrary conclusion. In those decisions, the district courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's determination in *Lynd* that Title III of the CRA is a special statutory proceeding. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 at *7–8 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 at *8 & n.15 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026). However, *Powell* applied certain Federal Rules of Civil Procedure to an IRS administrative summons against a citizen. The Supreme Court explained that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" *Powell*, 379 U.S. at 58 n.18. The *Oregon* court erroneously applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402 at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). The *Oregon* court omitted any explanation that the quoted language from *Powell* referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a

taxpayer "to unnecessary examination or investigations." *Id.* at 52–53 (quoting 26 U.S.C. § 7605(b)).  However, no similar language limits the Attorney General's authority to compel records under the CRA and the CRA is not directed at a private citizen but rather state election officers acting in their official capacity. *See* 52 U.S.C. § 20701 *et seq*. Nor does the CRA provide any process for election officers to object to CRA proceedings being initiated against them. *Cf. id.*

The *Weber* court, in addition to *Powell*, referred to what it indicated was a decision of the United States Supreme Court also supporting this argument.  *See Weber*, 2026 WL 118807 at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect.  *Becker* was an order issued by the Circuit Justice on an application for a temporary stay.  *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court).  The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority. Moreover, because *Becker* involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (citation omitted). Far from supporting Movants' arguments that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it. As the Supreme Court later clarified, "post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971) (collecting cases).

6

That is exactly what has happened here.  The Commissioner was notified of and responded to the Motion to Compel. *See* Dkts. 39; 56. Even if this court decides to apply the Federal Rules of Civil Procedure, the rules must be applied on a limited basis—that is, no discovery is permitted—consistent with the investigative, pre-suit, summary nature of a CRA proceeding. Moreover, with respect to Movants' respective motions to dismiss, this court must draw all reasonable inferences in favor of the United States, *Hall v. DirectTV,* 846 F.3d 757, 765 (4th Cir 2017), within the constraints imposed by the CRA. *Lynd*, 306 F.2d at 225–30. Taking as true the allegations in the United States' Complaint, the United States has satisfied each of the four elements of its CRA action. Therefore, the motion to dismiss must be denied.

### B.   Virginia's SVRL falls within Section 301's broad definition of "all records and papers" that come into the Commissioner's possession.

Congress broadly established the scope of federal election records covered by Title III. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election.  52 U.S.C. § 20701 (emphasis added); *see also Lynd*, 306 F.2d at 226.

Contrary to what Movants argue, the *Benson* decision does not substantially change the application of "all records" to the SVRL, as required by the plain language of Section 301 of the CRA, 52 U.S.C. § 20701. *See* Dkt. 47 at 8–9; Dkt. 49 at 16–17; Dkt. 51 at 13–14. Regardless of who created the SVRL, Commissioner Koski has "custody, possession, or control of such record or paper" and must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

Virginia's SVRL is merely a composite of individual records relating to voter registration

7

for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. §21803, the SVRL is the method by which Virginia accumulates the records of who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384) – namely, voter "registrations." 52 U.S.C. § 20701; *cf.* Va. Code. § 24.2-405 (requiring a voter to appear on the registration list to vote); Va. Code. § 24.2-101 (defining a registered voter as "any person who is maintained on the Virginia voter registration system.").

Indeed, federal courts that have applied 52 U.S.C. § 20701 have concluded that Congress meant what it said in the statute. It does not exclude any voting record that the Commissioner maintains, despite his argument that the SVRL is excluded because his office "created" it. *See* Dkt. 47 at 8–9. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

8

Furthermore, the Supreme Court has previously held in Freedom of Information Act cases that, when the agency is in control of the materials at the time the request is made, the materials have "come into the agency's possession" in the course of official duties. *DOJ v. Tax Analysts,* 492 U.S. 136, 144–45 (1989). Thus, the Supreme Court has made clear that an agency record can be both created by the agency and have come into the agency's possession—coming into possession of material refers to *when,* not how, the possession began. *See id.* at 146. In this case, at the time the United States made its request the Commissioner was in possession of the SVRL.

Nothing in Section 301 restricts "all records and papers" to only those records and papers submitted by voters.  Even if the examples of documents cited in the statute "refers to something that the voter submits or does," *Benson*, 2026 WL 362789 at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III). Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533).

Finally, Movants suggest that the CRA, NVRA, and HAVA somehow conflict with one another. Dkt. 47 at 10; Dkt. 49 at 14–18. This argument does not withstand scrutiny and finds no support within their respective texts. Case in point, Title III's criminalization section considers willful, ill intent to alter SVRL records—using verbs "steals, destroys, conceals, mutilates, or

9

alters." *See* 52 U.S.C. § 20702. Indeed, verbs such as "alter[]" elucidate the meaning included in § 20702. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) (interpreting "otherwise" through neighboring words). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *Id.* at 489–90 (analyzing similar list of verbs). It does not, however, logically apply to SVRL maintenance, which is designed to ensure accuracy and confidence in voter registration rolls, not to undermine them. Furthermore, the use of "willfully" in criminal statutes generally requires the defendant to act "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 193 (1998). List maintenance is a statutory duty, not unlawful conduct.

### C.    The Attorney General's July 15 and August 14 Letters provided the basis and purpose to investigate Virginia's compliance with federal election laws.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of elections for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On July 15, 2025, the United States sent the Commissioner a written demand for a copy of Virginia's SVRL. Neff Decl. at ¶¶ 7–8. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose "was to ascertain Virginia's compliance with the list maintenance requirements of federal law, specifically the NVRA and HAVA." *Id.* ¶¶ 7–11.

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that it has not provided the true reason for the demand. Dkt. 47 at 3–4, 11, 19–20; Dkt. 49 at 3, 11–12, 14, 17; Dkt. 51 at 2, 5–12, 17–18, 20–23. In a last-ditch effort, Movants also claim that the July 15 and August 14 Letters cannot be read together as the United States' demand under Title III. See Dkt. 47 at 14; Dkt. 49 at 20. This line of reasoning is unavailing.

10

To begin, recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 15–16. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N.C. State Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as First Neff Decl. ¶ 16, Ex. 4). One of the problems was that even though some of the registration applications had HAVA identifiers, counties failed to input those identifiers into the SVRL. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N.C. State Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Eric Neff's second declaration submitted with this response and reply ("Neff 2d Decl.") at ¶9, Ex. 9).

Movants argue, based entirely on unreliable hearsay, that the Department of Justice is amassing a nationwide voter database. Dkt. 47, at 3–4, 19–20; Dkt. 49 at 3. Dkt. 51 at 2, 5–12, 20–23. Movants' arguments are absurd and false – as the United States District Court for the Eastern District of North Carolina recently found in rejecting such arguments as "speculative and premature." *United States v. N.C. State Bd. of Elections*, No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025), Dkt. 87, Order Denying Motion for Reconsideration of Motions to Intervene at 7 (attached to the Neff 2d Decl. ¶10, Ex. 10).

Indeed, obtaining an SVRL to assess and enforce HAVA and the NVRA is not new. As mentioned in its Motion to Compel, the United States used the CRA to obtain statewide voter lists to assess compliance with list maintenance requirements in Georgia and Texas. Dkt. 39 at 20–21. Similarly, in 2007, the United States entered a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086, 2007 WL

11

1059565 (D. Me. Apr. 4, 2007). (attached to the Neff 2d Decl. at ¶11, Ex.11). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." *Id.* at *5 (emphasis added).[4] The United States entered into similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance compliance.[5] Likewise, Indiana was required by consent decree to retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by Section 20701. Dkt. 5 at 6 in *United States v. Indiana*, No. 1:06-cv-01000 (S.D. Ind. July 5, 2006) (attached to the Neff 2d Decl. at ¶13, Ex.13).

In *Indiana,* the United States later moved to amend the consent decree to obtain the full, unredacted SVRL, including driver license numbers and social security numbers. Dkt. 16 in *Indiana*, 1:06-cv-01000. (attached to the Neff 2d Decl. at ¶14, Ex. 14). As discussed in the Motion, the United States was entitled to the unredacted SVRL pursuant to Title III, notwithstanding any conflicting state laws. *Id*. at 2. The consent decree acknowledged that the State is "required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the Constitution." *Id*. at 4. Importantly, the United States agreed to "use the voter registration list information to assess the State's compliance with federal voting laws, including,

---

[4]    Paragraph 11 of the consent decree explicitly invokes the CRA, referring to 42 U.S.C. § 1974, which was later transferred to 52 U.S.C. § 20701. *Maine,* 2007 WL 1059565, at *5.
[5]    *See United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006). In New Jersey, paragraph 5 of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendant to retain voter registration and list maintenance records. Dkt. 2 in 2:06-cv-04889.  (attached as 2d Neff Decl. as Ex. 12).

but not limited to, the NVRA." *Id*. The Order granting the Motion to Amend the Consent Decree required Indiana, within 21 days of the order, to immediately make available to the United States the full statewide voter registration list including information such as full names, voter identification numbers, and driver license numbers.[6]

The United States' use of Title III of the CRA is not limited to investigating compliance with HAVA and the NVRA. It also has used the law in the enforcement of the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq*. The United States sued Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c),[7] which required Alabama to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for Federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. *See* Dkt. 1, *United States v. Alabama*, No. 2:08-cv-00920 (M.D. Ala. March 28, 2009). (attached to the Neff 2d Decl. at ¶15, Ex. 16).[8]

The United States has also used the CRA in enforcement of the Voting Rights Act. The United States sought election records from counties gathering evidence for a lawsuit brought under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), Dkt. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A copy of a letter

---

[6]    An amended order required Indiana to produce data in electronic format. Dkt. 18 in *Indiana*, No. 1:06-cv-01000. (attached to the Neff 2d Decl. at ¶14, Ex. 15).

[7]    UOCAVA was transferred to 52 U.S.C. § 20301 *et seq*.

[8]    Similarly, the United States sought data in 21 Alabama counties under the CRA, and the Court issued an Order approving that request, and indicated that it would send demand letters to each of those counties for those election records. *Id*. at Dkt. 24. A copy of a letter sent to Shelby County in 2009 requesting election records pursuant to Title III is attached to (attached to the Neff 2d Decl. at ¶16, Ex. 17). The United States filed a similar lawsuit in Vermont to enforce UOCAVA reporting requirement. *See, e.g.*, Dkt. 1, *United States of America v. Vermont*, No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009). (attached to the Neff 2d Decl. at ¶16, Ex. 18).

13

sent to Newton County, Georgia is attached to the Neff 2d Decl. at ¶17, Ex. 19). The Federal Prosecution of Election Offenses explains under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – in many instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Fed. Prosecution of Election Offenses* 75 (8th ed. 2017). That document further provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates."[9] *Id.* at 78.

Also, Movants claim that the July 15 and August 14 Letters cannot be read together as encompassing the United States' demand under Title III. Dkt. 47 at 14; Dkt. 49 at 20. Movants' rigid, single document argument finds no support in the law. Movant NAACP cites to the inapposite case *Niz-Chavez v. Garland*, 593 U.S. 155 (2021), to support its contention that multiple letters cannot be read together to supply the basis and purpose for the Attorney General's demand. Dkt. 49 at 20. In *Niz-Chavez*, the Supreme Court held that an alien-removal statute referring to "a notice to appear" requires providing an alien with one document containing all the statutorily required elements in order to stop the clock on his "continuous[] presen[ce]" in the United States and thus reduce his likelihood of entitlement to discretionary relief. 592 U.S. at 160–61. In sending its separate notices, the *Niz-Chavez* court noted that "the federal government s[ought] a procedural

---

[9]    In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Fed. Law Constraints on Post-Election "Audits"* 2 (April 2024), https://www.justice.gov/crt/media/1348586/dl?inline (accessed April 10, 2026).

14

advantage against an individual" in the removal process. *Id.* at 172. Here, Movants cannot seriously claim the United States, through its two consistent letters, sought some procedural advantage against an individual. Rather, it has sought what a government official—the Commissioner—has a duty to disclose.

As the *Niz-Chavez* Court also noted, its interpretation may have been different if the statute had referred merely to "notice" without any article, as opposed to "a notice." *Id.* at 163. Unlike the situation in *Niz-Chavez*, that is precisely how "demand" is used in 52 U.S.C. 20703. Records and papers must be made available "upon demand in writing" – not "a demand in writing." Only in the next sentence, does the statute then refer back to whatever written demand has been given (which may be made up of multiple writings) and use the adjective "[t]his" to refer collectively to the entire demand. And Section 20703's use of "a" is in the context of "a statement of the basis and the purpose" that forms part of this demand. 52 U.S.C. 20703.

The August 14 letter and the July 15 letter provided Virginia with the statement of the basis and purpose of the Attorney General's demand. Nothing precludes the letters being read together, particularly when the letters provided the Commissioner notice of the United States' intent to accomplice its purpose – compliance under federal law. The district court in Michigan found as such when denying Movants' arguments on this exact issue. *Benson*, 2026 WL 362789, at *8, n.3. Accordingly, the United States has provided a sufficient statement of basis and purpose for its demand for federal election records.

**D.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is titled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306

15

F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [his] representative" such records.  52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Movants suggest that the only permissible basis for a Title III request is to investigate racial discrimination in voting and not to assess a state's compliance with HAVA and the NVRA. Dkt. 47 at 17–18; Dkt. 49 14–15.  Movants are mistaken. Congress made clear in the CRA where it intended that a remedy be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101).[10]

Moreover, in *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." 187 F. Supp. at 848 (emphasis added). The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the

---

[10]   This is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

16

principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants also suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Dkt. 47 at 17–18; Dkt. 49 at 21–22. Actually, the opposite is true – examining compliance with HAVA is essential to securing an individual's right to vote. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32–33 (Aug. 2021). (excerpts attached to the Neff 2d Decl. at ¶18, Ex. 20). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* The Commission explained, "[u]sed

17

cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when Congress enacted HAVA in 2002. Congress explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[11] H.R. Rep. 107–329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate as well as undermine the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. *See Ebert v. Poston*, 266 U.S. 548, 554–55 (1925). Likewise, legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress

---

[11]     Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 15–17. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N.C. State Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to the Neff Decl. at ¶16, Ex. 4). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N.C. State Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached to the Second Neff Decl. at ¶9, Ex. 9).

18

has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952); *accord Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654–55 (2020).

The *Benson* court rejected arguments that parallel those of Movants' in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. *Benson* first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, 2026 WL 362789 at *8, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation." *Id.*

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

### E.    The United States is entitled to unredacted "reproduction" and "copying" of Virginia's SVRL.

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or his representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants ask the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available SVRL. Dkt. 47 at

19

21–22; Dkt. 49 at 23–24; Dkt. 51 at 24–28. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Furthermore, Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act. *See* 52 U.S.C. § 20704.[12]

Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Despite this, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position Movants advance by the statute's broad reference to "all records and papers." 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including Virginia's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Movants' arguments that non-public records are excluded fail as a matter of law.

Finally, this court's adoption of Movants' position would eviscerate Title III. Because Virginia's voting list will contain numerous individuals with the same name, the Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the

---

[12] Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury. 52 U.S.C. § 20704.

NVRA by having access to the voter identification numbers required by federal law. For each voter in Virginia, that requires their social security number or other HAVA identifier. *See* 52 U.S.C. § 21083 (a)(5)(D). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[13] The only way for the United States to determine whether Virginia has an identifier for each person registered to vote for federal elections is by reviewing its complete SVRL. There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA and to ensure that Virginia is in compliance with HAVA's identification requirements are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642–43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same data twenty-six states and the District of Columbia routinely share with a third party, the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[14] Similarly, states have released to private parties even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter

---

[13]    *See generally* 52 U.S.C. § 20507 (a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083 (a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[14]    *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 11, 2026).

database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of Virginia's unredacted electronic SVRL under Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855–56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

F.      **The CRA respects federalism by trusting states to comply with federal election law and empowering the Attorney General to verify that States do so.**

Movants also argue that the United States is foreclosed from using the CRA to obtain Virginia's SVRL by principles of federalism. Movants suggest that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to Virginia's state privacy laws. *See* Dkt. 47 at 21–22; Dkt. 49 at 9–10. Movants are mistaken on both counts.

The Attorney General's use of the CRA to investigate compliance with HAVA and the NVRA and, if appropriate, to bring an enforcement action, fully respects the federal structure. Without question, the United States Constitution invests states with the primary responsibility for the conduct of federal elections. But at the same time, the Constitution explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state

22

regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7–9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the CRA, HAVA, and the NVRA, adopting a "trust, but verify" approach. State election officials including the Commissioner are given primary responsibility for administering federal elections. Title III of the CRA, however, imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 mandates that every state "ensure that voter registration records … are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

Each of these provisions regulate the conduct of federal elections and make state officials responsible for implementing them. But contrary to what Movants suggest, that does not mean that the Attorney General, as the Nation's chief law enforcement officer, plays no role at all. Far from it. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters. *See* 52 U.S.C.

23

§§ 20510 (b), 20507 (a)(4). Adopting this approach of trust but verify thereby respects the federal structure and the primacy of state officials in conducting federal elections.

Title III of the CRA further promotes the transparency of the state's conduct of federal elections by giving the Attorney General pre-suit investigative tools to evaluate a state's records pertaining to those elections, including its SVRL. As *Lynd* explained, "the right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right" to maintain a lawsuit. 306 F.2d at 227. "His right to records does not require that he show he could win without them." *Id.* That is, the CRA's purpose "is to enable the Attorney General to determine" if an enforcement action "should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Id.* at 228. To afford the Attorney General the ability to verify compliance with federal law, the CRA "has equipped him with the machinery thought suitable for the effective fulfillment of that obligation." *Id.* at 230. "Wide scope must be accorded the Attorney General" in his ability to review federal election records like the SVRL and "extends as far as the sovereign State itself." *Id.* at 228.

To be sure, the United States believes that state law can be read in harmony with federal law. However, if there is a direct conflict between state and federal laws, then state law must yield under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). The United States asks the Court to respect the federal structure, acknowledging that while Commissioner Koski is trusted to conduct federal elections, the Attorney General has been empowered by the CRA to verify that Commissioner Koski is doing so in compliance with HAVA and the NVRA.

24

**G.    The United States is complying with Federal privacy laws which do not prevent disclosure of the requested data to the United States.**

Movants next make a variety of arguments that various privacy laws – the Privacy Act, E-Government Act, Driver's Privacy Protection Act[15] – require dismissal of the United States' efforts to compel production of Virginia's federal election records.  *See* Dkt. 47 at 21–22; Dkt. 49 at 18–19; Dkt. 51 at 22.  Movants' arguments are misguided at best. These arguments are affirmative defenses and therefore cannot form the basis for dismissing the Complaint.[16]

First, the Privacy Act does not bar the disclosure of Virginia's SVRL to the United States, as Movants assert. Dkt. 47 at 22–23; Dkt. 49 at 27–29.  The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1). State and local entities fall outside that definition. The Privacy Act erects "certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974), only within the scope of the federal agency record systems. There is no basis for the Commissioner to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States in complying with the provisions of the Privacy Act.

To that extent, the voter information that the United States is collecting is maintained

---

[15]    Movant Common Cause claims that dismissal is warranted because the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). Dkt. 51 at 28. The DPPA explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(l), disclosure is allowed "for use by any government agency ... in carrying out its functions," including law enforcement or other regulatory enforcement purposes. The DPPA's prohibition is clearly not implicated in the present case.

[16]    As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act. *Lynd*, 306 F.2d at 230.

25

according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. [17] The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[18] The United States made its requests and filed the above captioned matter pursuant to those statutes. *See* Dkt., 1, ¶¶ 10–19. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.[19]

---

[17]   Routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 CFR 47611.

[18]   States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited May 11, 2026).

[19]   To the extent that Movants are concerned about the transport of such data to the United

Movants next argue that the demand for production of Virginia's SVRL and other federal election records violates the E-Government Act. According to Movants, the United States is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Dkt. 47 at 22; Dkt. 51 at 28 n. 17. Again, neither the E-Government Act nor case law supports this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107-347, § 208(b)(l)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The SVRL would be kept on a system for which a Privacy Impact Assessment has been done. Only when a new system is established – not when each new data request is made – is a Privacy Impact Assessment required.[20]

---

States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. The Privacy Act in conjunction with Section 204 of the CRA simply requires that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. As outlined herein, the United States will do that.

[20] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026).

27

**H.    Virginia law permits – rather than prevents – the United States from obtaining data maintained under HAVA or the NVRA.**

Finally, Movants ask the Court to legislate limitations conspicuously absent from Title III. Movants cite to Virginia laws concerning *public* inspection to support the argument that only a redacted version of the Virginian's SVRL is required. *See* Dkt. 47 at 20–22; Dkt. 49 at 25. Virginia law, however, does not prohibit – indeed cannot be construed against – the disclosure of the SVRL to the United States as the Movants claim.

Movants conveniently ignore Chapter 38.1 of the Virginia Code, titled "Protection of Social Security Numbers Act." By its express terms, the *full* Social Security numbers "contained in a public record" are not prevented from being released "[t]o any *federal*, state, or local law-enforcement personnel … seeking information in the course of his official duties." Va. Code § 2.2-3815(B)(2) (emphasis added).[21] Also, under subsection (b)(5), Social Security numbers must be released "to a federal agency in order to comply with any applicable law or regulation." Va. Code § 2.2-3815(B)(5). Title III which defines election records at 52 U.S.C. § 20701 and requires the Virginia to produce them upon demand, 52 U.S.C. § 20703, is that law.

To avoid this reality, the Commissioner claims that "because Virginia's privacy protections do not obstruct Title III, the NVRA, or HAVA, they can 'coexist' with" those federal statutes. Dkt. 47 at 22. This argument – while facially true – is legally untenable under Movants' theory because Movants seek to misapply Virginia's privacy laws to override the Attorney General's authority to investigate compliance with HAVA and the NVRA. As the United States explained, *supra*, p. 20–22, unredacted voter lists are necessary for the Attorney General to investigate whether Virginia

---

[21]    Virginia's definition of "public records" accounts for records – including the SVRL – "*prepared or owned by*, *or in the possession of* a public body or its officers, employees, or agents in the transaction of public business." *See* Va. Code § 2.2-3701 (emphasis added).

28

has complied with federal list-maintenance requirements. Virginia's own laws ensure that the Attorney General's investigation here can take place unimpeded. *See* Va. Code § 2.2-3815(B)(2) and (B)(5).[22] The unredacted SVRL can certainly be produced to the United States consistent with these federal protections through a protective order. *Lynd*, 306 F.2d at 230.

### IV.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss (Dkts. 46, 48, and 50) be denied.

DATED: June 1, 2026

Respectfully submitted,

TODD W. BLANCHE
Acting Attorney General

By: /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK
VSB. No. 37590
Office of United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/  *James T. Catania*
James T. Catania
Raymond Yang
Trial Attorneys
Voting Section, Civil Rights Division
4 Constitution Square
150 M. Street NE, 8th Floor
Washington, D.C. 20002
James.Catania@usdoj.gov
Raymond.Yang@usdoj.gov
202-812-2631

---

[22]    Even if the Court somehow finds there is a direct conflict between state and federal laws – and it should not – then state law nevertheless must yield under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15.

29