UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:26-cv-00042-RCY |
| STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections, | |
| Defendant. | |

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL**

**TABLE OF AUTHORITIES**

**Cases**

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ................................................................. 12

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................................. 2, 3, 12, 13

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ..................................................... 9

*United States v. Ajudua*, No. 1:12-cr-1702-JB, 2013 WL 2284960 (D.N.M. May 22, 2013) ......... 5

*United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) ........................................... 4

*United States v. Art Metal-U.S.A., Inc.*, 484 F. Supp. 884 (D.N.J. 1980) ........................ 5

*United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007) ....................................... 6

*United States v. Bellows*, No. 1:25-cv-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026) ....
..................................................................................................................... 2, 9, 10

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *appeal docketed*, No. 26-1225
(6th Cir. Feb. 27, 2026) ................................................................................... 2, 5, 6

*United States v. Fontes*, No. 2:26-cv-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28,
2026) ........................................................................................................................ 2

*United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966), *aff'd Texas v. United States*, 384 U.S.
155 (1966) ............................................................................................................... 4

*United States v. Wisconsin Elections Commission*, No. 3:25-cv-01036-JDP, 2026 WL 1430354
(W.D. Wis. May 21, 2026) ...................................................................................... 2

**Statutes**

52 U.S.C § 20703 ................................................................................................... 1, 3

52 U.S.C. § 20510 ..................................................................................................... 9

52 U.S.C. § 20701 ............................................................................................... passim

52 U.S.C. § 20702 ................................................................................................... 12

52 U.S.C. § 21081, *et seq* ...................................................................................... 12

52 U.S.C. § 21083 ..................................................................................................... 4

52 U.S.C. § 21111 ..................................................................................................... 9

8 U.S.C. § 1444 ......................................................................................................... 6

8 U.S.C. § 1445 ......................................................................................................... 6

8 U.S.C. § 1449 ......................................................................................................... 6

8 U.S.C. § 1453 ......................................................................................................... 6

i

8 U.S.C. § 1454 ................................................................................................................. 6

8 U.S.C. § 1455 ................................................................................................................. 6

**Other Authorities**

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. ___ (May 12, 2026) ... 8

*Black's Law Dictionary* (4th ed. 1951) ........................................................................... 6

Craig C. Donsanto & Nancy L. Simmons, *Fed. Prosecution of Election Offenses* (7th ed. 2007)  8

Special Message to the Congress on Civil Rights, Dwight D. Eisenhower, *Pub. Papers of the Presidents* (Feb. 5, 1959) .......................................................................................... 7

*Webster's New Int'l Dictionary* 545 (2d ed. 1959) ........................................................ 3

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 .............................................................................................. 1

H.R. Rep. No. 86-956 (1959) .....................................................................................10, 11

Nothing is more fundamental to our system of government than the fairness and reliability of our elections. Consistent with the principles of federalism, the Constitution gives primary authority over the conduct of federal elections to the states. However, the Framers also recognized the danger of giving states unlimited authority in this important area, and so they gave Congress power to "make or alter" regulations governing such elections. U.S. Const. art. I, § 4, cl. 1. History has shown though that states have sometimes abused the authority they have over federal elections. As a matter of federalism then federal oversight is essential to ensure the integrity of those elections, as well as to the faith of American citizens in the outcome of those elections.

To that end, Congress enacted Title III of the Civil Rights Act of 1960 ("CRA"). Section 301 requires state and local officials to "retain and preserve [for a designated period] … all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election. 52 U.S.C. § 20701. Section 303 authorizes the Attorney General to obtain copies of such records upon demand. *See id.* § 20703. Title III thus is an investigative tool. Its invocation by the Attorney General accordingly does not imply any violation of federal law. And although this broad grant of investigative power arose against race-based civil rights abuses of the 1960s, Title III reaches beyond those original abuses.

Possessing information indicating that states throughout the nation are not fully complying with federal voter-registration laws, the Attorney General recently demanded the statewide voter registration list ("SVRL") of nearly every state. His purpose was to verify compliance, and in the case of noncompliance, to work with states to bring their practices into compliance. When any state refused to make its SVRL available, the Attorney General went to the appropriate district court to compel the state to disclose its SVRL. In such cases, the Court's inquiry is a limited one,

1

aimed only at enforcing the Attorney General's Title III right of access to election records. *See Kennedy v. Lynd*, 306 F.2d 222, 225–26 (5th Cir. 1962).

Deciding that such demands are not lawful, several district courts have now ruled that an SVRL is not a "record … relating to … registration" for purposes of Section 301, 52 U.S.C. § 20701, and therefore that Title III does not apply. The decisions of these courts have differed in their details, but the core of each court's reasoning has been that an SVRL is created by election officials, not received from a voter-registration applicant, and therefore the SVRL does not "come into [the] possession" of an election official, 52 U.S.C. § 20701. *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036-JDP, 2026 WL 1430354, at *3–4 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 1:25-cv-00468-LEW, 2026 WL 1430481, at *6 (D. Me. May 21, 2026); *United States v. Fontes*, No. 2:26-cv-00066-PHX-SMB, 2026 WL 1177244, at *2–4 (D. Ariz. Apr. 28, 2026); *United States v. Benson*, 819 F. Supp. 3d 753, 768 (W.D. Mich. 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026).

It is critically important for courts to appreciate that if this cramped interpretation of Title III was the law during the 1960s, the Attorney General could not have investigated the discriminatory voter-registration practices that, at that time, prevented black citizens from registering in several local jurisdictions in Alabama, Mississippi, Louisiana, and other states.

Immediately after the CRA was enacted, Attorney General Robert F. Kennedy began using Title III as an investigative tool. In a series of cases, the United States sought records related to voter registrations. In those cases, federal district courts ordered the local election officials to produce all voter-registration records that they had "prepared or compiled." *See* 2d Neff Decl., Ex. 21; Dkt. 58-14. The wording of these orders made clear that local election officials had to produce not only election records they received from applicants (i.e., records they had "compiled") but also

2

election records they created themselves (i.e., records they had "prepared"). *See Webster's New Int'l Dictionary* 545 (2d ed. 1959) (defining "compile" as "[t]o put together; to heap up; to construct; build"); *id.* at 1952 (defining "prepare" as "to make ready; to put into a state for use or application"). Significantly, the Fifth Circuit in *Lynd* quoted, with approval, the "prepared or compiled" language from these district court orders, *Lynd*, 306 F.2d at 229, and it affirmed the orders, saying that they "were proper," *id.* at 231. And in response to the *Lynd* decision, local election officials produced election records they created (voter-registration lists) as well as those they received (applications for registration). Moreover, it was only because local officials were compelled in the 1960s to produce voter-registration lists that the Attorney General was able to confirm which voter-registration applications had been accepted, and which rejected, thus enabling him to prove discrimination against black citizens. Simply put, if Title III of the CRA did not apply to the voter-registration lists of the 1960s—lists that, like present-day SVRLs, were created by local election officials—then local jurisdictions could have continued to avoid accountability for excluding black citizens who sought to register, a result that would have clearly contradicted the intent of Congress in enacting Title III.

The SVRLs of the 2020s are not substantively different from the voter-registration lists of the 1960s. Like the voter-registration lists of the 1960s, an SVRL is a changing list of registered voters; like voter-registration lists of the 1960s, an SVRL is created by election officials; and like the voter-registration lists of the 1960s, an SVRL is a "record … relating to … registration" that election officials must make available to the Attorney General, 52 U.S.C. § 20701; *see id.* at § 20703. An electronic SVRL, the "computerized … list," as it is descried in Section 303(a)(1)(A) of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083(a)(1)(A), is in fact the only specific election related record that Congress has deemed that every "chief State election official" must

3

"implement," "maintain[]," and "administer[]." *Id.* Pursuant to HAVA, the SVRL must be maintained at the state level, not by local officials, *see* 52 U.S.C. § 21083(a)(1)(A), and must be stored electronically, not on paper. *See id.* But it is obviously a record, and it is obviously related to voter registration. Indeed, it is the paramount record related to all federal elections because HAVA itself requires that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* at § 21083(a)(1)(A)(viii). Thus, it is not only related to elections; elections could not occur without it. Nor could investigations of election practices.

The historical precursor to the present-day SVRL is the poll tax list. In several jurisdictions, the poll tax system *was* the voter registration system. *See, e.g.*, *United States v. Texas*, 252 F. Supp. 234, 240 (W.D. Tex. 1966), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966) (per curiam) ("Texas does not have a separate system for registration of voters.") Concluding that a SVRL is not a covered record under Section 301 is akin to exempting the entirety of the poll tax administration from Title III during the 1960s, no matter how much it "relat[es] to … payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701. *See United States v. Alabama*, 252 F. Supp. 95, 97 (M.D. Ala. 1966) ("[T]he collector is required to furnish the Judge of Probate in his county with a list, by name, sex and race, of those persons who have paid the poll tax. The Probate Judge compiles the list of qualified voters by comparing the list of registered electors with the poll tax lists furnished to him by the tax collectors, and furnishes the list of qualified electors to the appropriate election officials." (footnotes omitted)). That cannot be the law.

And it need not be the law. Instead, the phrase "come into . . . possession" can be given a natural meaning, encompassing not just those records in an election official's possession on a particular date, such as the date the law went into effect, but also any records that might, in the future,

4

come into the election official's possession, whether by his own act of creating the record or by the act of others. *See, e.g.*, *United States v. Ajudua*, No. 1:12-cr-1702-JB, 2013 WL 2284960, at *8 (D.N.M. May 22, 2013) (referring to the United States' request for disclosure of tax documents—including files that are created by the Internal Revenue Service ("IRS")—as a request for disclosure of documents "which come[] into possession of the IRS subsequent to the date of this order"); *United States v. Art Metal-U.S.A., Inc.*, 484 F. Supp. 884, 887 (D.N.J. 1980) (holding that "[26 U.S.C. § 6103] is not triggered until after the United States comes into possession of tax returns or return information," even though return information includes *data recorded by and prepared by* the Secretary of the Treasury).

The *Benson* decision cites 8 U.S.C. § 1454 as an example of the "distinction between possessing something and having something come into one's possession." *Benson*, 819 F. Supp. at 768. But Section 1454 of Title 8 merely demonstrates that the distinction is a temporal one, not a distinction between records obtained by creating them and those obtained from an outside source. Section 1454(a) imposes dual obligations, one immediate and one prospective: If a certificate of naturalization or a government-certified copy of a declaration of intention is lost, the Attorney General shall issue a replacement, and "the applicant or any other person who shall have" the certificate or declaration (i.e., at the time of issuing the replacement) "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" (i.e., at any later time) must likewise surrender it to the Attorney General. Thus, the phrase "come into possession" is used to express a continuing obligation. By contrast, the text of Section 1454(a) would make no sense if the distinction being made were between records obtained by creating them and those obtained from an outside source, because no applicant or private person has the authority to create a certificate of naturalization or a government-certified copy of a declaration of intention. *See*

5

8 U.S.C. §§ 1444(b), 1445(f), 1449, 1453, 1454(a), 1455(a)(2). Thus, the *Benson* court's example only demonstrates that Congress uses the phrase "come into possession" when it wants to express a continuing obligation. It follows, therefore, that in Section 301 of Title III, Congress used the phrase "records … which come into his possession," instead of the simpler phrase "records in the possession of," to establish a continuing obligation, not a one-time obligation. And for the same reason, we disagree with *Benson*, 819 F. Supp. at 768, that Section 301 contains surplusage.[1]

Reading the statute as the Attorney General proposes does not require an unreasonable distortion of the plain meaning of Congress's words. For instance, certainly a jeweler "comes into possession" of a gold ring by *making* one from uncast gold, not merely by *buying* one. This reading also harmonizes Title III with its ultimate purpose, which is to bring an end to voting-related civil rights abuses. Indeed, Section 301 of Title III expressly includes records created by election officials among the records those officials must retain and preserve. Section 301 refers to "any application [or] registration." 52 U.S.C. § 20701. An "application" is something created by a voter-registration applicant, not by any election official, but a "registration" (i.e., the formal approval of an application and the inclusion of the registrant in the voter-registration list) is something created by an election official. *See Black's Law Dictionary* 127 (4th ed. 1951) (defining "application" as "[t]he act of making a request for something"); *id.* at 128 (defining "apply" as "[t]o make a formal request or petition, usually in writing, to a court, officer, board, or company, for the granting of some favor, or of some rule or order, which is within his or their power or discretion"); *id.* at 1449 (defining "registration" as "[r]ecording; inserting in an official register; enrollment, as registration of voters; the act of making a list, catalogue, schedule, or register, particularly of an official

---

[1] Even if our interpretation of Section 301 were to create surplusage, "[i]t is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007).

character, or of making entries therein"; and as "[a]ny schedule containing a list of voters, the being upon which constitutes a prerequisite to vote"). Hence, there can be no doubt that records created by election officials fall within the scope of Title III.

Unsurprisingly, the legislative history of Title III of the CRA disproves the distinction between records created by election officials and those received from voter-registration applicants. On February 5, 1959, President Eisenhower first proposed the legislation that eventually became Title III. The President said:

> I recommend legislation to give the Attorney General power to inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection. [¶] The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination. Until the enactment of the Civil Rights Act of 1957, the Government could protect this right only through criminal prosecutions instituted after the right had been infringed. The 1957 act attempted to remedy this deficiency by authorizing the Attorney General to institute civil proceedings to prevent such infringements before they occurred. [¶] A serious obstacle has developed which minimizes the effectiveness of this legislation. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.

Special Message to the Congress on Civil Rights, Dwight D. Eisenhower, *Pub. Papers of the Presidents* 165-66 (Feb. 5, 1959). In this statement, two points bear emphasis. First, the records the President had in mind were referred to generically as "election records" or "registration records," with no distinction made between records obtained from voter-registration applicants and those created by election officials themselves. *Id.* Second, the original purpose of giving the Department of Justice access to these records was to enable the department "to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination." *Id.* Significantly, that determination could not be made without access to voter-registration lists, because only such lists

7

would confirm conclusively whether a black citizen's registration application had been accepted or rejected.

Of course, the Department of Justice now has enforcement authority over many election laws, not just the Civil Rights Act of 1957, but unlike other titles of the CRA, Title III is not limited by its text to cases involving racial discrimination. Indeed, the Department of Justice Office of Legal Counsel recently explained persuasively that Congress clearly intended Title III to apply to new Congressional enactments, not just to preexisting laws:

> If anything, other aspects of Section 303's legislative history demonstrate that it does *not* limit the purposes for which it can be used to enforce preexisting voting statutes. For example, an early version of what eventually would become Section 303 would have authorized [the Department of Justice], when "conducting any investigation in carrying out the powers and authority conferred in [section 131(c) of the 1957 law] …, to require by subp[o]ena the production of such [materials] as may be relevant or material to such investigation." … As enacted and signed into law, section 303 conspicuously omits that limitation … "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded."

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. ___, slip op. at 19 (May 12, 2026) (citations omitted). Furthermore, regardless of which federal election law the Department of Justice might be enforcing, the problem recognized by President Eisenhower remains: without access to state and local election records, including records created by election officials, enforcement is hampered, "minimiz[ing] the effectiveness" of the federal laws. *Id.* It follows, then, that as Congress enacted new federal election laws and expanded the Attorney General's enforcement authority to cover those new laws, it also intended Title III of the CRA to apply, giving the Attorney General access to the election records that were necessary to verify compliance with the new laws. This intention has long been recognized, without controversy. *See, e.g.*, Craig C. Donsanto & Nancy L. Simmons, *Fed. Prosecution of Election Offenses* 84–85 (7th ed. 2007) ("[Section 301] does not require that states or localities produce records in the course of their election

8

processes. However, if a state or locality chooses to create a record that pertains to voting, this statute requires that record be retained if it relates to voting in an election covered by the statute."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (noting that Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves").

In *Bellows*, the court wrongly concluded that the Attorney General could not rely on Title III to gain access to election records if his purpose was to enforce the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501 *et seq.*, and the HAVA. The court said:

> Together, the NVRA and HAVA create a comprehensive scheme … for the enforcement of the list maintenance requirements imposed by those statutes. That scheme … gives the Attorney General the power to "bring a civil action" against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, but it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions … If the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes—which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list.

*Bellows*, 2026 WL 1430481 at *8. This statement is demonstrably incorrect. The NVRA and HAVA do not include a "comprehensive scheme" for their enforcement; rather, they merely state that the Attorney General may bring an action to enforce their provisions. 52 U.S.C. §§ 20510(a), 21111. When, as is true in the case of the NVRA and HAVA, federal law requires states to take detailed actions, and when all the records necessary to verify compliance with federal law are within the exclusive control of the states, there can be no enforcement without access to the relevant records, which is precisely the point President Eisenhower made when he declared the need for Title III. In addition, the *Bellows* court was also wrong to assert that the NVRA and HAVA do "not contemplate

9

the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with [their] provisions." *Bellows*, 2026 WL 1430481 at \*8. On the contrary, such an audit is precisely what the NVRA and HAVA contemplate, *first* by setting forth several pages of detailed requirements that states must satisfy when creating and maintaining an SVRL (including the use of unique numeric identifiers for each voter), and *second* by empowering the Attorney General to enforce all those detailed requirements. There is simply no way to determine whether a state is complying with the NVRA and HAVA without looking at the end-product of its actions, which is the SVRL (including the unique numeric identifiers). Trying to do so would be like trying to determine whether a builder had built a house in accordance with the architect's blueprints without looking at the house. Finally, the United States is not planning to "demand the correction of inaccuracies" in a state's SVRL, *id.*; rather, it is planning to compel states that are not in compliance with the NVRA and HAVA to come into compliance. If, as a result, inaccuracies are corrected, so be it.

Importantly, the concerns that President Eisenhower expressed in his proposal for new legislation were echoed in House Report 956, in which the House Committee on the Judiciary reported favorably on the bill that gave rise to Title III. H.R. Rep. No. 86-956 (1959). That Report stated:

> So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.

*Id.* at 7. This Report makes clear that access to state and local election records is critical to enforcement of the law and that Congress intended the Attorney General to have such access.

The minority views of the House Judiciary Committee, which criticized the bill, are particularly telling since they underscored the breadth of the power that Congress eventually enacted into law:

> Another latent defect of this title is that in effect the enactment of title III would hand to the Attorney General of the United States unlimited power of discovery. Congress in the past has rejected requests to provide the Attorney General of the United States with the power of subp[o]ena. Here, however, he would be provided with even greater power than that available under the ordinary power of subp[o]ena upon a mere demand, the refusal of which can be made the subject of a contempt of court and the failure to meet the statutory requirement is made a criminal offense. All the election records of each State of the United States are made available to him for a period of 2 years.

*Id.* at 39. This minority statement leaves little doubt about Congress's intention regarding the scope of Title III: "All the election records of each State" must be "made available" to the Attorney General "upon a mere demand." *Id.* With these minority views before it, Congress chose to enact Title III, thus clearly intending to give the Attorney General broad access to election records. The notion that Congress intended to exclude voter-registration lists from such access is nonsensical, for if so, then the very problem Congress was trying to address would have remained unsolved. As noted, the immediate purpose of the Title III was to enable the Department of Justice to determine whether black citizens were being discriminatorily prevented from registering, and it was only through access to voter-registration lists that the Attorney General could definitively confirm whether a specific black citizen's registration application had been accepted or rejected.

Several courts have attempted to bolster the argument that an SVRL is not a "record" for purposes of Title III by pointing out that an SVRL must be updated on an ongoing basis—for example, as voters move in or out of the state—and if SVRLs are records under Section 301, 52 U.S.C. § 20701, then such updating of the SVRL, or performing list maintenance under HAVA, would be "alter[ing] [a] record]" in violation of Section 302, *id.* § 20702.

11

This argument does not withstand scrutiny. The prohibition against altering a record is clearly aimed at actions that conceal wrongdoing, a point that becomes obvious when we consider that Section 302 extends to anyone who "steals, destroys, conceals, mutilates, or alters [a] record." *Id.* Thus, when read in context, the word "alters" must mean alters in a manner that spoliates. This Court should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Updating a voter-registration or poll tax list in the 1960s, or an SVRL today, does not spoliate voter-registration records; rather, it is the means of preserving voter-registration records and ensuring fair elections. HAVA, moreover, does not use the word "alter" at any point in its text. 52 U.S.C. §§ 21081, *et seq.* Therefore, such updating could not possibly be a violation of Title III under any fair reading of its language. Indeed, in light of Section 302's prohibition against destroying election records, the most prudent way to maintain an SVRL would be for a state to never delete data from its SVRL—even when deregistering a voter who has died, moved out of state, or is otherwise no longer considered eligible—and also to mark all additions of data to the SVRL with metadata indicating the precise time of the addition, thus allowing the state to easily reconstruct the list as it existed at any particular point in time.

Not surprisingly, local election officials in the 1960s, seeking to keep their records secret and avoid accountability, made many of the same arguments that the states are now making: "that the statement of 'the basis and purpose therefor' in the letter demand was inadequate; that the demand as made would be in conflict with applicable [state] statutes; that there was no necessity for the inspection … since there was no [violation of substantive law]." *Lynd*, 306 F.2d at 229. During the 1960s, federal courts, cognizant of their duty to protect basic civil rights, rejected those arguments, and they should continue to reject them now. Moreover, they should do so

12

expeditiously. In a case brought to enforce Title III, "[t]he Court, *with expedition*, should grant the relief sought or, if the respondent-custodian opposes the grant of such relief, the matter should be set down without delay for suitable hearing on the matters open for determination. These are, of course, severely limited." *Id*. at 226 (emphasis added). In *Lynd*, the Fifth Circuit criticized the district court in one of the cases then on appeal, commenting with exasperation that there was "no indication that this interminable proceeding would ever come to an end." *Id*. at 227. The court added that "the disposition [of a Section 303 proceeding] would hardly be the prompt one which our decisions require if effective compliance is to be postponed five months." *Id*. at 231. In our present historical moment, these words still ring true. The intense litigation and long delays that have followed the Attorney General's demands, in 2025, for state election records is hampering his ability to investigate possible violations of federal law, preventing him from ensuring that future federal elections are based on well-maintained and accurate SVRLs.[2]

The risk of voting-related civil rights abuses like those of the 1960s is still with us, and the Attorney General must have the investigative power to prevent such abuses. Moreover, new voting-related civil rights abuses have led to new federal election laws, and the Attorney General must likewise have the investigative power to prevent these new abuses. Whether the offender is a local election jurisdiction that unlawfully excludes the registrations of black citizens or a state that unlawfully includes the registrations of noncitizens, the votes of citizens are debased, and Title III exists to give the Attorney General the practical ability to identify such abuses and put an end to them. History has shown that the integrity of federal elections cannot be left exclusively to the

---

[2] Correspondence between the Attorney General's representative and the chief election officials of the several states began last summer. That correspondence culminated in demands, under Title III, for state election records, which led to over two dozen lawsuits, most of them filed in late 2025 or January 2026. Here we are, in June 2026, with no relief in any of those cases.

states. The federal government has an appropriate oversight role, through the uniform enforcement

of minimum standards and through Title III, so that the outcome of every federal election—who-

ever the winner or the loser might be—is one we can trust.


DATED: June 1, 2026


                                                    Respectfully submitted,


TODD W. BLANCHE                                     HARMEET K. DHILLON
Acting Attorney General                             Assistant Attorney General
                                                    Civil Rights Division

By: /s/ Jonathan H. Hambrick
JONATHAN H. HAMBRICK                                ERIC V. NEFF
VSB No. 37590                                       Acting Chief, Voting Section
*Local Attorney for the United States*              Civil Rights Division
Office of the United States Attorney
919 East Main Street, Suite 1900                    */s/  James T. Catania*
Richmond, Virginia 23219                            James T. Catania
                                                    Raymond Yang
                                                    Trial Attorneys, Voting Section
                                                    Civil Rights Division
                                                    4 Constitution Square
                                                    150 M Street NE, 8th Floor
                                                    Washington, D.C. 20002
                                                    James.Catania@usdoj.gov
                                                    Raymond.Yang@usdoj.gov
                                                    202-812-2631

                                                    *Attorneys for the United States*


14