**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

STEVEN KOSKI, in his official capacity as
Commissioner of the Virginia Department of
Elections,

*Defendant*.

No. 3:26-cv-42

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Jay Jones
 *Attorney General*

Travis G. Hill
 *Chief Deputy Attorney General*

Tillman J. Breckenridge (#85647)*
 *Solicitor General*

Daniel J. Honold (#102490)*
 *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us

June 8, 2026

*Counsel of Record for Defendant

1

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................. 4

    I.     This Court can consider the validity of the United States' demand. ...................... 4

    II.    The United States' demand exceeds the bounds of Title III. ................................. 6

          A.     Section 20701 does not cover Virginia's voter rolls................................... 6

          B.     The United States inadequately articulated the basis and the purpose for its demand under § 20703................................................................................ 8

          C.     The United States obfuscates the real reason it wants the states' unredacted voter rolls.................................................................................. 10

          D.     The United States' opposition cannot save its inadequately pled complaint. ................................................................................................................ 12

          E.     Virginia law does not authorize Commissioner Koski to turn over the unredacted voter rolls.............................................................................. 13

          F.     No case law supports the United States' novel demand. ........................... 15

CONCLUSION............................................................................................................ 16

## TABLE OF AUTHORITIES

**Cases**

*Anand v. Commonwealth*,
  No. 1:23-cv-87, 2023 WL 7301995 (E.D. Va. Nov. 3, 2023) ................................................... 12

*Coinbase, Inc. v. Suski*,
  602 U.S. 143 (2024).................................................................................................................. 6

*DOJ v. Tax Analysts*,
  492 U.S. 136 (1989).................................................................................................................. 7

*Goodman v. Praxair, Inc.*,
  494 F.3d 458 (4th Cir. 2007) ................................................................................................. 12

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ............................................................................................... 5, 6

*United States v. Amore*,
  --- F. Supp. 3d ----, No. 25-cv-00639, 2026 WL 1040637, at *4 (D.R.I. Apr. 17, 2026) .......... 5

*United States v. Oregon*,
  --- F. Supp. 3d. ---, No. 6:25-cv-1666, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026).......... 5, 6

*United States v. Powell*,
  379 U.S. 48 (1964).................................................................................................................. 5, 6

**Statutes**

26 U.S.C. § 7604............................................................................................................................ 5

52 U.S.C. § 20701......................................................................................................................... 7

52 U.S.C. § 20702......................................................................................................................... 8

52 U.S.C. § 20703...................................................................................................................... 8, 10

52 U.S.C. § 20705......................................................................................................................... 5

52 U.S.C. 20703............................................................................................................................ 9

Fed. R. Civ. P. 15(a) .................................................................................................................... 12

Va. Code § 2.2-3815 .................................................................................................................... 14

Va. Code § 24.2-405 .................................................................................................................... 13

Va. Code § 24.2-406 .................................................................................................................... 13

Va. Code § 24.2-407 .................................................................................................................... 13

**Other Authorities**

Post by @AAGDhillon, December 5, 2025, *available at*
  *h*ttps://x.com/AAGDhillon/status/1997003629442519114, https://perma.cc/Q3A5-4PRA .... 11

**ARGUMENT**

The United States' recent filings get one thing right: "the fairness and reliability of our elections" are paramount. ECF No. 59 at 1. Regrettably, its demand for Virginia's full, unredacted voter rolls undermines those very values.

As Commissioner Koski established in his motion to dismiss, the demand was unauthorized by Title III, lacked an adequate basis, and acceding to it would violate Virginia privacy laws. ECF No. 47 at 8–22. Worse, the demand is not designed to facilitate an investigation into whether Virginians "were being discriminatorily prevented from registering," ECF No. 59 at 11; rather, it is but one of many similar demands transparently intended to create a federally controlled national voter database, *see* ECF No. 47 at 18–20, ECF No. 41 at 5–9. This Court should reject this unlawful and dangerous effort, and it should grant Virginia's and the intervenors' motions to dismiss.

### I.       This Court can consider the validity of the United States' demand.

As an initial matter, a motion to dismiss under Rule 12 is an available response to the United States' complaint, which: a. commenced this civil action under Rule 3; b. was subject to service and summons requirements under Rules 4 and 5; and c. the United States amended under Rule 15. *See* ECF Nos. 1 (complaint), 28 (amended complaint), 29 (proposed summons), 30 (summons), 36 (return of service). Indeed, the United States's own proposed summons in this case states that after service of the complaint, the defendant "must serve on the plaintiff an answer to the attached complaint or *a motion under Rule 12 of the Federal Rules of Civil Procedure*." ECF No. 29 at 1 (emphasis added). That is precisely what Commissioner Koski did. ECF No. 46 at 1 (motion to dismiss filed "[p]ursuant to Federal Rule of Civil Procedure 12(b)(6)"). The United States cannot now claim that the motion it invited is procedurally inappropriate.

The United States' inconsistent positions aside, the Supreme Court has already held that a similarly worded statute does not allow the United States' selective application of the Federal

Rules. In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court determined that the Federal Rules of Civil Procedure applied to a statute that provided the district court "jurisdiction by appropriate process to compel" testimony or documents that the IRS could seek as part of an investigation. *Id.* at 52 & n.10 (quoting 26 U.S.C. § 7604); *id.* at 58 n.18 (holding that because the phrase "appropriate process" does not "specify[] the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" (citation omitted)). The operative part of § 7604 is nearly identical to 52 U.S.C. § 20705, the part of Title III the United States invokes here. *Compare* 52 U.S.C. § 20705, *with* 26 U.S.C. § 7604(a). *Powell*'s reasoning applies with equal force to the same language in Title III, meaning that Federal Rules, which include "filing a complaint, followed by answer and hearing," 379 U.S. at 58 n.18, apply.

The United States' attempts to distinguish *Powell* fall short. It argues that Title III is different because other sections of the Internal Revenue Code contain processes and safeguards that Title III does not, and because § 7604 is directed towards citizens and not election officials. ECF No. 58 at 5–6. But none of those differences matter to the statutory language that the Supreme Court interpreted in *Powell*: the phrase "by appropriate process," does not specify what procedures apply, and so the Federal Rules do. 379 U.S. at 58 n.18.

The United States' reliance on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), is misplaced. One need not look past the case caption to discern that it is an out-of-circuit case decided two years before *Powell*. And its reasoning on this point does not survive *Powell*. *Accord United States v. Amore*, --- F. Supp. 3d ----, No. 25-cv-00639, 2026 WL 1040637, at *4 (D.R.I. Apr. 17, 2026); *United States v. Oregon*, --- F. Supp. 3d. ---, No. 6:25-cv-1666, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026) ("The Supreme Court's holding in *Powell* squarely rejects [the United States'] . . . reliance on *Lynd*."), *appeal docketed*, No. 26-1231 (9th Cir. 2026). As these courts have

5

recognized, *Lynd*'s assertion that a Title III demand is "not the commencement of an ordinary, traditional civil action with all of its trappings," 555 F.3d at 225, is irreconcilable with *Powell*'s holding that the Federal Rules of Civil Procedure apply to nearly identical statutory language.

Pivoting, the United States argues that it is entitled to a summary proceeding "because Commissioner [Koski] was notified of and responded to the Motion to Compel." ECF No. 58 at 7 (citing ECF Nos. 39 (motion to compel), 56 (Commissioner Koski's opposition)). But the United States opted not to pursue its demand via a *standalone* motion to compel; rather, it filed a complaint, amended it, and served summons on Commissioner Koski. It has thus initiated a full-fledged civil proceeding, to which the Federal Rules apply, and it filed its purported motion to compel within that proceeding. *See Oregon*, 2026 WL 318402, at *8 n.1 (noting that even if *Lynd* remained good law, it would not apply where the United States "made an affirmative choice to file a complaint and proceed through ordinary litigation"). This Court can save for another day whether a more summary proceeding would be available for a standalone motion to compel, and whether such a procedure is even viable.

Finally, even if a summary proceeding were available to compel records within Title III's scope, that does not remove this Court's important role in determining the validity of the request in the first place. *Cf. Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024) ("[B]efore referring a dispute to an arbitrator . . . the court determines whether a valid arbitration agreement exists." (citation and internal quotation marks omitted)). The invalidity of the demand is the core of Commissioner Koski's motion to dismiss.

## II.    The United States' demand exceeds the bounds of Title III.

### A.    Section 20701 does not cover Virginia's voter rolls.

The United States' demand runs afoul of the law, and thus warrants dismissal, in several independent ways. To start, it is undisputed that the United States may only demand the records

described in 52 U.S.C. § 20701. That provision covers "all records and papers which come into [an election official's] possession relating" to certain "act[s] requisite to voting in [an] election." *Id.* But Virginia's full voter roll falls outside the scope of § 20701.

As Commissioner Koski showed in his motion to dismiss, the voter roll is a composite of the records that Virginian voters submit to election officials. ECF No. 47 at 8–9. Nobody submits the voter roll to the election officials; they create it. *Id.* Accordingly, it does not "come into [an election official's] possession," and so by definition it is not one of the records that the United States can demand. *See* ECF Nos. 49 at 9 (collecting dictionary definitions); 51 at 14 (collecting cases). That straightforward reading is enough to dismiss this case.

The United States' opposition all but ignores this statutory limitation.  Instead, it focuses most of its energy arguing that the surrounding phrases—1) "all records" and 2) "relating to" certain voting acts—are broad. ECF No. 58 at 7–8. The breadth of those phrases is irrelevant to the independent statutory requirement that only records that "come into [an official's] possession" count.

Congress knows how to broaden the scope of demandable records, but it did not do so here. Indeed, in the primary case on which the United States relies (at 9), the Supreme Court interpreted a definition of "agency records" in FOIA that included "documentary materials, regardless of physical form or characteristics, *made or received* by an agency." *DOJ v. Tax Analysts*, 492 U.S. 136, 145 (1989) (quoting 44 U.S.C. § 3301) (emphasis added). Congress could have drafted Title III to permit the Attorney General to demand "all records made or received by" an election official, but it only authorized the latter category. If the United States wants authorization to compel production of a document that Virginia election officials *made,* it should ask Congress, not this Court, to amend the statute.

7

Finally, Commissioner Koski appreciates the United States' concession that the verb "alters" in 52 U.S.C. § 20702 is limited to altering in a way that would "make a document unavailable, inaccessible, or inaccurate for evidentiary purposes." ECF No. 58 at 9–10. But it does not follow that that narrowed definition "does not . . . logically apply to [voter-roll] maintenance." *Id.* at 10. The United States could still argue that knowingly updating the voter rolls without saving every previous version (a logistical impossibility given the number of daily changes), means that a state has made those prior versions "unavailable . . . for evidentiary purposes," and thus "alter[ed]" them for purposes of § 20702. Accordingly, § 20702 still supports that state-maintained voter rolls are not "records" within the meaning of Title III.

> **B.    The United States inadequately articulated the basis and the purpose for its demand under § 20703.**

The United States did not meet Title III's "straightforward requirement," ECF No. 58 at 10, that the Attorney General articulate "the basis and the purpose" for his demand, 52 U.S.C. § 20703. As Commissioner Koski established in the motion to dismiss, this Court can assess the adequacy of the Attorney General's basis and purpose for the demand, as stated in the demand letter itself. ECF No. 47 at 11–14. The demand, whether assessing it by looking solely at the August 2025 demand letter or by cobbling it together with the July 2025 letter, is inadequate.

The July 2025 letter was not a demand letter and was not incorporated by reference in the August 2025 demand letter. *See* ECF Nos. 39-3 at 2 (July 2025 letter "request[ing] information" without invoking Title III); 39-4 at 3 (August 2025 letter "demanding an electronic copy of Virginia's complete and current" voter rolls without referencing the July 2025 letter). Absent some affirmative step by the United States to tie the two together, this Court should not allow the bootstrapping that the United States now seeks. The United States (at 14–15) offers no limiting principle for what correspondence falls outside "the basis" that must appear in the "demand in

8

writing." 52 U.S.C. 20703. Under its theory, any prior correspondence to an election official could theoretically form part of "[t]his demand." *Id.* But that would leave the states to comb through their prior correspondence and to guess at what other documents the United States had in mind when it sends a lacking demand letter. The better reading of the text—which refers to a singular "demand in writing" that must contain "the basis" for the demand, *id.*—is that only the basis that appears in the demand letter itself counts.

The United States' opposition makes no effort to defend the adequacy of the August 2025 letter standing alone. *See* ECF No. 58 at 10 (disputing that "the July 15 and August 14 Letters cannot be read together"), 14–15 (arguing that "[t]he August 14 letter and the July 15 letter provided Virginia with the statement of the basis"). This lack of a response concedes the point.

In any event, the July 2024 letter was also inadequate. That letter requested Virignia's current voter rolls—again, invoking other statutes but not Title III—without explaining why it was asking for them. ECF No. 39-3 at 2. It then requested "[a]dditional" information from a different time frame: from "close of registration for the November 2022 general election through the close of registration for the November 2024." *Id.* at 3. For example, it asked about "what actions Virginia [was] taking to ensure that voters who should not be on the voter roll are being removed," *id.*, and "what actions Virginia [was] taking to identify duplicate registrations and to remove those duplicates," *id.* For those additional requests, the letter noted several purported responses by Virginia to a federal election survey, and the requests bore at least some superficial nexus to the responses. *See id.* But the letter did not even attempt to provide a basis for its separate request for the voter rolls.

Nor could wanting more information about the survey responses covering a period of November 2022 to November 2024 provide a basis for demanding the "current" voter rolls in July

9

2025. The United States has never explained the fundamental disconnect between inquiries into past voting misconduct—which, if anything, would form the basis for demanding records responsive to those time periods—and demanding current voter rolls, which will have changed significantly in the interim. The most straightforward explanation for the disconnect is that the United States is not interested in investigating discrete allegations of past misconduct; rather, it wants to create a national voter database under a pretense.

The bulk of the United States' opposition regarding the inadequacy of its demand is irrelevant. It argues that "recent enforcement efforts [in North Carolina] by the Attorney General demonstrate the need for federal scrutiny." ECF No. 58 at 11; *see id.* at 11–14 (similar). Putting aside that North Carolina's alleged problems have no logical bearing on Virginia's compliance, meeting the articulation requirement in § 20703 turns on what the Attorney General says in the *demand letter*, not what the United States later says in an opposition to a motion to dismiss. *See* 52 U.S.C. § 20703 ("This demand [in writing by the Attorney General] shall contain a statement of the basis and the purpose therefor."). The time for meeting this requirement passed long ago.

**C.** **The United States obfuscates the real reason it wants the states' unredacted voter rolls.**

This Court need not blind itself to the United States' true motives here. It is obvious that it is trying to amass an unauthorized national voter database, and this lawsuit is one step in furtherance of its plan it has attempted to execute around the country. Commissioner Koski and the intervenors presented a mountain of reporting, as well as social-media posts by the very Assistant Attorney General in the United States' signature block, demonstrating as much. *See* ECF Nos. 47 at 3–4, 19–20; 49 at 3–4; 51 at 5–9. The volume and timing of similar demands across the country for states' full, unredacted voter rolls—more than 30 similar lawsuits since September 2025, *see* ECF No. 47 at 6 n.3 (collecting cases)—only confirms this.

The United States briefly characterizes the news of this plan as "absurd and false." ECF No. 48 at 11. But other than broadly asserting that the reporting is based on "unreliable hearsay," *id.*, it does nothing to show how its conduct leads to any other conclusion. *See* ECF No. 58 at 11–14. It especially does not grapple with (and could hardly characterize as "unreliable hearsay"), AAG Dhillon's recorded video statement. *See* December 5, 2025, Post by @AAGDhillon, *available at* https://x.com/AAGDhillon/status/1997003629442519114, https://perma.cc/Q3A5-4PRA (cited in ECF No. 51 at 8 & n.10). That post admitted that the United States had "reached out to all 50 states" demanding their voter rolls. *Id.* at 00:15. It then described the 15 then-pending lawsuits and assured that the United States would "get to the rest of the states." *Id.* at 01:14. It noted that it had received voluntary disclosures from several states and checked over 40 million voter records. *id.* at 01:20. Then, tellingly, it proceeded to *aggregate the data* it had amassed from the voluntary disclosure states. *See id.* at 01:25 (asserting more than 20,000 "dead people" and "several thousand non-citizens" across those states' voter rolls). The post concluded by promising that the United States "will not rest" until it completes "this project." *Id.* at 02:04. The post speaks for itself.

The United States makes no effort to demonstrate that any statute, let alone the ones at issue here, authorize the compilation of such a database. On the contrary, it is antithetical to the primacy of the states in conducting elections. *See* ECF No. 58 at 22 (agreeing that "the United States Constitution invests states with the primary responsibility for the conduct of federal elections").

Relatedly, the United States's argument that Title III is not limited to remedying racial discrimination in voting, ECF No. 58 at 16–19, is a straw man. Even if correct, it would not change the fact that their actual motives for seeking Virginia and other states' records is unauthorized by

11

Title III. Nor would it change that the United States requested documents outside the scope of Title III, nor that it provided an inadequate basis for the demand.

    **D.**       **The United States' opposition cannot save its inadequately pled complaint.**

The Commissioner argued that the amended complaint failed to plead facts that demonstrated compliance with the Privacy Act of 1974 and E-Government Act of 2002. ECF No. 47 at 22–23. The United States' response attempts to add facts to the complaint, for example, that "the voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online." ECF No. 58 at 25–26; *see also id.* at 27 n.20 (implying that it will store state voter rolls on a particular cloud-storage service and alleging that it already "prepared a Privacy Act Assessment" for that service). But a plaintiff cannot amend its pleadings through motions practice. *E.g.*, *Anand v. Commonwealth*, No. 1:23-cv-87, 2023 WL 7301995, at *8 (E.D. Va. Nov. 3, 2023) (noting that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint" (citation omitted)). The United States' effort to do so here only underscores the inadequacy of the amended complaint in these areas. Given that the United States has already amended its complaint once, it must seek leave of the court before attempting to plead additional facts. *See* Fed. R. Civ. P. 15(a).

The United States does not argue that its amended complaint establishes its compliance with these laws. Rather, it argues that the lack of compliance amounts to an "affirmative defense[]" and therefore cannot form the basis for dismissing the Complaint." ECF No. 58 at 25. That is flatly inconsistent with Fourth Circuit case law the Commissioner cited, which holds that a district court can reach affirmative defenses where "all facts necessary to the affirmative defense "clearly appear[ ] on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (citation and emphasis omitted) (cited in ECF No. 47 at 8).

**E.      Virginia law does not authorize Commissioner Koski to turn over the unredacted voter rolls.**

Commissioner Koski established that turning over unredacted voter rolls containing full social-security numbers, full drivers-license numbers, and other sensitive information would violate Virginia privacy laws. ECF No. 47 at 20–21 (explaining that Title 24.2 of the Virginia Code makes the Department of Elections responsible for maintaining registration records and severely restricting the disclosure of social-security numbers, full dates of birth, and certain voters' addresses) (citing Va. Code §§ 24.2-404, 24.2-444(C), 24.2-405(C), 24.2-406(C), 24.2-407.1, 24-1002.1, 2.2-3808.1). These prohibitions are backed by criminal penalties for the unauthorized disclosure of social-security numbers, subject to narrow exceptions. Va. Code §§ 24.2-405(C), 24.2-406(C), 24.2-407.1. Thus, the United States effectively demands that Commissioner Koski violate Virginia law, further underscoring the demand's unlawfulness.

The United States' first response is yet another straw man: that statutory limitations on the United States' ability to disclose the records it receives must mean that it is entitled to receive "non-public information." ECF No. 58 at 20. Assuming for the sake of argument that "records" in Title III can include some non-public information, it does not follow that this must include full social-security numbers and drivers-license numbers.

Nor would such a limitation "eviscerate Title III." ECF No. 58 at 20. The United States worries that it will not be able to distinguish between voters with the same name without additional identifiers. *Id.* at 20–21. But it does not establish that full, unredacted social-security numbers and drivers-license numbers are necessary for this goal, or that Title III would be "eviscerate[d]" without their disclosure. *See id.* It does not, for example, explain how partial identifying numbers would be inadequate to differentiate between voters with the same name. *See id.* The United States'

13

insistence on receiving the full numbers only supports that their true goal is creating their own national database.

Lastly, the United States is incorrect that Virginia law authorizes Commissioner Koski to disclose these records. It relies on Virginia Code § 2.2-3815(B)(2) and (5). But (B)(2) authorizes disclosure of social-security numbers to "federal, state or local law-enforcement or correctional personnel, including a law-enforcement officer, probation officer, parole officer or administrator, or a member of a parole board, seeking information in the course of his official duties." Three aspects of this law make it inapplicable here:

*First*, looking at the enumerated examples in this list, the Attorney General is plainly not one of the "law-enforcement or correctional personnel" within the scope of this statute. *See* ECF No. 58 at 10 (citing *Fischer v. United States*, 603 U.S. 480, 487 (2024) ("the canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated" and it "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with the company it keeps" (citations and internal quotation marks omitted)). The provision includes police, probation, and parole-board members, and is plainly geared towards facilitating the share of individual-scale information between discrete law-enforcement bodies, *see* Va. Code § 2.2-3815(B)(2), not the wholesale disclosure of thousands of Virginians' sensitive information to the Attorney General of the United States. *Second*, as established in the motions to dismiss and this reply, the Attorney General is not acting "in the course of his official duties," *id.*, by making a demand for records that is unauthorized by any statute and for which he has obscured his true motives. *Third*, even if the provision applied, § 2.2-3815 only covers social-security numbers, and not drivers-license numbers. *See id.*

Subsection (B)(5) fares no better. It authorizes disclosure "to comply with any applicable law or regulation." But that begs the question whether Title III is "applicable," and Commissioner Koski has thoroughly demonstrated that it is not.

### F.   No case law supports the United States' novel demand.

For all its case citations, the Unites States' opposition has a glaring omission: a single case in which a court has ordered a state to turn over its full, unredacted voter rolls pursuant to a demand under Title III. Indeed, the opposition's authority amounts to little more than several examples of states voluntarily disclosing their records. ECF No. 58 at 11–14. But other states' voluntary decisions have no bearing on whether the United States can use the courts to force such a disclosure. On the contrary, every federal court to have decided a similar dispute has ruled against the United States. ECF Nos. 47 at 7 (collecting cases); 55 at 2 (noting two additional cases decided since the motion to dismiss). This Court should join the growing chorus refusing the United States' invitation to stretch Title III beyond all recognition.

## CONCLUSION

This Court should dismiss the United States' complaint.

Date: June 8, 2026

Respectfully submitted,

STEVEN KOSKI, IN HIS OFFICIAL CAPACITY
AS COMMISSIONER OF THE VIRGINIA
DEPARTMENT OF ELECTIONS

By: */s/ Tillman J. Breckenridge*

Jay Jones
  *Attorney General*

Tillman J. Breckenridge (#85647)*
  *Solicitor General*

Travis G. Hill
  *Chief Deputy Attorney General*

Daniel J. Honold (#102490)*
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 786-1991
SolicitorGeneral@oag.state.va.us


***Counsel of Record for Defendant*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June, 2026, I filed the foregoing using the Court's

CM/ECF filing system, which sends an electronic notification of the same to counsel of record.


By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge (#85647)
*Solicitor General*