# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVEN KOSKI, in his Official Capacity as Commissioner of the Virginia Department of Elections,<br><br>    Defendant. | No. 3:26-cv-00042<br>(Hon. Roderick C. Young) |

**REPLY IN SUPPORT OF INTERVENOR-DEFENDANTS COMMON CAUSE AND KATHERINE ELLENA'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT............................................................................................................................. 2

   I.   THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ........................................................................................................................ 2

   II.    THE UNITED STATES SEEKS RECORDS OUTSIDE THE SCOPE OF TITLE III. . 3

   III.    THE UNITED STATES HAS NOT COMPLIED WITH TITLE III'S BASIS AND PURPOSE REQUIREMENT. ....................................................................................... 7

   IV.    THE UNITED STATES' DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND CONSTITUTIONAL RIGHTS OF VOTERS. ........................................................... 13

CONCLUSION....................................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Coalition for Open Democracy v. Scanlan*,
No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ............................................ 16

*Colonial Penn Insurance Co. v. Coil*,
887 F.2d 1236 (4th Cir. 1989) ................................................................................................. 13

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024)..................................................................................................................11

*Just Puppies, Inc. v. Brown*,
123 F.4th 652 (4th Cir. 2024) .................................................................................................. 13

*Navigators Insurance Co. v. Under Armour, Inc.*,
165 F.4th 171 (4th Cir. 2026) .................................................................................................. 13

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)..................................................................................................................11

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ................................................................................................... 14

*Shore v. Charlotte-Mecklenburg Hospital Authority*,
412 F. Supp. 3d 568 (M.D.N.C. 2019)..................................................................................... 13

*State of Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960).......................................................................................... 5

*United States Department of Justice v. Tax Analysts*,
492 U.S. 136 (1989).................................................................................................................. 4

*United States v. Amore*,
No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)............................ 2, 8, 9

*United States v. Bellows*,
No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026) ........................................ 2

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026)......................................................................... 2, 4, 6

*United States v. Fontes*,
No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026).................... 2, 4, 6, 7

*United States v. Galvin*,
No. 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ...................................... 2, 8, 9

*United States v. Oregon*,
   No. 25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ................................... 1, 7, 13

*United States v. Powell*,
   379 U.S. 48 (1964)............................................................................................................. 3

*United States v. Simms*,
   914 F.3d 229 (4th Cir. 2019)............................................................................................ 14

*United States v. Weber*,
   816 F. Supp. 3d 1168 (C.D. Cal. 2026)....................................................................... 1, 9, 13

*United States v. Wisconsin Elections Commission*,
   No. 3:25-cv-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ............................. 2, 4

**Statutes**

52 U.S.C. § 20702........................................................................................................................ 6

52 U.S.C. § 20703........................................................................................................................ 3

52 U.S.C. § 20705..................................................................................................................... 3, 5

**Other Authorities**

106 Cong. Rec. 3692 (1960)........................................................................................................ 6

Authority to Obtain and Share Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026),
   https://www.justice.gov/olc/media/1440346/dl ................................................................. 12

*Technology & Security Overview*, ELECTRONIC REGISTRATION INFORMATION CENTER,
   https://ericstates.org/security/ .................................................................................... 16, 17

**Rules**

Fed. R. Civ. P. 1.......................................................................................................................... 3

Fed. R. Civ. P. 81........................................................................................................................ 3

**INTRODUCTION**

The United States has not plausibly pleaded its entitlement to seize Virginia's statewide voter registration lists ("SVRL"), replete with voters' sensitive personal information, over the State's objection. This action must accordingly be dismissed.

Even if the United States' requested records fell under the scope of the statute invoked—which they do not—the United States never identifies a factual basis or a legitimate, non-pretextual purpose for its unprecedented request for Virginia's complete and unredacted SVRL—let alone "*the* basis" and "*the* purpose"—as Title III of the Civil Rights Act of 1960 ("CRA" or "Title III") requires (emphasis added). 52 U.S.C. § 20703. *See* United States' Opposition to Defendant's and Intervenors' Mots. to Dismiss ("U.S. MTD Opp."), Dkt. No. 58; United States' Mem. in Support of its Mot. to Compel Federal Election Records Under the Civil Rights Act of 1960 ("U.S. MTC Br."), Dkt. No. 39-1. The statutory requirement to state "the basis and the purpose" of a Title III demand in writing is not an empty formality; it is a key statutory prerequisite that, under the United States' reading, would be rendered almost meaningless.

Nor does the United States explain why, even if production were required, redactions would not be permissible to protect Virginia voters' sensitive personal information, as is common with productions under analogous provisions of the National Voter Registration Act ("NVRA"), including under Fourth Circuit precedent. Because the Complaint claims entitlement to the full, unredacted SVRL, it is fatally defective on that basis as well.

Eight courts have addressed the merits of similar CRA lawsuits by the United States, and all eight have granted dismissal, rejecting the United States' demand for states' complete and unredacted SVRLs. *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026);

1

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 1:25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 1, 2026); *United States v. Amore*, No. 1:25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026), *appeal docketed*, No. 25-1665 (1st Cir. June 3, 2026); *United States v. Fontes*, No. 2:26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026), *appeal docketed*, No. 26-3609 (9th Cir. June 4, 2026); *United States v. Bellows*, No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026), *appeal docketed*, No. 26-1676 (1st Cir. June 8, 2026); *United States v. Wis. Elections Comm'n*, No. 3:25-cv-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026), *appeal docketed*, No. 26-2217 (7th Cir. June 8, 2026).

The Amended Complaint here is no different. This Court should dismiss as well.

## ARGUMENT

**I.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.**

The United States uses its opposition to the motions to dismiss to rehash many of the same arguments from its motion to compel, asserting, based primarily on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), and other non-binding cases from more than half a century ago in a radically different context, that it is entitled to summary disposition of its CRA claim without meaningful judicial review. *See* U.S. MTD Opp. at 1–7. These arguments, which fly in the face of binding Supreme Court precedent, statutory text, and the Federal Rules of Civil Procedure, are all thoroughly addressed in Intervenor-Defendants' opposition to the United States' motion to compel, which Intervenor-Defendants incorporate here by reference. *See* Intervenor-Defendants Common Cause and Katherine Ellena's Mem. of Law in Opposition to Plaintiff's Mot. to Compel ("MTC Opp."), Dkt. No. 57.

2

The United States' only slightly new argument on this score is the assertion that the text of the CRA does not "provide any process for election officers to object to CRA proceedings being initiated against them." U.S. MTD Opp. at 6. That is obviously wrong. The statute expressly provides that an attempt to compel records sought under Title III must be made in federal court, and that the court has "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. The appropriate process for a plaintiff who initiates an action in federal court to obtain the relief it seeks is the process set forth in the Federal Rules, which govern in all such actions. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57–58 & n.18 (1964) (where statute provided that IRS could obtain documents via "appropriate process" and did not otherwise "specify[] the procedure to be followed in invoking the court's jurisdiction," the Court held that "the Federal Rules of Civil Procedure apply"); Fed. R. Civ. P. 1, 81.

## II.    THE UNITED STATES SEEKS RECORDS OUTSIDE THE SCOPE OF TITLE III.

The United States claims that it is entitled to Virginia's SVRL under Title III of the CRA. U.S. MTD Opp. at 7–10. But as a threshold matter, the SVRL falls outside the scope of Title III.

Section 301 of the CRA requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303—the provision granting the Attorney General authority to request records—obligates officials to make "available for inspection, reproduction, and copying at the principal office of such custodian," "[a]ny record or paper required by [Section 301] to be retained and preserved," *id*. § 20703; that is to say, only those records that have "come into [their] possession," *id*. § 20701.

3

As multiple courts have now recognized, because Congress specified in the text of Title III that covered "records and papers" are those that "*come into* [election officials'] possession"— express and particular statutory language which refers to "items that a person *obtains* rather than *creates*," as opposed to broader language like any records and papers that are "in[] [their] possession," or simply referring to "all records and papers" with no qualifier—SVRLs created by state officials are not included. *See Benson*, 819 F. Supp. 3d at 768 (emphasis in original); *see also Fontes*, 2026 WL 1177244, at *2 (noting that the phrase "come into [the state's] possession" "would be superfluous if it also encompassed records the state *created*" (internal citation omitted)); *Wis. Elections Comm'n*, 2026 WL 1430354, at *3 (similar).

The United States suggests in its brief that the SVRL is merely "a composite of individual records," U.S. MTD Opp. at 7–8, but does not cite any document or paragraph of the pleadings to support this assertion. Nor in the end does it dispute that the SVRL is a document that is created by state officials, not one that comes into their possession, for example, because it was submitted or supplied by a voter. And its attempts to evade plain text fail.

The United States claims that "coming into possession of material refers to *when*, not how, the possession began," citing *U.S. Department of Justice v. Tax Analysts*. *See* 492 U.S. 136, 145 (1989). U.S. MTD Opp. at 9 (citations omitted). But *Tax Analysts* says no such thing. In that case, the Court interpreted the meaning of the term "agency records" in the Freedom of Information Act (FOIA), and concluded that this term included records obtained by the agency as well as those generated internally. 492 U.S. at 145-146. The case did not analyze the term "come into possession" at all. It only used the phrase to describe how a record that "come[s] into the agency's possession in the legitimate conduct of its official duties" is in the agency's "control" and is therefore an "agency record" for FOIA purposes. *Id.* Indeed, if anything, the entire premise of the

4

dispute in *Tax Analysts* is the fact that records that come into an agency's possession are only one distinct subset of agency records, as compared to those created by the agency. Here, unlike in the FOIA context, the CRA does not use a general term like "agency records" that encompasses both records that come from third parties and records that are generated internally; rather, it expressly covers only those that "come into [the officials'] possession." 52 U.S.C. § 20705. With such clear differences in text come differences in statutory scope and meaning.

The United States also cites a snippet from *Gallion*, an inapposite, non-binding 1960 district court case which involved a demand for voter registration applications received from voters, and not for any internally generated materials like the SVRL. *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 & n.7 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). In *Gallion*, the State of Alabama argued that voter applications submitted prior to the CRA's passage were not covered, and the courts rejected that argument, holding that "[r]egardless of when these records came into the possession of the election official," otherwise covered records that were already in election officials' possession "prior to the passage and approval of the [CRA]" were still subject to Title III. *Id.* at 855 & n.7. Again, the case simply does not speak to the issue here.

The United States further claims, without support, that "[l]imiting Section 301 to materials that a state election official has acquired from a third party would undermine the [CRA]'s purpose" —without explaining what this purported purpose would be—and that "[i]nterpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred." U.S. MTD Opp. at 9. Not so. In fact, the history motivating the passage of Title III factored prominently into the

analysis of *Benson* and other courts. As those courts explained, holding hat SVRLs do not fall within the scope of Title III because they do not "come into [election officials'] possession" makes particular sense in light of the specific history that motivated Title III. *See, e.g.*, *Benson*, 819 F. Supp. 3d at 769. Indeed, Congress' primary concern in fashioning Title III was to allow the Attorney General to stop election officials from receiving voter registration applications from Black voters and then refusing to process or even destroying them—in other words, Title III was specifically intended to reach the voter registration materials that state election officials *acquired or obtained from voters*. *See id.* at 769 (citing a 1959 report from the United States Commission on Civil Rights finding that "[r]ejected [voter registration] applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"); *see also, e.g.*, 106 Cong. Rec. 3692 (1960) (Sen. Javits) ("[e]xperience has also shown that local registration officials engage in every possible dilatory tactic to delay enforcement of voting rights").

This reading is also consistent with Section 302 of the statute, which creates liability for "[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or alters any" covered record under Title III. 52 U.S.C. § 20702; *see also Fontes*, 2026 WL 1177244, at *4. Applying the statute to voter registration applications and other materials received from others, this provision merely prevents officials from tampering with those submitted records. But as the court in *Fontes* pointed out, if SVRLs were covered records "under § 20703, then § 20702 would necessarily outlaw any person from altering the SVRL. However, this interpretation conflicts with the very purpose of VRLs and would place Title III in conflict with" the list maintenance requirements of the NVRA and HAVA, which require SVRLs to be regularly altered. 2026 WL 1177244, at *4–5. In response, the United States says the word "alter" should be given an unnatural meaning, because the other

6

verbs used in Section 20702 "all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes," a description that does not "logically apply to SVRL maintenance, which is designed to ensure accuracy and confidence in voter registration rolls, not to undermine them." U.S. MTD Opp. at 9–10 (internal citations omitted). But the much simpler explanation is that the CRA language "does not . . . logically apply to SVRL maintenance," precisely *because* SVRLs were not intended to be included in the scope of Title III. *Id.*; *see, e.g.*, *Fontes*, 2026 WL 1177244, at *4–5. The United States' demand fails as a matter of law and the case can be dismissed for this reason alone.

## III.   THE UNITED STATES HAS NOT COMPLIED WITH TITLE III'S BASIS AND PURPOSE REQUIREMENT.

Even if the United States had sought records that were covered by Title III, the Attorney General must still comply with the requirement to provide "a statement of the basis and the purpose" in writing for any CRA demand. 52 U.S.C. § 20703. Here the United States failed to comply with this express statutory requirement.

"Basis" and "purpose" are distinct concepts. In this context, the "basis" is the factual explanation of why the Attorney General believes there is a violation of federal law in the first place, whereas the "purpose" explains how the requested records would help the Attorney General ultimately determine if there is, in fact, a violation of the law. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6 (noting written demand stating "[t]his demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction" and stating "[t]he purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred"); *see also Oregon*, 2026 WL 318402, at *9 ("Reading 'basis' in the way [the United States] suggests collapses its meaning with

7

that of 'purpose'. . . . If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose."); *Amore*, 2026 WL 1040637, at *5 (similar); *Galvin*, 2026 WL 972129, at *4 ("[T]he statutory text clearly conveys that 'the basis' and 'the purpose' are conceptually distinct.").

The United States now asserts that its July 15, 2025 letter to Susan Beals, Virginia's then-Commissioner of the Department of Elections, provided the basis for its demand, which was "Title III of the CRA, the NVRA and HAVA." U.S. MTD Opp. at 10; *see also* U.S. MTC Br., Ex. 2, Letter of Michael E. Gates to Hon. Susan Beals dated July 15, 2025 ("July 15 Letter"), Dkt. No. 39-3. In its motion to compel, the United States insisted that the basis for its demand, as stated in its separate August 14, 2025 letter to then-Commissioner Beals, was simply Title III of the CRA itself. U.S. MTC. Br. at 11; *see also* U.S. MTC Br., Ex. 3, Letter of Harmeet K. Dhillon to Hon. Susan Beals dated Aug. 14, 2025 ("August 14 Letter"), Dkt. No. 39-4. And its First Amended Complaint did not identify a basis at all. *See* Am. Compl. ¶ 30, Dkt. No. 28 (making only a conclusory statement that its August 14 Letter "contained a statement of the basis and the purpose therefor") (citation modified).

Even ignoring the inconsistency throughout these representations, none of these set forth the requisite *factual* basis for the United States' demand. Merely invoking the CRA at most involves a statement of the *legal* basis for the request, but of course, the CRA is by definition the legal basis for every CRA request. *See Galvin*, 2026 WL 972129, at *5 (explaining that asserting the CRA as the "basis" for the demand "confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand"); *Amore*, 2026 WL 1040637, at *5 (noting that "the 'basis' contemplated by Title III is a factual, not legal basis," and rejecting the argument that a

8

legal basis like Title III itself could be sufficient, because "Congress could not have intended Title III to be interpreted in this redundant and circular manner").[1] Nor could invoking the NVRA or HAVA, without more, amount to a sufficient statement of the basis for the demand. The court in *Galvin* also addressed this exact point. *See* 2026 WL 972129 at *5 ("Perhaps the federal government means that, by stating that its purpose was 'to ascertain [the state]'s compliance with the list maintenance requirements of the NVRA and HAVA,' it implied that its 'basis' was [the state]'s 'possible lack of compliance' with those requirements." (internal citations omitted)). As the *Galvin* court explained, "this sort of reasoning runs headlong into the CRA's text," since the "federal government's logic would collapse 'the basis' into 'the purpose,' rendering a statutory phrase superfluous. And suggesting that the CRA is satisfied so long as a demand's recipient can infer the basis is contrary to the statute's requirement of a written demand 'contain[ing] a statement of the basis.'" *Id.* (internal citations omitted).

The United States also appears to argue that, taken together, the "August 14 letter and the July 15 letter provided Virginia with the statement of the basis and purpose of the Attorney General's demand," without actually articulating how those letters provide additional relevant information about the basis or the purpose. *See* U.S. MTD Opp. at 14–15. Whether or not both letters may be considered (despite the fact that the earlier July 15 Letter did not invoke the CRA

---

[1] To address palpable federalism concerns, the United States additionally attempts to frame its interpretation of federal and state roles as exemplifying a "trust, but verify" approach, which, it argues, still "respects the federal structure and the primacy of state officials in conducting federal elections." U.S. MTD Opp. at 23–24. But far from "trusting" the states and recognizing their primary role in conducting their own list maintenance, here, the United States provides zero factual basis for its demand that might explain what needs to be verified or why it needs to impinge on states' administration of elections, and indeed, affirmatively argues that no factual basis or justification at all is needed, *see* U.S. MTC Br. at 12–13. Far from a measured, "trust, but verify" approach, the United States' position, if accepted, would allow precisely the sort of unrestricted fishing expeditions that courts have warned against, *see Weber*, 816 F. Supp. 3d at 1184; *accord Amore*, 2026 WL 1040637, at *5.

at all), the United States simply points to nothing in either letter that amounts to a factual basis for its demand for Virginia's unredacted SVRL, such as any explanation whatsoever as to how anything in these letters might point to any potential violation of federal law or anything inconsistent with reasonable list maintenance efforts under the NVRA or HAVA. *See* U.S. MTD Opp. at 10–15.

In the absence of literally any factual basis to demand Virginia's SVRL, the United States now cites to various consent decrees and lawsuits that were not cited in its Amended Complaint involving states other than Virginia, ostensibly to show that "federal scrutiny" of list maintenance is warranted. *See* U.S. MTD Opp. at 11–14. None of those involved contested litigation over the application of the CRA and none of these involve Virginia. One involves a recent North Carolina consent decree where state officials had admittedly failed to ask some voters for any of the identification numbers required by HAVA, U.S. MTD Opp. at 11–12; *see also* Compl., *United States of America v. N.C. State Bd. of Elections*, No. 5:25-cv-283-M-RJ, at ¶¶ 34–42. The others involved consent decrees and/or settlements from nearly 20 years ago, some in matters relating to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") and the Voting Rights Act ("VRA"), U.S. MTD Opp. at 13–14. This smattering of inapposite docket entries from matters in other states only reinforces the impression that the United States is attempting to backfill a valid basis and purpose after the fact in order to justify a fishing expedition in Virginia.

The failure to state "the basis" for the request for Virginia's SVRL, as required by the CRA, 52 U.S.C. § 20703, is fatal to the United States' claim.

As for "the purpose," the United States asserts that the purpose for its demand for Virginia's complete and unredacted SVRL is "to ascertain Virginia's compliance with the list maintenance requirements of federal law, specifically the NVRA and HAVA." U.S. MTD Opp. at 10. But the

United States has been inconsistent in its representations about its purpose as well. And Section 303 of the CRA, by requiring a statement of "*the* basis and *the* purpose" of a records request, 52 U.S.C. § 20703 (emphasis added), and by twice using the definite article, requires not just an incomplete or inconsistent basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article).

For example, not once in its opposition to the motions to dismiss, motion to compel, or amended complaint does the United States make any reference to sharing data from Virginia's SVRL with other agencies, including agencies like the Department of Homeland Security ("DHS") with immigration enforcement responsibilities. *See generally* U.S. MTD Opp.; U.S. MTC. Br.; Am. Compl. Yet, in the course of litigation with materially identical CRA claims in different states, the United States has admitted that it does have such plans—including at a hearing for its lawsuit seeking Rhode Island's voter list, stating that it is "certainly" the "intention" of the Department of Justice ("DOJ") to "run [the lists] against DHS's SAVE database." *See* Mem. Of Law in Support of Intervenor-Defendants Common Cause and Katherine Ellena's Mot. to Dismiss ("MTD Br."), Ex. B, Mar. 26, 2026 Transcript of Hearing from *United States v. Amore* ("*Amore* Hearing Transcript"), Dkt. No. 51-2 at 50:17–23; *see also id.* at 66:12–14; 66:8–9 (admitting, in answering a question about whether voter lists could be used "for [Immigration and Customs Enforcement] going to people's homes and arresting them," that DOJ "cannot promise what any other agency will or will not do" with the data).

The United States attempts to wave away arguments about the United States' actual purpose as merely based on hearsay, U.S. MTD Opp. at 11, while ignoring, for example, DOJ's

11

own statement in the *Amore* Hearing Transcript, Dkt. No. 51-2, as well as DOJ's own memorandum of understanding for states to sign in connection with requests for SVRLs—which, far from indicating a purpose of ensuring compliance with the NVRA and HAVA, actually runs afoul of those statutes, *see* MTD Br. at 22–23; MTD Br., Ex. A, Confidential Mem. Of Understanding ("MOU"), Dkt. No. 51-1. And even a source cited by the United States itself in its opposition to the motions to dismiss—a recent Office of Legal Counsel ("OLC") opinion by its DOJ colleagues, which was supposedly requested by DOJ around the time it began its flurry of lawsuits seeking complete and unredacted SVRLs throughout the nation—still casts doubt on the United States' actual purpose for its requests for SVRLs. *See* U.S. MTD Opp. at 2 n.1 (citing Authority to Obtain and Share Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026), available at https://www.justice.gov/olc/media/1440346/dl ("OLC Opinion")). In this opinion, OLC responds to DOJ's proposal "to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ('HSI') or another unit within DHS"—a proposal which was already made and addressed by "early September 2025." OLC Opinion at 1. OLC adds a disclaimer that DOJ has "represented to us that, at the time the requests were made, DOJ did not intend to use these lists for immigration enforcement," accompanied by a footnote that "[t]o be clear, we have received no information as of the time of signature that this intent has changed," and also noting its awareness that DOJ's "efforts have come under significant scrutiny in litigation." *Id.* at 5–6 and nn.5–6. Yet the OLC Opinion is premised on questions regarding whether SVRLs may be shared with DHS. *See id.* at 1.

12

Extensive, judicially-noticeable evidence[2] further supports that the United States has not disclosed the actual purpose for its requests, *see* MTD Br. at 18–24. This Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184; *see also Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

## IV.    THE UNITED STATES' DEMAND IS INVALID BECAUSE IT DOES NOT ALLOW FOR REDACTIONS AND MODIFICATIONS TO PROTECT THE PRIVACY AND CONSTITUTIONAL RIGHTS OF VOTERS.

Even had the United States requested records covered by Title III and even had it complied with Title III's basis-and-purpose requirement—neither of which it did— its request would also be legally deficient because it does not allow for redactions, omissions, or other modifications to protect the privacy rights of Virginia voters.[3]

---

[2] *See, e.g.*, *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024). For example, this Court may take judicial notice of related court proceedings, such as proceedings in other cases seeking SVRLs. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239–40 (4th Cir. 1989). It may also take judicial notice of government documents produced by DOJ, such as the MOU. *See, e.g., Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019); *see also, e.g.*, *Navigators Ins. Co. v. Under Armour, Inc.*, 165 F.4th 171, 180 n.9 (4th Cir. 2026).

[3] The United States argues that the "only way" for it "to determine whether Virginia has an identifier for each person registered to vote for federal elections is by reviewing its complete SVRL," U.S. MTD Opp. at 21. But even assuming, in the United States' favor, that it must review the SVRL to determine whether it includes these identifiers, the United States could still make that assessment based on a version of Virginia's SVRL with highly sensitive personal information redacted. For example, SVRL fields with the relevant identifiers could be redacted except for one digit, which would still provide sufficient information regarding the *presence or absence* of such identifiers, if that is what the United States is so concerned about, but would still prevent the unnecessary disclosure of Virginia voters' driver's license numbers or Social Security Numbers. The United States could also, in the first instance, simply ask Virginia whether all of the records in the SVRL have unique identifiers for each registrant.

13

Courts have consistently held that redacting voters' sensitive personal data is appropriate and even necessary under the NVRA. Specifically, the Fourth Circuit has recognized that, in disclosing voting-related information pursuant to the NVRA's public records provisions, "uniquely sensitive information" may properly be redacted. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012); *accord Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," such redaction of "certain personal information" may be required to "assuage the potential privacy risks implicated by the public release of the Voter File"). Courts must interpret the disclosure provisions in statutes like the NVRA and the CRA in a manner that does not unconstitutionally burden the right to vote. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) ("We are obligated to construe a statute to avoid constitutional problems" where "such a reading is fairly possible") (citation modified).

Here, mass disclosure of voters' sensitive personal information would lead to a chilling effect that would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *See Long*, 682 F.3d at 339 (citation modified). The Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying pursuant to the NVRA's disclosure provisions, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse." *Id.* The court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of voters' personal information risked deterring citizens from registering to vote in the first place, and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339. The danger of imposing those burdens on Virginia voters and good-

14

government civic groups like Common Cause is present here. *See* Ex. A to Mot. to Intervene, Declaration of Suzanne Almeida, Dkt. No. 15-1, at ¶¶ 11–13.

The limited case law considering records requests under the CRA is not contrary to any of this. For example, even in the very different context of the Jim Crow South in the early 1960s, the CRA cases expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, and to shield voters' private, sensitive personal information from disclosure. *See id.* at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection"); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right").

The United States addresses none of this in its brief. It does not cite *Long*, which is controlling Fourth Circuit precedent. It suggests that a "protective order" may be sufficient, U.S. MTD Opp. at 25 n.16, 29, but never explains what the terms of such an order would be, or how it would mitigate the chilling effects for Virginia voters. And more broadly, a protective order presumes that the United States is entitled to the unredacted SVRL in the first place, which it is not.

Indeed, the United States' attempt to highlight the protective measures taken in another case only highlights how extreme its request is here. The United States argues that "states have released to private parties even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights," citing a case in New Hampshire,

*Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025). U.S. MTD Opp. at 21. As the United States is well aware, this case did not involve full disclosure of the unredacted, complete SVRL. In *Scanlan*, private parties brought constitutional claims challenging a state law requiring new forms of proof of citizenship to register to vote (i.e., it was a case nothing like this one). There, a version of the New Hampshire voter file was produced in the course of discovery because it was extremely relevant to determining the impact of the challenged registration restriction, but the file did *not* include sensitive information like Social Security numbers or driver's license numbers, and it was produced in discovery subject to severe restrictions, including a scrupulous protective order that designated the voter file as "highly confidential," restricted its use t*o the present litigation only*, restricted viewing to only a tight circle of designated personnel using "air-gapped computers," and mandated destruction of the data after the case is closed. *See* Ex. A, Protective Order, D.I. 87, at 4, 13–17, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025); Ex. B, Sched. A to Protective Order, D.I. 87-1, at 2–3, *Coal. for Open Democracy v. Scanlan*, 2025 WL 1503937.

The United States also attempts to downplay the sensitivity of the unredacted SVRL by arguing that the data it "has requested under the CRA is the same data that twenty-six states and the District of Columbia routinely share with a third party, the Electronic Registration Information Center, ('ERIC'), to facilitate their compliance with federal list-maintenance requirements." U.S. MTD Opp. at 21. But the United States neglects to mention ERIC's data security protocols, including having all member jurisdictions apply a "cryptographic one-way hash" to "sensitive data elements before the jurisdiction submits the data to ERIC." *Technology & Security Overview*, ELEC. REGISTRATION INFO. CTR., https://ericstates.org/security/ (last visited June 5, 2026). These

16

"sensitive data elements" include "the driver's license or state ID number, any part of the social security number, and date of birth," all of which the United States seek from Virginia in its SVRL. *Id.* Among other things, ERIC's "cryptographic one-way hash" converts this sensitive data "into what appears to be a string of random characters," which "is not meant to be decrypted."[4] In sum, the United States' request for the unredacted SVRL is a completely unprecedented intrusion that will chill voter participation and trammel federalism principles in the absence of any authorization by Congress.

The United States' demand for Virginia's complete SVRL with no redactions, modifications, or other procedural steps to protect voters' and ensure compliance with federal law is legally deficient. The Court can dismiss on that basis as well.

**CONCLUSION**

The United States' First Amended Complaint should be dismissed.

Dated: June 8, 2026                                Respectfully submitted,

                                                        /s/ Davin Rosborough

---

[4] These data security protocols are described in further detail:

> The hashing application converts these data into what appears to be a string of random characters, making the data significantly more difficult for a potential hacker to utilize. A cryptographic hash is not meant to be decrypted. ERIC only accepts voter and driver's license data files that have been hashed using the application. This ensures these sensitive data are protected at the source, in the member's environment, prior to submission to the ERIC data center. The distribution of the hashing application to ERIC members is a closely monitored and structured process. Once the data is hashed, ERIC members employ layers of industry-standard security mechanisms to transmit the data file to the ERIC data center, including multiple rounds and types of encryption. There are also specific procedures directed at communication of member credentials.

*Technology & Security Overview*, ELEC. REGISTRATION INFO. CTR., https://ericstates.org/security/ (last visited June 5, 2026).

Ari J. Savitzky*
Davin Rosborough (Va. Bar No. 85935)
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Facsimile: (212) 549-2539
asavitzky@aclu.org
drosborough@aclu.org
slakin@aclu.org

Patricia J. Yan*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
pyan@aclu.org

*Counsel for Intervenor-Defendants Common Cause and Katherine Ellena*


\* Admitted *pro hac vice*

18